EXHIBIT J

EXECUTION VERSION

# PURCHASE AND SALE AGREEMENT

by and between

**10-1301 HSW OWNER, LLC, a Delaware limited liability company,**

as Seller,

and

**URBAN COMMONS, LLC, a Delaware limited liability company,**
as Buyer

Effective Date: December 24, 2019

4124-5703-1711.13

# TABLE OF CONTENTS

Page

ARTICLE 1   CERTAIN DEFINITIONS ................................................................ 1
   SECTION 1.1.   Definitions ............................................................. 1
   SECTION 1.2.   Terms Generally ................................................... 15

ARTICLE 2   SALE OF PROPERTY ..................................................................... 15
   SECTION 2.1.   Sale of Property ..................................................... 15
   SECTION 2.2.   Payment of Deposit................................................ 16
   SECTION 2.3.   Applicable Terms; Failure to Make Deposit .............. 16
   SECTION 2.4.   Cash at Closing ...................................................... 16
   SECTION 2.5.   Submission Matters ................................................ 17

ARTICLE 3   TITLE MATTERS ............................................................................ 18
   SECTION 3.1.    Title Objections .................................................... 18
   SECTION 3.2.   Delivery of Title and Title Insurance....................... 18

ARTICLE 4   BUYER'S INVESTIGATIONS; AS-IS SALE .................................. 19
   SECTION 4.1.   Buyer's Investigations ........................................... 19
   SECTION 4.2.   Inspection ............................................................. 19
   SECTION 4.3.   Limit on Certain Contacts....................................... 21
   SECTION 4.4.   As-Is Provisions..................................................... 22
   SECTION 4.5.   Limitation on Seller's Liability .............................. 26

ARTICLE 5   ADJUSTMENTS AND PRORATIONS ........................................... 28
   SECTION 5.1.   Prorations, Credits and Other Adjustments .............. 28
   SECTION 5.2.   Safe Deposit Boxes ................................................ 34
   SECTION 5.3.   Inventory of Baggage ............................................ 35
   SECTION 5.4.   Closing Costs ......................................................... 35

ARTICLE 6   CLOSING ........................................................................................ 36
   SECTION 6.1.   Closing Mechanics................................................. 36
   SECTION 6.2.   Seller's Closing Deliveries...................................... 36
   SECTION 6.3.   Buyer's Closing Deliveries...................................... 38
   SECTION 6.4.   Conditions to Buyer's Obligations .......................... 39
   SECTION 6.5.   Conditions to Seller's Obligations........................... 39
   SECTION 6.6.   Waiver of Failure of Conditions Precedent .............. 40

ARTICLE 7   REPRESENTATIONS AND WARRANTIES................................... 40
   SECTION 7.1.   Buyer's Representations .......................................... 40
   SECTION 7.2.   Seller's Representations........................................... 42
   SECTION 7.3.   General Provisions.................................................. 46

ARTICLE 8   COVENANTS .................................................................................. 47
   SECTION 8.1.   Contracts, Maintenance of Property; Operation of Hotel................ 47
   SECTION 8.2.   Brokers................................................................... 49
   SECTION 8.3.   Publicity................................................................. 49
   SECTION 8.4.   Confidentiality ....................................................... 49

i

SECTION 8.5.    Franchise Agreement ................................................... 50
SECTION 8.6.    Intentionally Deleted ................................................ 51
SECTION 8.7.    Employees ................................................................ 51
SECTION 8.8.    Termination of Hotel Manager ................................. 54
SECTION 8.9.    Liquor License ......................................................... 54

ARTICLE 9   DEFAULTS ...................................................................... 55
SECTION 9.1.    Seller's Remedies for Buyer Defaults ...................... 55
SECTION 9.2.    Buyer's Remedies for Seller Defaults ...................... 57

ARTICLE 10  CASUALTY/CONDEMNATION ...................................... 58
SECTION 10.1.   Right to Terminate ................................................... 58
SECTION 10.2.   Allocation of Proceeds and Awards ........................ 58
SECTION 10.3.   Insurance .................................................................. 59
SECTION 10.4.   Waiver ..................................................................... 59

ARTICLE 11  MISCELLANEOUS ......................................................... 59
SECTION 11.1.   Buyer's Assignment ................................................. 59
SECTION 11.2.   Survival/Merger ...................................................... 60
SECTION 11.3.   Integration; Waiver .................................................. 60
SECTION 11.4.   Governing Law ........................................................ 61
SECTION 11.5.   Captions Not Binding; Exhibits ............................... 61
SECTION 11.6.   Binding Effect ......................................................... 61
SECTION 11.7.   Severability ............................................................. 61
SECTION 11.8.   Notices .................................................................... 61
SECTION 11.9.   Counterparts; Electronic Signatures ........................ 62
SECTION 11.10.  No Recordation ....................................................... 63
SECTION 11.11.  Additional Agreements; Further Assurances ............ 63
SECTION 11.12.  Construction ............................................................ 63
SECTION 11.13.  Time of Essence ...................................................... 63
SECTION 11.14.  JURISDICTION ...................................................... 63
SECTION 11.15.  WAIVER OF JURY TRIAL ................................... 63
SECTION 11.16.  RELEASES ............................................................... 64
SECTION 11.17.  Attorneys' Fees ....................................................... 64
SECTION 11.18.  Lead Paint ............................................................... 64
SECTION 11.19.  Bulk Sale and Tax Clearance Certificates ............... 64
SECTION 11.20.  Seller Disclosure Statement .................................... 64

ii

4124-5703-1711.13

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| EXHIBIT A | LEGAL DESCRIPTION OF HOTEL UNIT |
| EXHIBIT B | ESCROW PROVISIONS |
| EXHIBIT C | FORM OF DEED |
| EXHIBIT D | FORM OF BILL OF SALE |
| EXHIBIT E | FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT |
| EXHIBIT F | FORM OF FIRPTA AFFIDAVIT |
| EXHIBIT G | FORM OF OWNER'S AFFIDAVIT |
| EXHIBIT H | FORM OF CONDOMINIUM ASSIGNMENT |
| EXHIBIT I | FORM OF GARAGE UNIT ROFO ASSIGNMENT |
| EXHIBIT J | FORM OF INTERIM BEVERAGE AGREEMENT |
| EXHIBIT K | FORM OF UNION ASSUMPTION AGREEMENT |
| EXHIBIT L | FORM OF OWNER'S UNION ASSUMPTION AGREEMENT |
| EXHIBIT M | FORM OF ASSIGNMENT OF INDEMNITY AGREEMENT |
| EXHIBIT N | LICENSES AND PERMITS |
| EXHIBIT O | OCCUPANCY AGREEMENTS |
| EXHIBIT P | CONTRACTS |
| EXHIBIT Q | FORM OF R&W HOLDBACK ESCROW AGREEMENT |
| EXHIBIT R | FORM OF NOI HOLDBACK ESCROW AGREEMENT |
| EXHIBIT S | FORM OF PIP ESCROW HOLDBACK AGREEMENT |
| SCHEDULE 2.1 | PURCHASE PRICE ALLOCATION |
| SCHEDULE 4.2 | ADDITIONAL INSUREDS |
| SCHEDULE 5.1(j) | VOUCHERS |
| SCHEDULE 7.2(d) | LITIGATION |
| SCHEDULE 7.2(f) | COMPLIANCE WITH LAW |
| SCHEDULE 7.2(j) | LABOR MATTERS |
| SCHEDULE 7.2(k) | VIOLATIONS OF LICENSES AND PERMITS |
| SCHEDULE 7.2(q) | TAXES |

4124-5703-1711.13

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made to be effective as of December 24, 2019 (the "Effective Date") by and between 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("Seller"), and URBAN COMMONS, LLC, a Delaware limited liability company ("Buyer").

## *W I T N E S S E T H :*

In consideration of the mutual covenants and agreements set forth herein the parties hereto do hereby agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

SECTION 1.1.  Definitions.  In addition to terms defined elsewhere in this Agreement, as used herein, the following terms shall have the following meanings:

"Additional Deposit" shall mean the amount of Two Million Dollars ($2,000,000), together with any interest earned thereon.

"Adjusted Gross Revenues" shall mean Gross Revenues less the following revenues of the Hotel to the extent included in Gross Revenues: (a) any gratuities added to a customer's bill; (b) any credits or refunds made to customers, guests or patrons; (c) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges or similar taxes or charges as well as taxes and charges in replacement thereof; (d) any fire and extended coverage insurance proceeds (other than the proceeds of business interruption, use, occupancy or similar insurance); (e) any condemnation awards; and (f) any proceeds of financing or refinancing of the Hotel.

"Adjusted Purchase Price Balance" shall have the meaning given in Section 2.4.

"Adjusting Party" shall have the meaning given in Section 5.1(m).

"Agreement" shall have the meaning given in the preamble hereto.

"Assignment of Indemnity Agreement" shall have the meaning given in Section 6.2(j).

"Association" shall mean The 6th and University Condominium Association.

"Assumed Liabilities" shall have the meaning given in Section 4.4(c).

"Bargaining Unit Employees" shall mean all Employees whose terms and conditions of employment are covered by the Union Agreement.

"Bookings" shall mean, as of the time of Closing, all bookings, contracts and reservations, including any booking for which a written proposal has been made by or on behalf of Seller (including Hotel Manager on behalf of Seller) and accepted by the recipient thereof or for which

a written proposal has been received and accepted by or on behalf of Seller (including Hotel Manager on behalf of Seller), regardless of whether any deposit or other amount has been received with respect thereto, or not, with respect to the future use or occupancy of guest rooms, banquet facilities, meeting rooms, or other facilities or services of the Hotel or located within the Hotel Unit, with respect to any period from and after the Closing Date, including all deposits received by or on behalf of Seller with respect thereto.

"Business Day" shall mean any day other than Saturday, Sunday, any Federal holiday, or any day in the State in which the Property is located or the State of New York or California when banks are closed.  If any period expires or action is to be taken on a day that is not a Business Day, the time frame for the same shall be extended until the next Business Day.

"Buyer's Agents" shall have the meaning given in Section 4.2.

"Buyer's Knowledge" or words of similar import shall refer only to the actual knowledge of Jerome Yuan (the "Buyer Representative") and shall not be construed to impose upon the Buyer Representative any duty to investigate the matters to which such knowledge, or the absence thereof, pertains, including, but not limited to, the contents of the materials delivered or made available to Buyer's Representatives or the contents of files maintained by the Buyer Representative, and shall expressly exclude the knowledge of any other individuals.  There shall be no personal liability on the part of the Buyer Representative arising out of any of the Buyer's Warranties.

"Buyer's Warranties" shall mean, collectively, Buyer's representations and warranties set forth in Section 7.1.

"Cap Amount" shall have the meaning given in Section 4.5(a).

"Casualty/Condemnation Proceeds" shall have the meaning given in Section 10.2.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§9601 et seq., as amended by SARA (Superfund Amendment and Reauthorization Act of 1986) and as the same may be further amended from time to time.

"Closing" shall mean the closing of the Transaction.

"Closing Date" shall mean the day that the Transaction closes in accordance with this Agreement.

"Closing Documents" shall mean all documents executed and delivered by Buyer or Seller as required by Section 6.2 and Section 6.3 or as otherwise executed and delivered by Buyer or Seller as part of Closing.

"Closing Statement" shall have the meaning given in Section 5.1.

"Closing Tax Year" shall have the meaning given in Section 5.1(o).

2

"COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as the same may be amended from time to time.

"Common Elements Portion" shall have the meaning given in Section 10.1.

"Condominium" shall mean The 6th and University Condominium created by the Condominium Declaration (as defined below) and located on and comprising the property described in Exhibit A attached hereto.  The Condominium consists of the Tower Unit and the Garage Unit.

"Condominium Ancillary Documents" shall mean articles of incorporation, bylaws, and organizational consent to action in lieu of special meeting.

"Condominium Assignment" shall mean an assignment of declarant's rights in the form attached hereto as Exhibit H.

"Condominium Board" shall mean the board of directors of the Condominium.

"Condominium Declaration" shall mean that certain Condominium Declaration for the Condominium recorded under King County recording number 20151120000399, as amended by that certain Amendment No. 1 to Condominium Declaration for The 6th and University Condominium recorded under King County recording number 20151214000910 in the King County Recorder's Office (the "Recorder's Office").

"Condominium Documents" shall mean, collectively, the Condominium Declaration, Condominium Survey Map and Plans and the Condominium Ancillary Documents.

"Condominium Survey Map and Plans" shall mean that certain condominium survey map and plans recorded under King County recording number 20151120000398 in Volume 285 of Condominiums, pages 9 through 18, in the Recorder's Office.

"Confidentiality Agreement" shall have the meaning given in Section 8.4.

"Consumables" shall mean all the stock in trade of the Hotel owned by Seller, including both operating inventories and consumable inventories, including all (i) inventory held for sale to Hotel guests and others in the ordinary course of business, (ii) engineering, maintenance and housekeeping supplies, including soap and cleaning materials, (iii) fuel and materials, stationery and printing items, guest toiletries and supplies, (iv) provisions in store rooms, refrigerators, pantries, and kitchens, (v) other consumable supplies of all kinds, and (vi) any other item included within the meaning of "inventory" under the Uniform System of Accounts, whether used, unused, on order, or held in reserve storage for future use in connection with the maintenance and operation of the Hotel, together with any additions thereto prior to Closing, subject to depletion and restocking in the Ordinary Course, provided, however, "Consumables" shall not include any (a) Food and Beverage Inventory, (b) Operating Equipment, (c) items of Personal Property owned by Hotel Manager, guests, Employees, or others (unless such person owns such property for the account or benefit of Seller) or (d) Protected Personal Property.

3

"Contracts" shall mean, to the extent assignable, all leases relating to Leased Personal Property, leases of vehicles and all service agreements, maintenance contracts, equipment leasing agreements, warranties, guarantees, bonds, open purchase orders and other contracts listed on Exhibit P attached hereto for the provision of labor, services, materials or supplies relating to the Hotel or FF&E, together with all renewals, supplements, amendments and modifications thereof, and any new such agreements entered into after the Effective Date pursuant to the terms hereof. "Contracts" shall not include (a) any insurance policies held by Seller, (b) the Bookings, (c) the Occupancy Agreements, (d) the Hotel Management Agreement, (e) the Franchise Agreement, (f) the Union Agreement and (g) the Owner Agreement.

"Contribution Period" shall have the meaning given in Section 8.7(g)(iv).

"Cut-Off Revenue Time" shall have the meaning given in Section 5.1(d).

"Cut-Off Time" shall have the meaning given in Section 5.1(b).

"Deed" shall have the meaning given in Section 6.2(a).

"deemed to know" (or words of similar import) shall have the following meaning:  Buyer shall be "deemed to know" any fact, circumstance or information or shall have "deemed knowledge" of the same to the extent (a) any Buyer's Representative has actual knowledge of a particular fact or circumstance or information that is inconsistent with any Seller's Warranty, or (b) this Agreement, including all Schedules and Exhibits to this Agreement, any Closing Documents executed by Seller, any document posted in the electronic data room for the Transaction prior to December 9, 2019, all Submission Matters and any reports prepared or obtained by Buyer in connection with Buyer's due diligence, in each case, discloses a particular fact or circumstance or contains information that is inconsistent with any Seller's Warranty.

"Deferred Adjustment Items" shall have the meaning given in Section 5.1(m).

"Deposit" shall mean the sum of the Initial Deposit plus the Additional Deposit, together with any interest earned thereon.

"Designated Representative" shall have the meaning given in the definition of "Seller's Knowledge".

"Effective Date" shall have the meaning given in the preamble hereto.

"Employee Liabilities" shall mean all obligations and Liabilities, actual or contingent, with respect to Employees or former employees at or for the Property, including, without limitation, (a) for worker's compensation claims based on any real or alleged occurrence, state unemployment insurance, state disability insurance or similar private or public unemployment or disability compensation arrangements and (b) for claims under applicable Laws governing employer/employee relations (including, without limitation, anti-discrimination laws, the WARN Act, ERISA, the Occupational Health and Safety Act and COBRA).

"Employees" shall mean all employees employed at or for the Property by Hotel Manager or any affiliate thereof, as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence or otherwise inactive but still employed at or for the Property.

"Environmental Liabilities" shall have the meaning given in Section 4.4(b).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" shall mean First American Title Insurance Company, whose mailing address is 920 Fifth Avenue, Suite 1200, Seattle, Washington 98104, Attention: Laura Lau (telephone number: (206) 615-3017, e-mail address: llau@firstam.com).

"FF&E" shall mean all tangible personal property upon the Hotel Unit, including appliances, furniture, furnishings, equipment and machines (including kitchen, food and beverage service, cleaning service, laundry, office, telephone, facsimile and other telecommunication, cable and satellite television and computer equipment and machines), devices, tools, carpeting, draperies, curtains and other floor, window and wall coverings, lighting fixtures, decorations, artwork, signs and signage and other items of personal property used in connection with the ownership, occupancy or operation of the Hotel Unit, together with any additions thereto prior to the Closing and subject to resupply, substitution, replacement and disposition in the Ordinary Course, but not including any (a) Protected Materials, (b) property owned by guests, Hotel Manager, Franchisor or persons other than Seller, (c) Leased Personal Property, (d) Consumables, (e) Operating Equipment or (f) Protected Personal Property.

"Floor Amount" shall have the meaning given in Section 7.3(b).

"Food and Beverage Inventory" shall mean all food and beverage (alcoholic and non-alcoholic) held for sale to Hotel guests and others in the Ordinary Course or otherwise used in the operation of the Hotel (including the alcoholic beverage and other contents of any in-room service bars and mini-bars), subject to the depletion and restocking that occurs in the Ordinary Course. Food and Beverage Inventory shall not include alcoholic beverages if any applicable governmental regulation requires a separate sale and transfer of the alcoholic beverages.

"Franchise Agreement" shall mean that certain Franchise Agreement dated as of September 1, 2016 between Franchisor and Seller.

"Franchise Application" shall have the meaning given in Section 8.5.

"Franchise Guarantor" shall have the meaning given in Section 8.5.

"Franchise Guaranty" shall have the meaning given in Section 8.5.

"Franchisor" shall mean Hilton Franchise Holding LLC, a Delaware limited liability company, and its successors and assigns.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or

5

agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, as may be modified by the Uniform System of Accounts.

"Garage Unit" shall mean the "Garage Unit" as designated in the Condominium Declaration and Condominium Survey Map and Plans, within which is situated the parking garage under the Hotel Unit, together with such unit owner's interest in any Common Elements and Limited Common Elements (as such terms are defined in the Condominium Documents) as set forth in the Condominium Documents.

"Garage Unit Owner" shall mean the owner of the Garage Unit from time to time, which as of the Effective Date is PF Seattle Hilton, LLC.

"Garage Unit ROFO" shall mean that certain Right of First Offer Agreement dated December 11, 2015 between Jet City Lodging, LLC, a Delaware limited liability company ("Prior Owner"), as the prior owner of the Hotel Unit, and Prior Owner, as the then owner of the Garage Unit, as evidenced by that certain Memorandum of Right of First Offer Agreement dated December 11, 2015 between Prior Owner, as the owner of the Hotel Unit, and Prior Owner, as the then owner of the Garage Unit, and recorded under King County recording number 20151211000677 in the Recorder's Office, as assigned pursuant to that certain Assignment and Assumption of Right of First Offer Agreement dated September 1, 2016 between Prior Owner, as assignor, and Seller, as assignee, recorded under King County recording number 20160901000622 in the Recorder's Office.

"Garage Unit ROFO Assignment" shall have the meaning given in Section 6.2(g).

"Gross Revenues" shall mean all revenues and income of any nature derived directly or indirectly from the Hotel or from the use or operation thereof (including any revenue earned by Hotel Manager or New Manager under any license, management or other agreement with any liquor permit holder for any sales of alcoholic beverages at the Hotel), whether on or off the site, including total room sales, food and beverage sales, if any, laundry, telephone, telegraph and telex revenues, other income, rental or other payments from lessees, sublessees, licensees and concessionaires (but not (a) security deposits unless and until applied, (b) interest earned on security deposits and (c) the gross receipts of any lessees, sublessees, licensees or concessionaires) and the proceeds of business interruption, use, occupancy or similar insurance.

"Hilton Requirements" shall have the meaning given in Section 8.5.

"Hotel" shall mean that certain hotel facility commonly known as the "Hilton Seattle", located in the Hotel Unit at 1301 Sixth Avenue, Seattle, Washington 98101.

"Hotel Management Agreement" shall mean, collectively, that certain Hotel Management Agreement dated as of September 1, 2016 between Seller and Hotel Manager, as amended by that certain First Amendment to Hotel Management Agreement dated as of November 26, 2019 between Seller and Hotel Manager, pursuant to which Hotel Manager operates the Hotel on behalf of Seller.

6

"Hotel Manager" shall mean 365 Management Company, LLC.

"Hotel Manager Records" shall mean any books and records relating to the Hotel that are owned or maintained by Hotel Manager or that otherwise require Hotel Manager consent or approval to be transferred to a third party.

"Hotel Manager Records" shall exclude any Protected Materials.

"Hotel Owner Records" shall mean any books and records relating to the Hotel that are owned or maintained by Seller and can be transferred without Hotel Manager consent or approval. "Hotel Owner Records" shall exclude any Protected Materials.

"Hotel Payables" shall have the meaning given in Section 5.1(f).

"Hotel Records" shall mean, collectively, (a) the Hotel Owner Records and (b) the Hotel Manager Records, but only to the extent that the consent or approval of Hotel Manager to the transfer of such Hotel Manager Records has been obtained by Seller prior to the Scheduled Closing Date.

"Hotel Unit" shall mean the "Tower Unit" in the Condominium Declaration and Condominium Survey Map and Plans, and more particularly described in Exhibit A hereto, together with such unit owner's interest in all Common Elements and Limited Common Elements as set forth in the Condominium Documents.

"Indemnitors" shall mean, collectively, SH Hotel LLC, Richard C. Hedreen and Elizabeth A. Hedreen.

"Indemnity Agreement" shall mean that certain Environmental Remediation and Indemnity dated July 6, 2012 by and among Indemnitors in favor of Prior Owner, as amended by that certain First Amendment to Environmental Remediation and Indemnity dated August 12, 2014 by and among Indemnitors and Prior Owner, as further amended by that certain Second Amendment to Environmental Remediation and indemnity dated June 28, 2016 by and among Indemnitors and Prior Owner, as assigned to Garage Unit Owner pursuant to that certain Assignment of Undivided Interest in Environmental Remediation and Indemnity dated December 11, 2015 by and between Prior Owner and Garage Unit Owner and as assigned to Seller pursuant to that certain Assignment of Undivided Interest in Environmental Remediation and Indemnity dated September 1, 2016 by and among Prior Owner, Seller and the Association.

"Initial Deposit" shall mean the sum of Two Million Dollars ($2,000,000), together with any interest earned thereon.

"Intangible Property" shall mean, to the extent assignable, (a) intellectual property (including names, marks, copyrights, logos, designs, know-how, computer software, operating systems and databases (including disks and other storage medium with respect thereto) and related rights and documentation) of Seller used exclusively in the operation or ownership of the Hotel Unit, the Personal Property, or the Consumables or any part thereof), (b) Licenses and Permits associated with the Hotel, (c) manufacturer's or contractor's warranties and guaranties associated

with the Hotel or the Property, (d) internet sites and names associated with the Hotel (URLs) (specifically excluding, however, the brand for the Hotel and the reservation platform used by the Hotel, which are the property of Franchisor or Manager, as applicable), (e) blueprints, plans, specifications and surveys associated with the Hotel Unit, to the extent within Seller's actual possession or control, (f) all telephone, facsimile, and other telecommunication numbers and post office boxes, if any, used in or relating to the ownership, occupancy, use or operation of the Hotel, or any part thereof, (g) to the extent that Seller receives a credit for the same at Closing, Utility Deposits, and (h) all other goodwill and items of intangible property of whatever nature, if any, used in or primarily relating to the ownership, occupancy, use or operation of the Hotel, or any part thereof, but, in each category described in clauses (a) through (h), but excluding in connection with any and all of the foregoing any Protected Materials, Protected Personal Property and any of the foregoing that is confidential or proprietary to Franchisor or Hotel Manager and any intellectual property of Franchisor or Hotel Manager.

"Interior Unit Portion" shall have the meaning given in Section 10.1.

"Internal Revenue Code" shall have the meaning given in Section 7.1(f).

"Inventory" shall mean all articles of personal property that are held for resale and situated at the Hotel on the Closing Date, including inventory held for sale in any gift shop or news stand operated by Seller or Hotel Manager, subject to depletion and restocking that occurs in the Ordinary Course, but excluding: (a) Consumables, (b) Operating Equipment, (c) Food and Beverage Inventory and (d) Protected Personal Property.

"Laws" shall mean, collectively, all municipal, county, State or Federal statutes, codes, ordinances, laws, rules or regulations applicable to Seller, Buyer or the Property.

"Leased Personal Property" shall mean any items listed in the definition of "FF&E" that are leased, rather than owned by, Seller or Hotel Manager.

"Liabilities" shall mean, collectively, any and all losses, costs, damages, claims, liabilities, expenses (including reasonable attorneys' fees), demands or obligations of any kind or nature whatsoever, including Employee Liabilities.

"Licenses and Permits" shall mean, to the extent assignable, collectively, all licenses, permits, certificates of occupancy, approvals, dedications, subdivision maps and entitlements now or hereafter issued, approved or granted by any governmental authority exclusively in connection with the Hotel Unit or the operation of the Hotel, together with all renewals and modifications thereof, including, without limitation, the Licenses and Permits described on Exhibit N attached hereto.  "Licenses and Permits" shall not include the Liquor License.

"Liquor License" shall mean any alcoholic beverage license held by Liquor Licensee issued in connection with operation of the Hotel.

"Liquor Licensee" shall mean 365 Management Company, LLC.

"Major Casualty/Condemnation" shall have the meaning given in Section 10.1.

"New Franchise Agreement" shall have the meaning given in Section 8.5.

"New Liquor License" shall have the meaning given in Section 8.9.

"New Manager" shall have the meaning given in Section 8.7(a).

"New Title Exception" shall have the meaning given in Section 3.1(b).

"New Title Objection Notice" shall have the meaning given in Section 3.1(b).

"NOI" shall mean Adjusted Gross Revenues less Operating Costs, calculated for calendar year 2020.

"NOI Certificate" shall have the meaning given in Section 4.5(c).

"NOI Holdback Amount" shall have the meaning given in Section 4.5(c).

"NOI Holdback Escrow Agreement" shall have the meaning given in Section 4.5(c).

"NOI Holdback Release Date" shall have the meaning given in Section 4.5(c).

"NOI Threshold" shall have the meaning given in Section 4.5(c).

"Occupancy Agreements" shall mean all written leases, licenses, concession or occupancy agreements in effect as of the Effective Date and which are identified on Exhibit O attached hereto with respect to the Hotel under which any tenants, licensees or concessionaires occupy space in the Hotel (other than Hotel guests) and any such agreements entered into after the Effective Date pursuant to the terms hereof.  "Occupancy Agreements" shall not include the Bookings.

"Omnibus Assignment and Assumption Agreement" shall have the meaning given in Section 6.2(c).

"Operating Costs" shall mean shall mean all Hotel operating costs, as such costs and expenses are determined in accordance with GAAP, as modified by the Uniform System of Accounts, specifically including, but not limited to, (a) all fees, assessments and charges due and payable under the Franchise Agreement and New Franchise Agreement; (b) base management fees under the Hotel Management Agreement and new Hotel management agreement with New Manager; (c) the cost of Operating Equipment and operating supplies, wages, salaries and employee benefits, advertising and promotional expenses, common expenses under the Condominium Documents (but excluding any contributions to any reserve funds established under the Condominium Documents), the cost of personnel training programs, utility and energy costs, operating licenses and permits, and equipment rentals classified as an operating cost under the Uniform System of Accounts as in effect from time to time; (d) all expenditures made for maintenance and repairs to keep the Hotel in good condition and repair, specifically excluding capital expenditures; and (e) insurance premiums. Operating Costs shall not include Ownership Costs.

9

"Operating Equipment" shall mean all china, glassware, linens, towels, bedding, upholstery material, carpets, rugs, silverware, uniforms and other "Property and Equipment" (as defined in the most recent edition of the Uniform System of Accounts) owned by Seller and used or held in reserve storage for future use in connection with the operation of the Hotel, subject to the depletion and restocking that occurs in the Ordinary Course, excluding any Protected Personal Property.

"Ordinary Course" shall mean the course of day-to-day operations of the Hotel, in a manner that does not materially and adversely vary from the policies, practices and procedures in effect as of the Effective Date and which are consistent with the terms of the Franchise Agreement, but taking into account the termination of the Hotel Management Agreement and hotel management transition to occur at or prior to Closing, as contemplated by this Agreement.

"Outside Accountants" shall have the meaning given in Section 5.1(n).

"Owner Agreement" shall mean that certain Owner Agreement dated December 19, 2018 between Seller and UNITE HERE Local 8.

"Ownership Costs" shall mean the following costs which shall be excluded from Operating Costs: (a) depreciation of the Hotel, furnishings, fixtures and equipment; (b) debt service (interest and principal) on any mortgage encumbering the Hotel and on any mezzanine financing for the Hotel; (c) property taxes and assessments; (d) deposits into reserves required under the Condominium Documents and the Hotel Management Agreement and new Hotel management agreement with New Manager and capital expenditures; (e) audit, legal and other professional or special fees; (f) insurance premiums; (g) equipment rentals classified as ownership costs under the Uniform System of Accounts as in effect from time to time; (h) administrative and general expenses and disbursements of the Hotel owner, including compensation of employees of the Hotel owner; (i) Federal, State and local franchise and income taxes, any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges or similar taxes or charges as well as taxes and charges in replacement thereof; (j) amortization of bond discounts and mortgage expenses; (k) any incentive management fee or project management fees under the Hotel Management Agreement or the new Hotel management agreement with New Manager; and (l) such other costs or expenses which are normally treated as ownership costs under generally accepted accounting principles consistently applied and the Uniform System of Accounts as in effect from time to time.

"Owner's Title Policy" shall mean an ALTA owner's title insurance policy issued by the Title Company in an aggregate amount equal to the Purchase Price.

"Owner's Union Assumption Agreement" shall have the meaning given in Section 8.7(f).

"Parking Agreement" shall mean that certain Hotel Parking Agreement dated as of December 11, 2015, by and between Prior Owner and Garage Unit Owner, as assigned to Seller pursuant to that certain Assignment and Assumption Agreement dated as of September 1, 2016, by and between Prior Owner, as assignor, and Seller, as assignee, as the same may be further modified, amended or supplemented from time to time.

"Permitted Assignment" shall have the meaning given in Section 11.1(a).

"Permitted Exceptions" shall mean and include all of the following:  (a) applicable zoning, building and land use Laws and any other exception that is required to be recorded by any governmental authority pursuant to applicable Laws, (b) such state of facts as would be disclosed by a physical inspection or survey of the Property, (c) the lien of taxes, payments in lieu of taxes, assessments and other governmental charges or fees not yet due and payable, (d) any exceptions caused or agreed to by Buyer, (e) the Condominium Documents, (f) the rights of any tenant, licensee or concessionaire under any Occupancy Agreement, (g) those matters set forth on Schedule B Part II to the Title Commitment, (h) the exclusions from coverage set forth in the form of 2006 ALTA owner's title policy other than those exclusions that may be removed by endorsement or by the execution and delivery of a customary affidavit of Seller, (i) any Title Objections that are accepted by Buyer as Permitted Exceptions pursuant to Section 3.1(a), (j) any New Title Exceptions that are accepted by Buyer as Permitted Exceptions pursuant to Section 3.1(b), (k) all Violations that are a matter of public record and (j) if the Garage Unit is sold prior to Closing, a termination of the Garage Unit ROFO.  Notwithstanding any provision to the contrary contained in this Agreement or any of the Closing Documents, any or all of the Permitted Exceptions may be omitted by Seller in the Deed without giving rise to any liability of Seller, irrespective of any covenant or warranty of Seller that may be contained in the Deed (which provisions shall survive Closing and not be merged into the Deed).

"Personal Property" shall mean (a) the items of tangible personal property consisting of all FF&E, Consumables, Food and Beverage Inventory, Operating Equipment, Inventory and other tangible personal property of every kind and nature located at the Hotel and owned or leased by Seller including Protected Personal Property, (b) keys, pass-cards, and combinations to all doors, cabinets, enclosures and other locks in or about the Hotel, (c) copies of files maintained or generated in the Ordinary Course which are located at the Hotel (but only to the extent owned by Seller), operating and maintenance manuals and records, and budgets, (d) to the extent in Seller's possession, originals (or copies where originals are not in Seller's possession) of any Occupancy Agreement and the Contracts, which may remain at the Hotel at Closing, (e) vehicles owned by Seller and used in the operation of the Hotel, and (f) the items of intangible personal property consisting of all the Intangible Property, the Bookings, the Hotel Records and the Licenses and Permits, in each case excluding any Protected Materials.  To the extent any of the foregoing categories of property may consist of both tangible and intangible property, "Personal Property" shall include all of the personal property encompassed by such category, notwithstanding any classification of such property as tangible or intangible.

"Post-Closing Statement" shall have the meaning given in Section 5.1(m).

"Press Release" shall have the meaning given in Section 8.3.

"Proceedings" shall have the meaning given in Section 11.14.

"Prohibited Person" shall have the meaning given in Section 7.1(c).

"Property" shall have the meaning given in Section 2.1.

11

"Protected Materials" shall mean (a) any books, records or files (whether in a printed or electronic format) that consist of or contain any of the following:  Seller's, Hotel Manager's or Franchisor's organizational documents or files or records relating thereto; appraisals; budgets; strategic plans for the Property; internal analyses; information regarding the marketing of the Property for sale; submissions relating to obtaining internal authorization for the sale of the Property by Seller or any direct or indirect owner of any beneficial interest in Seller; attorney and accountant work product; attorney-client privileged documents; internal correspondence of Seller, Hotel Manager, Franchisor, any direct or indirect owner of any beneficial interest in Seller, Hotel Manager, Franchisor or any of their respective affiliates and correspondence between or among such parties; or other information in the possession or control of Seller, Hotel Manager, Franchisor or any direct or indirect owner of any beneficial interest in Seller, Hotel Manager or Franchisor which such party reasonably deems confidential, proprietary, or privileged; (b) any other proprietary or confidential materials, including proprietary management systems, software data and computer hardware that are used in connection with the proprietary management systems and accounting systems, including any software owned by Hotel Manager or Franchisor, and any intellectual property of Hotel Manager or Franchisor; and (c) any service marks, trademarks, trade names, insignias and logos used for Hotel services, for other related goods and services and for the Hotel business associated therewith that contain the name of Hotel Manager or Franchisor or by reason of extent of usage are associated with hotels operated by Hotel Manager, Franchisor or their respective affiliates.

"Protected Personal Property" shall mean any tangible personal property (located at the Property or otherwise used for Hotel services) bearing any service marks, trademarks, trade names, insignias or logos used for Hotel services, for other related goods and services and for the Hotel business associated therewith that contain the name of Hotel Manager or Franchisor or by reason of extent of usage are associated with hotels operated by Hotel Manager or Franchisor or their respective affiliates.

"Purchase Price" shall have the meaning given in Section 2.1.

"R&W Holdback Escrow Agreement" shall have the meaning given in Section 4.5(b).

"RCRA" shall mean the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§6901 et seq., as the same may be amended from time to time.

"Real Property" shall mean the Hotel Unit.

"Rehired Employees" shall have the meaning given in Section 8.7(a).

"Remove" with respect to any exception to title shall mean that Seller causes the Title Company to remove of record or affirmatively insure over the same in a manner reasonably acceptable to Buyer.

"Requesting Party" shall have the meaning given in Section 5.1(m).

"Required Removal Exceptions" shall mean, collectively, (i) any mortgage, deed of trust, security agreement, financing statement or other monetary lien executed or caused by Seller

affecting the Hotel Unit, (ii) any liens under the Perishable Agricultural Commodities Act or the Packer Stockyard Act (iii) any mechanic's or similar liens for work performed at the Property at Seller's request and (iv) any other monetary lien on the Property up to Three Hundred Thousand and No/100 Dollars ($300,000.00) in the aggregate that are not Permitted Exceptions and that are not caused by Buyer or any other Buyer's Agents.

"Retained Liabilities" shall mean: (i) any Employee Liabilities during Seller's ownership of the Property that accrued prior to the Closing, but only if and to the extent that the Buyer did not receive a credit therefor at Closing; and (ii) third party tort claims for personal injury that arise out of events occurring prior to the Closing Date during Seller's ownership of the Property; and (iii) Liabilities arising or accruing during Seller's ownership of the Property under the Bookings, Contracts, Owner Agreement, Condominium Documents, Franchise Agreement, Hotel Management Agreement and Occupancy Agreements, but only if Buyer did not receive a credit therefor at Closing.   For clarity, Retained Liabilities shall not include any Environmental Liabilities or any matters relating to the structural, physical or environmental condition of the Property for which Buyer is deemed to take the Property subject to as provided in Section 4.4 and for which Buyer is releasing Seller of any Liability and any item for which Buyer receives a credit at Closing.

"Scheduled Closing Date" shall mean February 13, 2020, as the same may be accelerated or extended pursuant to the terms of this Agreement.

"Seller" shall have the meaning given in the preamble hereto.

"Seller Parties" shall mean and include, collectively, (a) Seller; (b) its counsel; (c) Seller's Broker; (d) Franchisor; (e) Hotel Manager; (f) the Condominium Board; (g) any direct or indirect owner of any beneficial interest in Seller; (h) Seller's lender, (i) any officer, director, member, manager, partner, advisor, shareholder, employee, representative or agent of Seller, its counsel, Seller's Broker, Franchisor, Hotel Manager (including Employees), Condominium Board, Seller's lender or of any direct or indirect owner of any beneficial interest in Seller; and (j) any other entity or individual affiliated or related in any way to any of the foregoing.

"Seller's Broker" shall mean Eastdil Secured.

"Seller's Contingent Retained Liability" shall have the meaning given in Section 4.5(b).

"Seller's Indemnitee" shall have the meaning given in Section 4.2.

"Seller's Knowledge" or words of similar import shall refer only to the actual knowledge of Matt Kenney (the "Designated Representative") and shall not be construed to impose upon the Designated Representative any duty to investigate the matters to which such knowledge, or the absence thereof, pertains, including, but not limited to, the contents of the materials delivered or made available to Buyer's Representatives or the contents of files maintained by the Designated Representative, and shall expressly exclude the knowledge of any other individuals.  There shall be no personal liability on the part of the Designated Representative arising out of any of the Seller's Warranties.

"<u>Seller's Warranties</u>" shall mean, collectively, Seller's representations and warranties set forth in <u>Section 7.2</u>, as such representations and warranties may be deemed modified, qualified or waived by Buyer, pursuant to the terms of this Agreement.

"<u>Submission Matters</u>" shall have the meaning given in <u>Section 2.5</u>.

"<u>Survival Period</u>" shall have the meaning given in <u>Section 7.3(c)</u>.

"<u>Taxes</u>" shall have the meaning given in <u>Section 5.1(a)</u>.

"<u>Title Commitment</u>" shall mean the First American Title Insurance Company Commitment for Title Insurance No. NCS-984828-WA1, with an effective date of October 30, 2019.

"<u>Title Company</u>" shall mean First American Title Insurance Company, whose mailing address is 920 Fifth Avenue, Suite 1200, Seattle, Washington 98104, Attention: LaVonne Bowman (telephone number: (206) 615-3269, e-mail address: lavbowman@firstam.com), or such replacement Title Company selected by Seller pursuant to the terms of <u>Section 3.1(b)</u>.

"<u>Transaction</u>" shall mean the transaction contemplated by this Agreement.

"<u>Uniform System of Accounts</u>" shall mean the Eleventh Revised Edition of the Uniform System of Accounts for the Lodging Industry, published by the Educational Institute of the American Hotel and Motel Association.

"<u>Union</u>" shall mean UNITE HERE Local 8.

"<u>Union Agreement</u>" shall mean, collectively, that certain Collective Bargaining Agreement between Hilton Seattle Hotel and the Union, effective June 1, 2018 – May 31, 2021 (inclusive of all side letters, memoranda of understanding, amendments and modifications as of October 1, 2019, and that certain Letter of Understanding (Seattle Municipal Code Chapters 14.27, 14.28 and 14.29) to be entered into after the Effective Date between Hotel Manager and the Union).

"<u>Union Assumption Agreement</u>" shall have the meaning given in <u>Section 8.7(f)</u>.

"<u>Union Notice</u>" shall have the meaning given in <u>Section 8.7(f)</u>.

"<u>Unopened Supplies</u>" shall have the meaning given in <u>Section 5.1(g)</u>.

"<u>Utility Deposits</u>" shall mean all deposits made by or for the account of Seller with the persons or entities providing water, sewer, gas, electricity, telephone and other public utilities to the Hotel Unit.

"<u>Violations</u>" shall mean, collectively, any violations of law or municipal ordinances, orders or requirements issued by the department of buildings, fire, labor, health or other federal, state, county, municipal or other departments or governmental agencies having jurisdiction against or affecting the Hotel Unit, and any outstanding work orders.

"<u>Vouchers</u>" shall have the meaning given in <u>Section 5.1(j)</u>.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act and any similar local or state laws or regulations.

SECTION 1.2. Terms Generally.  Definitions in this Agreement apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Articles, Sections, Schedules and Exhibits shall be deemed to be references to Articles and Sections of, and Schedules and Exhibits to, this Agreement unless the context shall otherwise require.  Any accounting term used but not defined herein shall have the meaning assigned to it in accordance with GAAP, unless the Uniform System of Accounts shall apply pursuant to the express terms of this Agreement.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation" unless such phrase already appears.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.

## ARTICLE 2
## SALE OF PROPERTY

SECTION 2.1.  Sale of Property.  Subject to the terms of this Agreement and the Closing Documents, Seller agrees to sell and Buyer agrees to purchase all of Seller's right, title and interest in and to the following property (collectively, the "Property"), subject only to the Permitted Exceptions:

(a)     the Hotel Unit;

(b)     the FF&E;

(c)     the Operating Equipment;

(d)     the Consumables;

(e)     the Food and Beverage Inventory;

(f)     the Inventory;

(g)     the Contracts;

(h)     the Occupancy Agreements;

(i)     the Bookings;

(j)     the Licenses and Permits;

(k)     the Intangible Property; and

(l)     the Hotel Records.

15

Notwithstanding anything to the contrary in this Agreement, the Property shall not include: (i) the Hotel Management Agreement; (ii) the Franchise Agreement; (iii) the Protected Materials; (iv) the Leased Personal Property (but shall include the Contracts pursuant to which such Leased Personal Property is leased to Seller); (v) items of personal property owned by Hotel Manager, Franchisor, Employees, guests or tenants of the Hotel or others; (vi) Utility Deposits, tax deposits and other deposits held by parties other than Seller; (vii) any tax, insurance, FF&E, capital improvement, working capital and/or other escrows, impounds, accounts, cash on hand, house banks or reserves held by Seller's lender, Hotel Manager or any other party; and (viii) all checks, drafts, notes and other evidence of indebtedness held at the Hotel on the Closing Date and any balances on deposit with banking institutions or Hotel Manager relating to the Hotel.   In consideration therefor, Buyer shall pay to Seller Ninety-Seven Million Five Hundred Thousand and No/100 Dollars ($97,500,000.00) (the "Purchase Price"), subject to the closing adjustments and prorations that are calculated pursuant to Article 5 hereof.  The Purchase Price shall be paid in accordance with the terms of Sections 2.2, 2.3 and 2.4 hereof.  Seller and Buyer have agreed to the estimated allocation of the Purchase Price among the Real Property, the items of tangible Personal Property and the items of the intangible Personal Property set forth in Schedule 2.1. Seller and Buyer acknowledge that the allocation set forth on Schedule 2.1 is an estimate and is subject to modification based on a third-party valuation report that Seller is in the process of obtaining, subject to the approval of Buyer and Seller, which approval shall not be unreasonably withheld, conditioned or delayed.

SECTION 2.2.  Payment of Deposit.  No later than three (3) Business Days after the execution of this Agreement by both Buyer and Seller, Buyer shall pay the Initial Deposit to Escrow Agent.  The Initial Deposit shall be nonrefundable to Buyer, except as otherwise provided in Sections 3.1, 6.6, 7.3(b), 9.2 and 10.1. On or prior to January 10, 2020, Buyer shall pay the Additional Deposit to Escrow Agent. The Deposit shall be nonrefundable to Buyer, except as otherwise provided in Sections 3.1, 6.6, 7.3(b), 9.2 and 10.1.

SECTION 2.3.  Applicable Terms; Failure to Make Deposit.  The Deposit shall be paid to Escrow Agent in immediately available funds.  Except as expressly otherwise set forth herein, the Deposit shall be applied against the Purchase Price at Closing and shall otherwise be held and delivered by Escrow Agent in accordance with the provisions of this Agreement and Exhibit B. Notwithstanding any provision in this Agreement to the contrary, if Buyer fails to timely make the Deposit as provided herein (it being acknowledged that, as set forth in Section 11.13, time is of the essence with respect to such obligation), this Agreement shall automatically terminate and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations that expressly survive the termination of this Agreement.  Seller shall have the right to retain the Deposit as liquidated damages as set forth in Section 9.1.

SECTION 2.4.  Cash at Closing.  On or prior to 10:00 a.m. Pacific Time on the Scheduled Closing Date, Buyer shall deposit or cause to be deposited into escrow with the Escrow Agent an amount equal to the balance of the Purchase Price, as prorated and adjusted as set forth in Article 5 and Section 6.1 and as otherwise provided under this Agreement (such amount, the "Adjusted Purchase Price Balance"), in immediately available funds as more particularly set forth in Section 6.1.  Such funds shall be held and delivered by Escrow Agent in accordance with the terms of this Agreement and Exhibit B.  If the Closing occurs under this Agreement, any interest earned

on the Deposit shall be paid to Seller (with credit against the Purchase Price). If this Agreement is terminated, any interest earned on the Deposit shall accrue to the benefit of the party entitled to receive the Deposit pursuant to the terms of this Agreement.

SECTION 2.5. <u>Submission Matters</u>. Buyer acknowledges and agrees that Buyer has received copies of and approved the following (collectively, the "<u>Submission Matters</u>"):

(a)      All Occupancy Agreements and Contracts in effect as of the date of this Agreement.

(b)      All Licenses and Permits.

(c)      The Franchise Agreement.

(d)      The Union Agreement and the Owner Agreement.

(e)      The Condominium Documents.

(f)      The most recent profit and loss statements with respect to the Hotel that have been prepared by Hotel Manager and for the previous three (3) calendar years that have been prepared by Hotel Manager.

(g)      The Title Commitment and Seller's existing survey of the Property.

(h)      Any environmental reports related to the Hotel prepared for Seller or any of its affiliates.

(i)      All architectural and design drawings for the Hotel Unit, including as-built plans and specifications for the Hotel.

(j)      The most recent real estate and personal property tax bills and tax receipts for the Property and for the previous three (3) calendar years ending December 31, 2018.

(k)      A current payroll report.

(l)      A list of all Bookings.

(m)      The operating budget for the Hotel for the current fiscal year prepared by Hotel Manager.

(n)      The Parking Agreement.

(o)      The most recent STAR Report for the Hotel.

17

# ARTICLE 3
# TITLE MATTERS

SECTION 3.1.  Title Objections.

(a)      Buyer acknowledges that it has reviewed and approved (i) the Title Commitment and survey of the Real Property and (ii) copies of the exception documents referred to in Schedule B of the Title Commitment, other than Required Removal Exceptions.

(b)      If any update of the Title Commitment delivered to Buyer after the Effective Date discloses any exception to title to the Real Property that (i) is not disclosed in the then most recent Title Commitment, (ii) is not a Permitted Exception, (iii) Buyer otherwise did not have knowledge of prior to the Effective Date, (iv) would result in actual damages to Buyer in excess of Three Hundred Thousand Dollars ($300,000), (v) is not a survey matter and (vi) was not caused or agreed to by Buyer or any other Buyer's Agents (any such exception that satisfies all of the foregoing, a "New Title Exception"), then Buyer shall have the right to object to such New Title Exception by providing written notice to Seller within the earlier of: (A) five (5) Business Days after receiving such update of the Title Commitment, or (B) the Scheduled Closing Date (the "New Title Objection Notice").  If Buyer provides a New Title Objection Notice to Seller, Seller shall have the right, but not the obligation, to elect to Remove such New Title Exception at or prior to Closing (other than Required Removal Exceptions, which Seller shall be obligated to Remove at Closing).  Seller shall notify Buyer in writing within five (5) Business Days following receipt of Buyer's notice of any New Title Objection Notice whether Seller elects to attempt to Remove any of the New Title Exceptions.  If Seller elects to attempt to Remove any New Title Exceptions, then Seller shall have until the Closing to attempt to Remove any such New Title Exceptions.  If Seller elects not to Remove any New Title Exceptions specified in Buyer's New Title Objection Notice, or if Seller is unable to Remove any New Title Exceptions prior to Closing, Buyer shall elect (i) within five (5) Business Days following receipt of Seller's notice or (ii) if Seller has elected to attempt to remove any New Title Exceptions but is unable to do so before Closing, prior to the Scheduled Closing Date, either to (A) terminate this Agreement by sending written notice thereof to Seller and Escrow Agent and thereafter Buyer shall receive a refund of the Deposit and the parties shall have no further rights or obligations hereunder except for obligations that expressly survive the termination of this Agreement, or (B) accept such New Title Exceptions as Permitted Exceptions and the Closing shall occur as herein provided without any reduction of or credit against the Purchase Price.

(c)      Notwithstanding anything to the contrary, Seller shall have the right to extend the Scheduled Closing Date for up to thirty (30) days, in order to Remove any Required Removal Exceptions or Title Objections that Seller elects to Remove.  If the Title Company fails or refuses to Remove any Required Removal Exceptions or Title Objections, Seller shall have the right to replace the Title Company with another nationally recognized title insurance company reasonably acceptable to Buyer.

SECTION 3.2.  Delivery of Title and Title Insurance.  At Closing, the Title Company shall issue the Owner's Title Policy to Buyer, insuring that title to the Real Property is vested in Buyer subject only to the Permitted Exceptions.  By acceptance of the Deed and the closing of the purchase of the Property, Buyer agrees that Seller shall have conclusively satisfied its obligations

18

with respect to title to the Property, subject to any ongoing title warranties provided to Buyer under the Deed (as defined below).

# ARTICLE 4
# BUYER'S INVESTIGATIONS; AS-IS SALE

SECTION 4.1.  Buyer's Investigations.  Buyer acknowledges and agrees that prior to the Effective Date, Buyer had the opportunity to examine and investigate the Property and the Submission Matters and all other matters that Buyer deemed necessary or desirable in connection with the Transaction, and that Buyer has approved the condition of the Property (including, but not limited to, the physical and environmental condition of the Property), all Submission Matters, all Permitted Exceptions, the Title Commitment, the zoning for the Property, the Licenses and Permits, the Contracts, the Occupancy Agreements and all other diligence matters.  Buyer's execution of this Agreement shall constitute Buyer's election to proceed with the acquisition of the Property and waiver of any right to terminate this Agreement or receive a refund of the Deposit based upon the condition of the Property, subject to the conditions set forth in Section 6.4 below and the termination rights set forth in Sections 3.1, 6.6, 9.2 and 10.1.  Subject to the provisions of Section 9.2, any costs incurred by Buyer in examining and investigating the Property under this Agreement shall be at Buyer's sole cost and expense.

SECTION 4.2. Inspection. Buyer acknowledges that Buyer has had access to the Property and has had the opportunity to conduct such surveys, investigations and inspections of the Property as Buyer deemed necessary. Buyer acknowledges and agrees that Buyer has approved all such surveys, investigations and inspections of the Property and Buyer shall have no right to terminate this Agreement or receive a refund of the Deposit because Buyer is not satisfied with the results of any surveys, investigations, tests or inspections that Buyer chooses to perform as contemplated by this Section 4.2 or if Buyer elects to review any additional reports, information or documents, including any documents provided by Seller that may be requested by Buyer after the Effective Date. From and after the Effective Date, Buyer may, subject to the terms of this Section 4.2, conduct such surveys, investigations and inspections of the Property as permitted by this Agreement. Seller shall use commercially reasonable efforts to provide Buyer with reasonable access to make such inspections of the Property (including an inspection for zoning, land use, environmental compliance and the availability of water and other utilities) as Buyer, in Buyer's sole discretion, deems necessary to determine the physical and land use and environmental characteristics of the Property.  Buyer and its agents, employees, representatives, contractors and consultants, each acting within their authorized scope of work (collectively, "Buyer's Agents"), shall, at Buyer's sole cost and expense, subject to any reasonable limitations imposed by Seller or Hotel Manager, be entitled to enter the Property to perform inspections and tests of the Property and its structural and mechanical systems; provided, however, that Buyer provides at least two (2) Business Days prior e-mail notice to Seller (with e-mail to MPrice@wbproperties.com constituting proper notice for such purpose) prior to any Buyer's Agent's entry onto the Property together with details of the scope and nature for the requested access, the name or names of Buyer's Agents that will enter onto the Property and the business hours during which such Buyer's Agents would like to enter onto the Property (including any work proposed, provided such work does not involve any testing, whether intrusive or non-intrusive, as addressed below, and any intended contact with third parties), and obtains Seller's prior written consent, not to be unreasonably withheld, conditioned

19

or delayed, (which may be given by e-mail); <u>provided further</u>, Buyer shall not perform any testing (invasive or non-invasive, including in connection with a Phase II environmental report or otherwise, or any drilling, boring or sampling on, in or beneath the Property or sampling of building materials), each without the prior written consent of Seller, which consent may be given, withheld or conditioned in Seller's sole and absolute discretion; provided further that any Buyer's Agent's entry onto the Property shall be accompanied by a representative of Seller if Seller so desires, and otherwise shall neither interfere with nor disrupt Seller's or Hotel Manager's, as applicable, use, renovation or operation of the Hotel or any contractor's, subcontractor's, architect's, engineer's, hotel guest's, tenant's or occupant's use, occupancy or enjoyment of the Hotel.  Prior to disclosing any data, reports, test results or other materials generated during Buyer's evaluation of the Property to any governmental or regulatory agency in accordance with <u>Section 8.4</u> below, Buyer shall, unless otherwise prohibited by law, provide Seller with a reasonable opportunity for Seller to review the same and, in Seller's sole discretion, Seller may object to such disclosure if such disclosure is not required by applicable law.  Immediately following each entry by any Buyer's Agent, Buyer shall restore the Property to its original condition as existed prior to any such entry and to Seller's reasonable satisfaction.  Buyer shall keep the Property free and clear of any mechanics' liens or materialmen's liens related to any Buyer's Agent's access, examination, inspection and investigation and Buyer shall protect, defend (with legal counsel acceptable to Seller), indemnify and hold Seller, the parties listed on <u>Schedule 4.2</u> and their respective past and present principals, members, managers, partners, officers, directors, agents, shareholders, beneficiaries of (or any direct or indirect owners of any beneficial interest in) Seller, representatives, advisors, attorneys, brokers, employees, affiliates, subsidiaries, successors and assigns (each, a "<u>Seller's Indemnitee</u>") harmless from and against any and all actual out-of-pocket losses, costs, expenses (including reasonable out-of-pocket attorneys' fees and court costs), claims, damages (excluding any prospective or speculative profits, consequential, punitive, special, exemplary or indirect damages), demands, causes of action, liabilities, lawsuits, judgments, liens and stop notices whatsoever, including but not limited to reasonable out-of-pocket costs of remediation, restoration and other similar activities, and mechanics' and materialmen's liens, and shall repair any and all damages and loss to any portion of the Property or the Condominium arising out of any Buyer's Agent's access to the Property or conducting such inspections, investigations, surveys, tests and studies.  Notwithstanding the foregoing, Buyer shall have no liability or obligation for: (i) any loss or damage to the Property or Seller resulting from the gross negligence or willful misconduct of any Seller Indemnitee; or (ii) the mere discovery of any pre-existing condition relating to the Property by Buyer or its agents or contractors, except to the extent exacerbated by Buyer or any Buyer's Agent; or (iii) Buyer's discovery of any information that may be found to negatively impact the value or marketability of the Property, provided Buyer and Buyer's Agents maintain such information in strict confidentiality, except for disclosures that are required by Law. Prior to any Buyer's Agent's entry onto the Property Buyer shall demonstrate to Seller with respect to any Buyer's Agent that shall make entry onto the Property, and shall provide Seller with Certificates of Insurance documenting that Buyer or such other Buyer's Agent has obtained, (a) Commercial General Liability insurance, in an amount not less than Two Million Dollars ($2,000,000) per occurrence and Three Million Dollars ($3,000,000) general aggregate combined limits for any injuries, deaths or property damage (including loss of use) sustained as a result of any one accident or occurrence, (b) Worker's Compensation and Employer's Liability (Washington Stop Gap) insurance covering all personnel entering the Property, and such Employer's Liability insurance shall be in an amount not less than

One Million Dollars ($1,000,000) for each accident, disease per employee and disease policy limit, and (c) business automobile coverage in an amount not less than One Million Dollars ($1,000,000) per occurrence. Such limits may be achieved through the use of a combination of Umbrella Liability with coverage of not less than Five Million Dollars ($5,000,000) that extends over the Commercial General Liability, Auto and Employer's Liability insurance. All required policies shall be issued from a licensed insurance company with an A.M. Best Rating of A-VIII, insuring any applicable Buyer's Agent against any liability arising out of or resulting from such Buyer's Agent's entry or inspections of the Property pursuant to the provisions hereof. Any Buyer's Agent that conducts environmental inspections of the Property shall also provide evidence of environmental liability insurance of not less than One Million Dollars ($1,000,000) per occurrence. Any policy maintained by any other Buyer's Agent pursuant to this Section 4.2 shall (i) insure the contractual liability of Buyer covering Seller, (ii) name Seller (and its successors and assigns) and any Seller Indemnitee requested by Seller (including, without limitation, the parties listed on Schedule 4.2) as additional insureds, (iii) contain a provision that the insurance provided by such Buyer's Agent hereunder shall be primary and noncontributing with any other insurance available to Seller, (iv) be in form and substance adequate to insure against all liability of such Buyer's Agent arising out of or resulting from any entry or inspections of the Property pursuant to this Agreement and (v) remain in effect for at least six (6) months following the last date that any Buyer's Agent enters the Property. All such insurance shall be written on a primary and non-contributory basis and include waiver of subrogation in favor of Seller and each Seller's Indemnitee. Buyer shall provide Seller with certificates of insurance evidencing Buyer's compliance with this Section 4.2 at least one (1) Business Day prior to Buyer's limited access as stated herein and ten (10) days prior to any renewal of said insurance. Buyer's compliance with the provisions of this section shall in no way limit Buyer's liability under any other provisions of this Agreement. Said insurance shall not be cancelled or materially and adversely altered without thirty (30) days' prior written notice to Seller. In no event shall there be any reduction in the amount of coverage provided by Buyer below the initial amounts set forth herein. No deductible (including any self-insured retention) under any policy of insurance carried by Buyer or Buyer's Agents referenced herein shall be borne by Seller in any way. Such deductible (or self-insured retention) shall be the sole responsibility of Buyer or Buyer's Agents, as applicable.

SECTION 4.3. Limit on Certain Contacts. Notwithstanding any provision in this Agreement to the contrary, Buyer agrees that Buyer's Agents (other than as may be necessary to obtain a phase I environmental report, a zoning report and a survey) shall not contact, directly or indirectly, any other party with regard to the Hotel, including without limitation (a) any governmental, municipal or city agency, authority, official or representative regarding the Property (including with respect to hazardous materials on, or the environmental condition of, the Property, or zoning, permitting or entitlement issues), (b) Hotel Manager or any affiliate thereof, (c) any employees, contractors, subcontractors, architects or engineers of the Hotel or any prospective employees, contractors, subcontractors, architects or engineers, tenants or guests of the Hotel or any parties to any Occupancy Agreement, (d) the Garage Unit Owner or any affiliate thereof, (e) the Union or any other labor union, or (f) any member of the Condominium Board, in each case without Seller's prior written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed and which consent shall be deemed to be provided if Seller fails to respond to Buyer's request within two (2) Business Days. Buyer shall provide e-mail notice to Seller of any intended contact together with details of the scope and nature of such contact and if Seller's

21

consent to any such contact is obtained by Buyer, Seller shall have the right to have a representative present when any Buyer's Agent has any such contact and the right to participate in any such contact.

SECTION 4.4.  As-Is Provisions.

(a)      <u>As-Is Sale</u>.  Buyer acknowledges and agrees that:

(i)      The Property shall be sold, and Buyer shall accept possession of the Property as of Closing, "AS IS, WHERE IS, WITH ALL FAULTS", with no right of setoff or reduction in the Purchase Price, except as expressly set forth to the contrary in Seller's Warranties or any representations or warranties of Seller set forth in the Closing Documents, if any.

(ii)      Except for Seller's Warranties or any representations or warranties of Seller set forth in the Closing Documents, if any, none of the Seller Parties shall be deemed to have made any verbal or written representations, warranties, promises or guarantees (whether express, implied, statutory or otherwise) to Buyer with respect to the Property, any matter set forth, contained or addressed in the materials delivered or made available to Buyer, including the accuracy and completeness thereof, or the results of Buyer's due diligence.  Buyer acknowledges and agrees that all materials, data and information delivered by or on behalf of Seller to Buyer in connection with the Transaction contemplated hereby are provided to Buyer as a convenience only and that any reliance on or use of such materials, data or information by Buyer shall be at the sole risk of Buyer.  Without limiting the generality of the foregoing provisions, Buyer acknowledges and agrees that (a) any environmental, property condition or other report with respect to the Property that is delivered by or on behalf of Seller to Buyer shall be for general informational purposes only, (b) Buyer shall not have any right to rely on any such report delivered by or on behalf of Seller to Buyer, except at the sole risk of Buyer, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Buyer with respect thereto, and (c) neither Seller, any affiliate of Seller nor the person or entity that prepared any such report delivered by or on behalf of Seller to Buyer shall have any liability to Buyer for any inaccuracy in or omission from any such report or in verbal communication.

(iii)      Buyer acknowledges and agrees that (A) Buyer has completed such due diligence as Buyer deems necessary or appropriate in its sole and absolute discretion, (B) Buyer has independently confirmed to its satisfaction that it has received and reviewed all information that it considers material to its purchase of the Property and/or the Transaction and (C) Buyer will not have any right to terminate this Agreement based upon any additional due diligence that Buyer elects to perform after the Effective Date.

(iv)      EXCEPT AS EXPRESSLY SET FORTH IN SELLER'S WARRANTIES OR ANY REPRESENTATIONS OR WARRANTIES OF SELLER SET FORTH IN THE CLOSING DOCUMENTS, IF ANY, IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER,

22

EXPRESSED OR IMPLIED, WITH RESPECT TO THE PROPERTY (OR ANY PORTION OR COMPONENT THEREOF), INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, PAST, PRESENT OR FUTURE FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, ANY DESIGN OR CONSTRUCTION ERRORS, OMISSIONS OR DEFECTS, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH GOVERNMENTAL LAWS OR THE EXISTENCE OR NON-EXISTENCE OF ANY VIOLATIONS THEREOF, ANY LITIGATION OR OTHER LEGAL OR ADMINISTRATIVE ACTION OR PROCEEDING, THE TRUTH, ACCURACY OR COMPLETENESS OF THE SUBMISSION MATTERS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY (OR ANY PORTION OR COMPONENT THEREOF). BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN SELLER'S WARRANTIES. BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO MADE OR FURNISHED BY SELLER, HOTEL MANAGER, FRANCHISOR OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN SELLER'S WARRANTIES OR ANY REPRESENTATIONS OR WARRANTIES OF SELLER SET FORTH IN THE CLOSING DOCUMENTS, IF ANY. BUYER REPRESENTS TO SELLER THAT BUYER IS A SOPHISTICATED INSTITUTIONAL INVESTOR WITH SUBSTANTIAL EXPERIENCE AND EXPERTISE WITH INVESTMENT PROPERTIES AND HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ANY SELLER PARTIES WITH RESPECT THERETO, OTHER THAN SELLER'S WARRANTIES OR ANY REPRESENTATIONS OR WARRANTIES OF SELLER SET FORTH IN THE CLOSING DOCUMENTS, IF ANY.  UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS AND OTHER MATTERS DESCRIBED IN THIS SECTION 4.4(A)(IV), MAY NOT HAVE BEEN REVEALED BY BUYER'S

23

INVESTIGATIONS OR ANY SUBMISSION MATTERS.  BUYER AGREES THAT SHOULD ANY CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS ON THE PROPERTY BE REQUIRED AFTER THE CLOSING DATE, SUCH CLEAN-UP, REMOVAL OR REMEDIATION SHALL BE THE RESPONSIBILITY OF AND SHALL BE PERFORMED AT THE SOLE COST AND EXPENSE OF BUYER AND SELLER SHALL NOT BE LIABLE TO BUYER FOR SUCH CLEAN-UP, REMOVAL OR REMEDIATION. BUYER AND SELLER EACH ACKNOWLEDGES THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY PROSPECTIVE OR SPECULATIVE PROFITS, OR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER BASED UPON CONTRACT, TORT OR NEGLIGENCE OR IN ANY OTHER MANNER ARISING FROM THIS AGREEMENT OR THE TRANSACTION.

(b)     Release.  By accepting the Deed and closing the Transaction, Buyer, on behalf of itself, its affiliates and their respective successors and assigns, shall thereby, and does hereby, release each of the Seller Parties from, and waive any and all Liabilities (other than the Retained Liabilities) against each of the Seller Parties for, attributable to, or in connection with the Property and the Transaction, whether known or unknown, direct or indirect, arising or accruing before, on or after Closing and whether attributable to events or circumstances that arise or occur before, on or after Closing, including the following:  (i) any and all statements or opinions heretofore or hereafter made, or information furnished with respect to the Property to Buyer, whether by any of the Seller Parties or any of their respective affiliates, employees, officers, directors, members, partners, agents, representatives or direct or indirect owners; (ii) any and all Liabilities with respect to the structural, physical, or environmental condition of the Property, including all Liabilities relating to the release, presence, discovery or removal of any hazardous or regulated substance, chemical, waste or material that may be located in, at, about, emanating from, migrating to or under the Property, or connected with or arising out of any and all claims or causes of action based upon CERCLA, RCRA, any state or local counterparts thereof, any regulations promulgated thereunder, or any related claims or causes of action, including without limitation the matters addressed in the Indemnity Agreement (collectively, "Environmental Liabilities"); and (iii) any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to any portion of the Property.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

24

BUYER UNDERSTANDS THAT SUCH WAIVER AND RELEASE INCLUDES STATUTORY AS WELL AS "COMMON LAW" EQUITABLE RIGHTS AND REMEDIES AND THAT IT COVERS POTENTIAL CLAIMS OF WHICH BUYER MAY BE CURRENTLY UNAWARE OR UNABLE TO DISCOVER. BUYER ACKNOWLEDGES THAT THE FOREGOING WAIVER AND RELEASE IS OF MATERIAL CONSIDERATION TO SELLER IN ENTERING INTO THIS AGREEMENT, THAT BUYER'S COUNSEL HAS ADVISED BUYER OF THE POSSIBLE LEGAL CONSQUENCES OF MAKING SUCH WAIVER AND RELEASE AND THAT BUYER HAS TAKEN INTO ACCOUNT, IN AGREEING TO PURCHASE THE PROPERTY AT THE PURCHASE PRICE SPECIFIED HEREIN, SELLER'S DISCLAIMER OF ANY WARRANTIES AND REPRESENTATIONS REGARDING THE PROPERTY (OTHER THAN SELLER'S WARRANTIES). BUYER FURTHER AGREES AND ACKNOWLEDGES THAT, IN GIVING THE FOREGOING WAIVER AND RELEASE, IT HAS WITH ITS LEGAL COUNSEL, CONSIDERED ANY STATUTE OR OTHER LAW THAT MIGHT APPLY TO AND LIMIT THE EFFECT OF BUYER'S WAIVER AND RELEASE HEREIN AND HEREBY KNOWINGLY WAIVES THE BENEFITS OF ANY SUCH LAW AND INTENDS THAT IT NOT BE APPLICABLE HERE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE FOREGOING RELEASES APPLY EVEN WHEN THE APPLICABLE MATTERS RESULT FROM THE SELLER PARTIES' OWN NEGLIGENCE. BUYER EXPRESSLY WAIVES ITS RIGHTS GRANTED UNDER ANY PROVISION OF APPLICABLE LAW THAT PROVIDES THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT BUYER DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE. WHICH IF KNOWN MUST HAVE MATERIALLY AFFECTED ITS AGREEMENT TO RELEASE SELLER. IN ORDER TO CONFIRM SUCH WAIVER, BUYER HAS INITIALED THIS SUBSECTION IN THE SPACE PROVIDED BELOW.

_____
BUYER'S INITIALS

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

(c)      Assumption of Liability.  By accepting the Deed and closing the Transaction, Buyer shall thereby and thereafter assume and take responsibility and liability for the following:  (i) any and all Liabilities attributable to the Property to the extent that such Liabilities arise or accrue on or after Closing, including, without limitation (A) under the Bookings, Contracts, the Union Agreement, the Owner Agreement, the Occupancy Agreements, the New Franchise Agreement, the new Hotel management agreement with New Manager, and the Condominium Documents and (B) any Employee Liabilities; (ii)  any and all Liabilities for third party tort claims that occur on or after the Closing Date; (iii) any and all Liabilities with respect to the structural, physical or environmental condition of the Property, whether such Liabilities are latent or patent, including all Environmental Liabilities and violations of any Law and any and all judgments, fines, penalties assessed on or after the Closing Date and other costs and liabilities related thereto (excluding Liabilities for third party tort claims that occur prior to the Closing during Seller's ownership of the Property; provided that this exclusion shall not limit the scope of the release of Seller and the Seller Parties as set forth in Section 4.4(b)), other than Seller's defense of Buyer if Buyer is named as a defendant in any such third party tort claim action that is a Retained Liability and that is based upon events occurring prior to the Closing during Seller's ownership of the Property; and (iv) any and all Liabilities with respect to which Buyer receives a credit at Closing (collectively, the "Assumed Liabilities").  Buyer acknowledges and agrees that the Liabilities to be assumed by Buyer pursuant to each of the foregoing clauses are intended to be independent of one another, so Buyer shall assume Liabilities described in each of the clauses even though some of those Liabilities may be read to be excluded by another clause.  Buyer hereby agrees to indemnify, defend and hold harmless Seller and the Seller Parties from and against any and all of the Assumed Liabilities.  Seller agrees to indemnify, defend and hold harmless Buyer from and against any and all of the Retained Liabilities; provided the liability of Seller pursuant to the foregoing indemnity shall be subject to the Survival Period, the Cap Amount and the Floor Amount.  The provisions of this Section 4.4(c) shall survive the Closing (and not be merged into the Deed).

(d)      Successors and Assigns.  The provisions of this Section 4.4 shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(e)      Reaffirmation and Survival.  The provisions of this Section 4.4 shall be deemed reaffirmed by Buyer by acceptance of the Deed and the provisions of Section 4.4(c) shall be deemed reaffirmed by Seller upon the Closing of the Transaction subject to Section 4.5 and shall survive the Closing (and not be merged into the Deed) or earlier termination of this Agreement.

SECTION 4.5.  Limitation on Seller's Liability.

(a)      Maximum Aggregate Liability.  Notwithstanding any provision to the contrary contained in this Agreement or the Closing Documents, (i) the maximum aggregate liability of the Seller, and the maximum aggregate amount that may be awarded to and collected at any time by Buyer after the Closing, in connection with the Transaction, the Property and any Liabilities attributable to Seller or the Property, under this Agreement, under any Closing Documents or otherwise in connection with the Property, including in connection with the breach of any covenant of Seller contained in this Agreement or any Closing Document (other than any such covenant that has been waived by Buyer, including pursuant to Section 9.2 hereof, for which Seller shall have

26

no further liability to Buyer) or for any of Seller's Warranties shall not exceed One Million Seven Hundred Thousand Dollars ($1,700,000) (the "Cap Amount"), and (ii) no claim by Buyer may be made, and Seller shall not be liable for any judgment in any action based upon any claim for breach of this Agreement or any Closing Documents (other than any such covenant that has been waived by Buyer, including pursuant to Section 9.2 hereof, for which Seller shall have no further liability to Buyer) or for any of Seller's Warranties, unless and until such claim is for an aggregate amount in excess of the Floor Amount. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not have any recourse to any direct or indirect member, partner, principal, shareholder, stockholder, manager, representative, affiliate, officer, director, beneficial owner, employee, advisor or agent of Seller for any liabilities of Seller in connection with the Transaction (including the Retained Liabilities), the Property and any Liabilities attributable to the Property, under this Agreement, or under any Closing Document or otherwise in connection with the Property or Transaction, and no claim shall be made against any of the foregoing.

(b)    R&W Holdback.  Seller and Buyer hereby agree that at Closing, Escrow Agent shall hold back from Seller's proceeds from the sale of the Property a portion of the Purchase Price equal to the Cap Amount during the Survival Period to secure Seller's obligations for breach of Seller's Warranties, Seller's Contingent Retained Liability (as hereinafter defined), Taxes relating to the operation of the Hotel that are the responsibility of Seller under this Agreement and any claims by Buyer for attorneys' fees if Buyer is the prevailing party under this Agreement, pursuant to the terms and conditions of a holdback escrow agreement in the form attached hereto as Exhibit Q (the "R&W Holdback Escrow Agreement").  As used herein, "Seller's Contingent Retained Liability" shall mean a third party claim asserted in writing against Buyer for a Retained Liability that is not covered by insurance or a reasonably adequate reserve established by Seller to pay any such third party claim against Buyer for Seller's Retained Liabilities and with respect to which Seller has not obtained a written agreement from such third party that Buyer is not liable for such third party claim.

(c)    NOI Holdback. Seller and Buyer hereby agree that at Closing, Escrow Agent shall hold back from Seller's proceeds from the sale of the Property a portion of the Purchase Price equal to Two Million and No/100 Dollars (the "NOI Holdback Amount") until March 1, 2021 or if there is a dispute regarding the calculation of NOI, three (3) Business Days after the resolution of the dispute by the Outside Accountants (the "NOI Holdback Release Date") pursuant to the terms and conditions of a holdback escrow agreement in the form attached hereto as Exhibit R (the "NOI Holdback Escrow Agreement").  On or prior to the February 15, 2021, Buyer shall deliver to Seller a certificate of NOI signed by Buyer's chief executive officer, Howard Wu, together with such other evidence and supporting documentation of such calculation of NOI as may be reasonably requested by Seller, including the profit and loss statement for the Hotel prepared by Buyer's hotel manager for the 2020 calendar year (the "NOI Certificate").  If Seller does not dispute the calculation set forth in the NOI Certificate by written notice to Buyer and Escrow Agent prior to March 1, 2021 and if the NOI is less than Seven Million and No/100 Dollars ($7,000,000.00) as may be equitably adjusted if Buyer elects to take any hotel rooms out of service during 2020 for any hotel renovations (the "NOI Threshold"), (i) Escrow Agent shall pay Buyer from the NOI Holdback Amount the difference between the NOI Threshold and NOI (the "NOI Payment") and (ii) any funds remaining in the NOI Holdback shall be released to Seller by Escrow Agent. If NOI is equal to or greater than the NOI Threshold, then Escrow Agent shall pay the NOI

27

Holdback Amount, together with all interest earned thereon, to Seller on the NOI Holdback Release Date. If there is a dispute regarding the calculation of NOI for the NOI Payment, then either party shall have the right to submit such dispute to the Outside Accountants, and the determination of the Outside Accountants, which shall be made within a period of fifteen (15) days after such submittal by the parties, shall be conclusive. The fees and expenses of the Outside Accountants shall be shared equally by Buyer, on the one hand, and Seller on the other hand.

(d)     PIP Holdback. If the PIP Estimate exceeds Two Million Dollars ($2,000,000) for the first twelve (12) months following the Closing and Seller has elected to fund the Excess PIP Costs (as hereinafter defined), Seller and Buyer hereby agree that at Closing, Escrow Agent shall hold back from Seller's proceeds from the sale of the Property a portion of the Purchase Price equal to the amount of the Excess PIP Costs to pay for any Excess PIP Costs that Buyer actually incurs during the first twelve (12) months following the Closing pursuant to the terms and conditions of an escrow holdback agreement (the "PIP Escrow Holdback Agreement") in the form of Exhibit S attached hereto and incorporated by reference herein.

(e)     Survival.   The provisions of this Section 4.5 shall survive Closing (and not be merged into the Deed) or any earlier termination of this Agreement.

## ARTICLE 5
## ADJUSTMENTS AND PRORATIONS

SECTION 5.1.   Prorations, Credits and Other Adjustments.   At Closing, Buyer and Seller shall prorate all items of income and expense that are customarily prorated between a purchaser and seller for hotel properties comparable to the Hotel, including the prorations and other adjustments provided below, and the net amount consequently owing to Seller or Buyer, as applicable, shall be added to or subtracted from the proceeds of the Purchase Price payable to Seller at Closing.   Seller and Buyer shall, or shall designate a third-party accountant to, prepare a statement of prorations, credits and other adjustments (the "Closing Statement") in a mutually acceptable format, with the understanding that any deviations from the requirements of this Section 5.1 shall be "trued-up" in the Post-Closing Statement pursuant to the terms of this Agreement.

(a)     Proration of Taxes.   All real estate ad valorem taxes, including general assessments and special assessments and all personal property ad valorem taxes assessed against the Hotel Unit (generically and collectively, "Taxes"), which are payable during the full tax year during which Closing occurs shall be prorated between Buyer and Seller as of the Closing Date.   Taxes that become due and payable during the following tax year, if assessed with respect to the current tax year, shall also be prorated.   Seller retains the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period that encompasses any period prior to the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings; provided, however, that if such proceedings may have an effect on any Taxes owing after the Closing Date, Seller shall obtain Buyer's prior written consent, which shall not be unreasonably withheld, and, if Seller does not commence or diligently continue any such proceeding which may have an effect on any Taxes owing after the Closing Date, Buyer may commence or continue such proceeding and Seller shall reasonably cooperate with Buyer in connection therewith at no cost or expense to Seller.   Any amounts recovered in such settlement

28

or proceeding, net of the expenses of recovery thereof, shall be appropriately apportioned between Seller and Buyer.

(b)      General Proration of Expenses.  The following items of expense with respect to any portion or aspect of the Hotel shall be prorated between Seller and Buyer as of 12:01 a.m. on the Closing Date (the "Cut-Off Time"), such that expenses attributable to the period prior to the Cut-Off Time shall be the responsibility of Seller, and the expenses attributable to the period following the Cut-Off Time shall be the responsibility of Buyer:

(i)      All charges and expenses under any Contracts.

(ii)      All utility charges, provided that Seller shall request each utility company providing utility service to the Property to cause all utility billings to be closed and billed as of the Closing Date (or as near as possible to and before the Closing Date) in order that utility charges may be separately billed for the period prior to the Closing Date and the period on and after the Closing Date.  If any such utility charges are not separately billed, the same shall be prorated.  In connection with any such proration, it shall be presumed that utility charges were uniformly incurred during the billing period in which the Closing Date occurs.  Seller shall receive a credit at Closing for any transferrable Utility Deposits with respect to the Property.

(iii)      Fees and other compensation payable to Hotel Manager under the Hotel Management Agreement shall be the responsibility of Seller.

(iv)      Fees, reimbursements and other compensation payable to Franchisor under the Franchise Agreement if Buyer fails to enter into a New Franchise Agreement, and excluding all Franchise Application fees required by Section 8.5 which shall be paid by Buyer.

(v)      Prepaid expenses of the Property including (A) the expense of all Licenses and Permits obtained in connection with the operation of the Hotel and (B) the expense and premiums of all insurance obtained by Seller, Condominium Board or Hotel Manager for the Hotel.

(vi)      All condominium common charges, fees and assessments due and payable pursuant to the Condominium Documents with respect to the Hotel Unit (it being agreed that proration will be subject to adjustment as provided in Section 5.1(m) based on actual yearly charges as determined by any annual audit that is performed pursuant to the Condominium Documents). Seller shall receive a credit in the amount of Fifty-Nine Thousand and No/100 Dollars ($59,000), which represents the amount that Seller contributed on behalf of the Hotel Unit to the reserves required under the Condominium Documents.

(vii)      All other Hotel operating expenses, other than employment expenses (which are covered by Section 5.1(c) below).

29

(c)      Employment Expenses.  Except as provided otherwise in this Agreement, Seller shall be responsible for all wages and other compensation accrued by Employees relating to the period prior to the Cut-Off Time, and the Buyer shall be responsible for all wages, benefits and other compensation accrued by Employees after the Cut-Off Time; provided, however, that Buyer shall receive a credit against the Purchase Price if it assumes the liability for any Employee wages, benefits and compensation that have accrued but have not been paid as of the Cut-Off Time and set forth in the Closing Statement approved by Buyer and Seller.   For purposes of this Section 5.1(c), compensation accrued by Employees shall include paid time off (including sick leave) only to the extent that such paid time off has accrued and is payable to such Employees on or before the Closing Date pursuant to the Union Agreement and applicable Laws.

(d)      Hotel Revenues.  Seller shall receive all revenues from the Hotel guest rooms and facilities occupied on the evening immediately preceding the Closing Date (including any such sales from mini-bars, in-room food and beverage, telephone, facsimile and data communications, in-room movie, laundry, and other service charges allocable to such rooms with respect to the evening immediately preceding the Closing Date) and determined as of 12:01 a.m. on the Closing Date by the night audit conducted on the evening of the day prior to the Closing Date (the "Cut-Off Revenue Time"), with Buyer receiving all revenue received after the Cut-Off Revenue Time; provided that all revenues from the Hotel guest rooms from the Closing Date attributable to guests who were occupying rooms as of the Cut-Off Revenue Time shall be divided equally between Buyer and Seller.  At Closing, all revenues from the Hotel guest rooms and facilities that are payable to third parties in respect of revenue earned before the Cut-Off Revenue Time (including any parking charges, fitness club fees, sales taxes, room taxes, occupancy taxes and other taxes charged to guests in such rooms) shall be allocated to Seller, and Buyer shall be allocated all of such revenue received after the Cut-Off Revenue Time.  All revenues from restaurants, lounges, vending machines and other service operations conducted at the Hotel shall be allocated to either Seller or Buyer based on whether the same accrued before or after the Cut-Off Revenue Time as described in the preceding sentence, and Seller shall cause Hotel Manager or Seller's designee to separately record sales occurring before and after the Cut-Off Revenue Time in the Hotel.

(i)      Revenues from conferences, receptions, meetings, and other functions occurring in any conference, banquet or meeting rooms in the Hotel, or in any adjacent facilities owned or operated by Seller, including usage charges and related taxes, food and beverage sales, valet parking charges, equipment rentals, and telecommunications charges, shall be allocated between Seller and Buyer, based on when the function therein commenced, with (A) one-day functions commencing prior to the Cut-Off Time but ending prior to 5:00 a.m. on the Closing Date being allocable to Seller, (B) functions commencing after the Cut-Off Revenue Time being allocable to Buyer, and (C) multi-day functions commencing prior to the Closing Date being allocated between Seller and Buyer according to when the event commences and ends, with revenues attributable to the period prior to the Closing Date allocable to Seller, and revenues attributable to the period from and after the Closing Date allocable to Buyer. Seller shall receive credit for any and all credit card charges and commissions that Seller has submitted for payment as of the Cut-Off Revenue Time.

30

(ii)     Buyer is not acquiring Seller's accounts receivable. All accounts receivable shall be retained by Seller, and for a period of six (6) months after the Closing Date, Buyer agrees to cooperate, and to cause Buyer's New Manager to cooperate in a commercially reasonable manner and at no cost or expense to Buyer, with Seller and Hotel Manager in the collection by Seller or Hotel Manager of any such accounts receivable retained by Seller.  Buyer shall promptly forward or cause New Manager to forward to Seller all moneys received at the Hotel marked for payment of accounts receivable belonging to Seller.  All payments received from any payor, at any time, shall be applied in the inverse chronological order (i.e., most recent first).  Buyer shall have no obligation to commence any action or proceeding or engage any collection agent to collect any Seller's Accounts Receivable or to terminate any lease or contract.

(iii)     Any operating revenues not otherwise provided for in this Section 5.1(d) shall be prorated between Buyer and Seller as of the Cut-Off Time.

(e)     Operating Account; Reserve; House Banks.  At Closing, Seller shall take possession of all till money, cash-on-hand, working capital, FF&E reserves and other cash and reserves in all accounts maintained by Hotel Manager or Seller's existing mortgage lender for the benefit of the Hotel and/or Seller and in all "house banks", and no party shall receive a credit for such amounts at Closing.

(f)     Hotel Payables.  Seller and Buyer shall identify all known outstanding obligations, liabilities, and other accounts payable for services and materials provided to the Hotel by third party service providers and vendors as of the Closing Date (collectively, the "Hotel Payables"), and such Hotel Payables shall be paid as part of the Closing or, if not paid at Closing, Buyer shall receive a proration credit equal to the aggregate amount of all such Hotel Payables remaining unpaid as set forth in a schedule to be attached to the Closing Statement and Buyer shall assume the obligation to satisfy all such Hotel Payables for which Buyer receives such credit at Closing. After Closing, before paying any amount invoiced or otherwise claimed by a third party vendor or service provider to be due with respect to the Hotel operations prior to Closing which is not included on such schedule (or is claimed in an amount larger than that shown on such schedule) and is not otherwise confirmed by Hotel Manager as an actual valid Hotel Payable, Buyer shall first notify Seller in writing of such invoice or claim, together with a copy of such invoice or claim and such appropriate back-up documentation in Buyer's possession as may be reasonable with respect thereto.  Unless Seller, within ten (10) Business Days following receipt of such submission, objects to such invoice or claim (thereby making it a "Seller Disputed Vendor Payable"), Buyer may pay the same and Buyer shall receive a credit for such payment (or such larger amount, as applicable) in connection with the Post-Closing Statement. Seller shall make commercially reasonable efforts to resolve any Seller Disputed Vendor Payables in a timely manner.

(g)     Credit for Certain Inventories.  As of the date immediately prior to the Closing Date, Seller and Buyer shall jointly conduct or cause Hotel Manager or any joint designee of Buyer and Seller to conduct an inventory of (i) all Inventory and (ii) all Food and Beverage Inventory, Consumables and supplies of all kinds, in each case, that are unused and unopened, including supplies held in reserve storage for future use in connection with the maintenance and operation of the Hotel, in each case to the extent located at the Hotel, to the extent contained in unopened

31

boxes, bottles, jars or containers of any type as of the Closing Date, (the items in the foregoing clause (ii) collectively referred to as the "Unopened Supplies"), and shall deliver a written report covering such Inventory and Unopened Supplies to Seller and Buyer.  For purposes of this Agreement, Unopened Supplies includes unopened packages of food, beverage and liquor (if and to the extent permitted to be transferred to Buyer under applicable law) in the store rooms and freezers and, for the avoidance of doubt, including, as an example, an unopened bottle in an opened box.  The parties hereby agree that Seller shall receive a credit for all Inventory and Unopened Supplies at Closing.  Seller shall receive a credit for all Operating Equipment, as carried on the Hotel balance sheet, in the amount of the unamortized value of such Operating Equipment as of the Closing Date.

(h)     Credit for Reservation Deposits.  Buyer shall receive a proration credit equal to the aggregate amount of advance cash (excluding credit card charges and commissions that have been paid by Seller) deposits that shall have been actually received by Seller prior to the Cut-Off Time on account of Bookings for the use or occupancy of the Hotel after the Cut-Off Time provided that Buyer honors such Bookings.

(i)     Regarding Hotel Prorations Generally.   Unless expressly provided herein otherwise:  (i) all prorations hereunder with respect to the Hotel shall be made as of the Cut-Off Time, (ii) all prorations shall be made on an actual daily basis, and (iii) for purposes of such prorations, all items of revenue and expense with respect to the Hotel's operations shall be classified and determined in accordance with the Uniform System of Accounts, as reasonably modified by Hotel Manager for use at the Hotel and otherwise in accordance with GAAP.  Except as otherwise expressly provided herein, in any case in which Buyer receives a credit at Closing on account of any obligation of Seller hereunder, Seller shall have no further liability for such obligation to the extent of the credit so given, and Buyer shall pay and discharge the same. All revenue payment prorations shall be subject to deduction for any actual collection costs incurred after Closing in connection with such collection.

(j)     Vouchers.  Buyer shall (i) honor all outstanding unexpired gift certificates, coupons or other writings issued by Seller, Franchisor or Hotel Manager that entitles the holder or bearer thereof to a credit (whether in a specified dollar amount or for a specified item, such as room night or meals) to be applied against the usual charge for rooms, meals and/or goods and services at the Hotel listed in Schedule 5.1(j) attached hereto and incorporated herein by this reference, as updated as of the Closing Date (collectively, "Vouchers") and shall assume all liability, if any, for all outstanding Vouchers as of the Closing Date, and (ii) indemnify, defend and hold Seller and the Seller Parties harmless from and against all claims, liabilities, costs and expenses arising out of the Vouchers from and after the Closing Date.  Buyer shall receive a proration credit at Closing equal to value of such Vouchers that are outstanding as of the Cut-off Revenue Time as reasonably determined by Seller.

(k)     Rentals and Security Deposits.

(i)     Rent receivables on Seller's books from any tenants, licensees or concessionaires under the Occupancy Agreements shall be allocated between Seller and Buyer, with rents attributable to periods prior to the Cut-Off Time being for the account of

Seller, and rents attributable to periods after the Cut-Off Time being for the account of Buyer.

(ii)     Buyer shall be entitled to a credit for all unapplied and refundable security and other deposits deposited by tenants with Seller and retained by Seller as of the Closing Date with respect to any Occupancy Agreements (excluding any security deposits maintained and held by Hotel Manager for the benefit of the owner of the Hotel).

(l)     Utility Deposits.  At Closing, Seller shall receive a credit for all refundable cash or other deposits posted with utility companies serving the Hotel or any governmental agencies or authorities or posted pursuant to any operating agreement.

(m)     Post-Closing Statement; Post-Closing Adjustments.  Except for (i) prorations for real estate taxes and other assessments, which shall be adjusted within fifteen (15) Business Days of receipt of the tax bill for the tax year in which the Closing occurs, (ii) prorations of condominium common charges, fees and assessments referred to in Section 5.1(b)(vi), which will be adjusted within fifteen (15) Business Days after receipt of results of any annual audit of such charges for the budget year which includes the Closing Date performed pursuant to the Condominium Documents, (iii) prorations of real estate tax refunds and related expenses, which shall be adjusted as provided in Section 5.1(o), and (iv) prorations of sales taxes that are subject to an audit, which shall be adjusted within fifteen (15) Business Days of completion of any such audit (the items referred to in the foregoing clauses (i)-(iv), collectively, "Deferred Adjustment Items"), Buyer and Seller shall make a one-time post-Closing adjustment of any item of income and expense subject to adjustment as provided above that was either incomplete or incorrect (whether as a result of an error in calculation or a lack of complete and accurate information) as of the Closing Date.  The parties will prepare and approve a statement of prorations (the "Post-Closing Statement") within ninety (90) days following the Closing Date, and the party in whose favor the original incorrect adjustment or error was made ("Adjusting Party") shall pay to the other party ("Requesting Party") the sum necessary to correct such prior incorrect adjustment or error within ten (10) Business Days after delivery of the Post-Closing Statement.  Notwithstanding any provision of this Agreement to the contrary, all items required to be adjusted pursuant to this Section 5.1(m) shall be adjusted within ninety (90) days of Closing (except for Deferred Adjustment Items, which shall be re-adjusted within the period set forth above), and such adjustment shall be final and no further adjustment to the prorations or the Purchase Price shall be made.

(n)     Resolution of Disputes.  In the case of a dispute under this Section 5.1, the parties shall attempt to resolve such dispute, but if for any reason such dispute is not resolved by the date that is sixty (60) days after the delivery of the original notice of the claimed adjustment by Buyer or Seller, but not to exceed thirty (30) days after the delivery of the Post-Closing Statement or, with respect to Deferred Adjustment Items, within thirty (30) days of a claims adjustment, then the parties shall submit such dispute to a "big four" accounting firm mutually agreed upon by Buyer and Seller (the "Outside Accountants"), and the determination of the Outside Accountants, which shall be made within a period of fifteen (15) days after such submittal by the parties, shall be conclusive.  The fees and expenses of the Outside Accountants shall be shared equally by Buyer, on the one hand, and Seller on the other hand.  At such time as the amount of any adjustment or

33

dispute shall be determined (either by agreement or by determination of the Outside Accountants), any amount that shall be payable to the Requesting Party by the Adjusting Party as a result of such adjustment or determination shall be paid within ten (10) Business Days after the date on which such agreement or determination shall have been made.

(o)     Seller Tax Appeal.  Seller shall have the right to control the progress of, and to make all decisions (including any decision to settle) with respect to, any contest or appeal of the real estate taxes and personal property taxes for the Property for tax years prior to and including the tax year in which Closing occurs (the "Closing Tax Year"); provided that (x) Seller shall keep Buyer reasonably informed regarding the status of any such contest or appeal with respect to the taxes attributable to the Closing Tax Year and (y) if any such contest or appeal may have an effect on any Taxes owing after the Closing Tax Year, Seller shall not settle any contest or appeal relating to taxes for the Closing Tax Year without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed.  Buyer shall cooperate with Seller in connection with any such contest or appeal.  To the extent any real estate or personal property tax refunds or credits are received after Closing with respect to the Property and such refunds or credits are attributable to real estate or personal property taxes paid for any tax year prior to the Closing Tax Year, or for any periods of the Closing Tax Year prior to the Closing Date, Seller shall be entitled to the entirety of such refunds and credits.  To the extent any such refunds or credits are attributable to real estate or personal property taxes paid for the Closing Tax Year, such amounts shall be distributed as follows:  first, to reimburse Seller and Buyer for all costs incurred in connection with the contest; second, to Seller to the extent such appeal covers the period prior to the Closing Date; and third, to Buyer to the extent such appeal covers the period from and after the Closing Date.

(p)     Survival.  The provisions of this Section 5.1 shall survive the Closing (and not be merged into the Deed) for a period of 130 days (except with respect to the provision of 5.1(a) which shall survive until 45 days after the last tax bill for the tax year in which the Closing occurs and, with respect to any dispute under Section 5.1(n) until the dispute in finally settled.

SECTION 5.2.  Safe Deposit Boxes.  On the day prior to the Closing Date, Seller shall (or shall cause Hotel Manager to) send written notice to guests in the Hotel who have safe deposit boxes advising them of the sale of the Hotel to Buyer and the procedures to be followed pursuant to this Section 5.2.  On the Closing Date, Seller shall (or shall cause Hotel Manager to) deliver to Buyer all keys to the safe deposit boxes in the Hotel, all receipts and agreements relating to such safe deposit boxes, and a complete list of the name and room number of each depositor.  Each box in use by a Hotel guest shall then be sealed by representatives of Seller and Buyer.  At Buyer's option, guests may be requested to remove and verify the contents of the sealed boxes prior to the Closing Date.   All such removals and verifications shall be under the supervision of a representative to be agreed upon between Buyer and Seller.  Buyer shall be responsible for all boxes once the seal is broken, and for the contents of all boxes which are verified.  Seller shall be responsible for any claims pertaining to any property allegedly deposited in a safe deposit box prior to the Closing Date, the seal of which was not broken.  From and after the Closing, Seller shall be relieved of any and all responsibility in connection with each said box, and Buyer shall indemnify and defend the Seller and the Seller Parties and hold them harmless from and against any actual out-of-pocket claim, liability, cost or expense (including reasonable out-of-pocket attorneys' fees) incurred by them, to the extent relating to items in such safety deposit boxes as of

the Closing Date.  Seller shall indemnify, defend and hold harmless Buyer and its affiliates from any other actual out-of-pocket liability, claim, cost or expense (including reasonable out-of-pocket attorneys' fees) to the extent relating to any such safety deposit box arising or attributable to the period prior to the Closing Date.  If Seller or Buyer should elect, as part of the Closing, they shall jointly, with each holder of any such safety deposit boxes, inventory the contents of such safety deposit boxes and seek to have the holder thereof confirm to Seller and Buyer, in writing, its contents as of the Closing.  The provisions of this Section 5.2 shall survive the Closing (and not be merged into the Deed).

SECTION 5.3.  Inventory of Baggage.   The representatives of Seller and/or Hotel Manager, and of Buyer shall prepare an inventory of baggage at the Hotel as of 9:00 a.m. on the Closing Date (which inventory of baggage shall be binding on all parties thereto) of (i) all luggage, valises and trunks checked or left in the care of the Hotel by guests then or formerly in the Hotel, (ii) parcels, laundry, valet packages and other property of guests checked or left in the care of the Hotel by guests then or formerly in the Hotel (excluding, however, property in Hotel safe deposit boxes), and (iii) all items contained in the Hotel "lost and found".  Buyer shall be responsible from and after the Closing Date for all baggage and other items listed in such inventory of baggage, and Buyer shall indemnify, defend and hold Seller and the Seller Parties harmless from and against any actual out-of-pocket claim, liability, cost or expense (including reasonable out-of-pocket attorneys' fees) incurred by Seller or any Seller Party to the extent relating to items listed in such inventory.  Seller shall indemnify, defend and hold harmless Buyer and its affiliates from any other actual out-of-pocket claim, liability, cost or expense (including reasonable out-of-pocket attorneys' fees) to the extent relating to guest baggage, packages and other property of guests checked or left in the care of the Hotel by guests then or formerly in the Hotel arising or attributable to the period prior to the Closing Date and not noted on the inventory provided in this Section 5.3. The provisions of this Section 5.3 shall survive the Closing (and not be merged into the Deed).

SECTION 5.4.   Closing Costs.  Buyer shall pay:  (i) the fees and expenses of any counsel representing Buyer in connection with the Transaction; (ii) the premium for the Owner's Title Policy (including any endorsements and affirmative insurance reasonably requested by Buyer); (iii) the cost of obtaining, updating or recertifying any survey of the Property ordered by Buyer; (iv) the sales and/or use taxes on the portion of the Purchase Price allocated to the Personal Property; (v) all recording and filing fees and charges in connection with the recordation of the Deed, the Condominium Assignment and the Garage Unit ROFO Assignment (if applicable); (vi) one-half (1/2) of any escrow fees charged by the Escrow Agent and/or Title Company in connection with the Closing (not to exceed $5,505); (vii) all costs incurred in connection with the Franchise Application and New Franchise Agreement, as applicable, including without limitation reimbursement of Seller for any property improvement plan inspection fees that Seller paid for as provided in Section 8.5; and (viii) all amounts incurred by Buyer in connection with the New Liquor License hereunder, including application fees. Seller shall pay:  (a) the real estate excise tax imposed on the sale of the Hotel Unit to Buyer, (b) the fees and expenses of any counsel representing Seller in connection with this Transaction; (c) one-half (1/2) of any escrow fees charged by the Escrow Agent and/or Title Company in connection with the Closing; and (d) all recording and filing fees and charges in connection with the recordation of releases of any Required Removal Exceptions.   Any other costs and expenses of Closing that are not addressed in this Agreement shall be allocated between Seller and Buyer in accordance with the customary

35

practice in Seattle, Washington.  The provisions of this <u>Section 5.4</u> shall survive the Closing or any termination of this Agreement.

## ARTICLE 6
## CLOSING

SECTION 6.1.  <u>Closing Mechanics</u>.

(a)     The parties shall conduct a New York style escrow closing through the Escrow Agent so that it will not be necessary for any party to physically attend Closing.

(b)     Provided all conditions precedent to Seller's obligations hereunder have been satisfied, Seller agrees to convey the Property to Buyer upon confirmation of receipt of the Adjusted Purchase Price Balance by the Escrow Agent as set forth below.  Provided all conditions precedent to Buyer's obligations hereunder have been satisfied, Buyer agrees to pay the Purchase Price by timely delivering the Adjusted Purchase Price Balance to the Escrow Agent by wire transfer of immediately available funds on the Scheduled Closing Date and unconditionally authorizing and directing the Escrow Agent no later than 10:00 a.m. Pacific Time on the Scheduled Closing Date to deposit the Adjusted Purchase Price Balance, together with the Deposit previously deposited with the Escrow Agent in Seller's designated account, by wire transfer of immediately available funds (it being acknowledged that, as set forth in <u>Section 11.13</u>, time is of the essence with respect to such obligations).

(c)     The items to be delivered by Seller or Buyer in accordance with the terms of <u>Sections 6.2</u> or <u>6.3</u> shall be delivered to Escrow Agent no later than 5:00 p.m. Pacific Time on the last Business Day prior to the Scheduled Closing Date except that (i) the items in the paragraph entitled "Keys and Original Documents" shall be delivered by Seller at the Hotel or made available by Hotel Manager at the Hotel immediately following the Closing on the Closing Date, and (ii) the Purchase Price shall be delivered by Buyer in accordance with the terms of <u>Section 6.1(b)</u>.

SECTION 6.2.  <u>Seller's Closing Deliveries</u>.  At Closing, Seller shall deliver the following:

(a)     <u>Deed</u>.  One (1) original of a statutory bargain and sale deed for the Hotel Unit in the form of <u>Exhibit C</u> attached hereto (the "<u>Deed</u>"), executed and acknowledged by Seller.

(b)     <u>Bill of Sale</u>.  One (1) original of a bill of sale in the form of <u>Exhibit D</u> attached hereto, executed by Seller.

(c)     <u>Omnibus Assignment and Assumption Agreement</u>.  Two (2) original counterparts of an assignment and assumption of the Occupancy Agreements, the Contracts and all other portions of the Property not included in the items set forth in 6.2(a) or (b) in the form of <u>Exhibit E</u> attached hereto (the "<u>Omnibus Assignment and Assumption Agreement</u>"), executed by Seller.

(d)     <u>Interim Beverage Agreement</u>.  The Interim Beverage Agreement, duly executed by the Liquor Licensee.

36

(e)     <u>Non-Foreign Status Affidavit</u>.  One (1) original of a non-foreign status affidavit in the form of <u>Exhibit F</u> attached hereto, as required by Section 1445 of the Internal Revenue Code, executed by the sole member of Seller.

(f)     <u>Holdback Escrow Agreement</u>. Three (3) original counterparts of the Holdback Escrow Agreement, executed by Seller.

(g)     <u>Evidence of Authority</u>.  Documentation to establish to the Title Company's reasonable satisfaction the due authorization of Seller's consummation of the Transaction, including Seller's execution of this Agreement and the Closing Documents required to be delivered by Seller.

(h)     <u>Garage Unit ROFO Assignment</u>.  If the Garage Unit ROFO has not been terminated prior to Closing, two (2) original counterparts of an assignment and assumption of the Garage Unit ROFO in the form attached hereto as <u>Exhibit I</u> (the "<u>Garage Unit ROFO Assignment</u>"), executed by Seller.

(i)     <u>Condominium Board Resignation</u>.  Evidence that the directors and officers of the Association appointed by Seller have been removed as directors and officers of the Association.

(j)     <u>Condominium Assignment</u>.  A copy of the Condominium Assignment, executed by Seller.

(k)     <u>Assignment of Indemnity Agreement</u>.  An Assignment of Indemnity Agreement in the form of <u>Exhibit M</u> attached hereto (the "<u>Assignment of Indemnity Agreement</u>"), executed by Seller and the Association.

(l)     <u>Hotel Management Agreement</u>.     Evidence of termination of the Hotel Management Agreement.

(m)     <u>REETA</u>.  A copy of the Washington State Department of Revenue Real Estate Excise Tax Affidavit (the "<u>REETA</u>"), executed by Seller.

(n)     <u>Closing Letters</u>.  Letters to each party to an Occupancy Agreement and each party to a Contract prepared by Buyer in a form reasonably approved by Seller notifying such persons of the sale of the Property, such letters to be signed by Seller and, if necessary, also by Buyer.

(o)     <u>Other Documents</u>.  An owner's affidavit in the form of <u>Exhibit G</u> attached hereto and such other documents as are legally required to record the Deed, as may be reasonably required by the Title Company to consummate the Transaction.

(p)     <u>Closing Statement</u>.  The Closing Statement, setting forth the prorations, Closing costs and other adjustments to the Purchase Price to be made pursuant to this Agreement, in a form mutually acceptable to Seller and Buyer, executed by Seller.

(q)     <u>Keys and Original Documents</u>.  Keys to all locks at the Hotel in Seller's possession and originals or, if originals are not available, copies, of all of the Submission Matters, in each case to the extent not previously delivered to Buyer.

37

SECTION 6.3.   Buyer's Closing Deliveries.   At Closing, Buyer shall deliver the following:

(a)      Purchase Price.   The Purchase Price, as adjusted for apportionments and other adjustments required under this Agreement, plus any other amounts required to be paid by Buyer at Closing.

(b)      Omnibus Assignment and Assumption Agreement.   Two (2) original counterparts of the Omnibus Assignment and Assumption Agreement, executed by Buyer.

(c)      New Franchise Agreement.   Three (3) originals of the New Franchise Agreement executed by Buyer and Franchisor, in each case, which may be delivered to Franchisor or its counsel if required by Franchisor.

(d)      Franchise Guaranty.   Two (2) originals of the Franchise Guaranty, executed by the Franchise Guarantor, which may be delivered to Franchisor or its counsel if required by Franchisor.

(e)      Union Assumption Agreement.   Three (3) original counterparts of the Union Assumption Agreement, executed by Buyer or New Manager.

(f)      Owner's Union Assumption Agreement.   One (1) original of the Owner's Union Assumption Agreement, executed by Buyer.

(g)      Holdback Escrow Agreement.   Three (3) original counterparts of the Holdback Escrow Agreement, executed by Buyer.

(h)      Evidence of Authority.   Documentation to establish to the Title Company's reasonable satisfaction the due authorization of Buyer's consummation of the Transaction, including Buyer's execution of this Agreement and the Closing Documents required to be delivered by Buyer.

(i)      Garage Unit ROFO Assignment.   If the Garage Unit ROFO has not been terminated prior to Closing, two (2) original counterparts of the Garage Unit ROFO Assignment, executed by Buyer.

(j)      Condominium Assignment.   A copy of the Condominium Assignment, executed by Buyer.

(k)      Assignment of Indemnity Agreement.   An Assignment of Indemnity Agreement, executed by Buyer.

(l)      REETA.   A copy of the REETA, executed by Buyer.

(m)      Consumer Use Tax Return.   A copy of the Washington State Department of Revenue Consumer Use Tax Return, executed by Buyer.

(n)      Other Documents.   Such other documents as may be reasonably required by the Title Company or may be agreed upon by Seller and Buyer to consummate the Transaction.

38

(o)      Interim Beverage Agreement.  The Interim Beverage Agreement duly executed by Buyer or its designee.

(p)      Closing Statement.  The Closing Statement, setting forth the prorations, Closing costs and other adjustments to the Purchase Price to be made pursuant to this Agreement, in a form mutually acceptable to Seller and Buyer, executed by Buyer.

SECTION 6.4.  Conditions to Buyer's Obligations.  Buyer's obligation to close the Transaction is conditioned on the satisfaction or waiver of all of the following on or prior to the Scheduled Closing Date:

(a)      Representations True.  All Seller's Warranties, as the same may be deemed modified as provided in Section 7.3, shall be true and correct in all material respects (subject to modification or waiver as set forth in Section 7.3) on and as of the Scheduled Closing Date, as if made on and as of such date except to the extent that they expressly relate to an earlier date and except as provided otherwise in Section 7.3.

(b)      Title Conditions Satisfied.  The Title Company shall be irrevocably committed to issue the Owner's Title Policy to Buyer.

(c)      Seller's Deliveries Complete.  Seller shall have delivered all of the documents and other items required pursuant to Section 6.2 and shall have performed in all material respects all other material obligations to be performed by Seller at or prior to Closing, except as provided otherwise in this Agreement.

SECTION 6.5.  Conditions to Seller's Obligations.  Seller's obligation to close the Transaction is conditioned on the satisfaction or waiver of all of the following on or prior to the Scheduled Closing Date:

(a)      Representations True.  All representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Scheduled Closing Date, as if made on and as of such date except to the extent that they expressly relate to an earlier date.

(b)      Buyer's Deliveries Complete.  Buyer shall have timely delivered the funds required under this Agreement and all of the documents to be executed by Buyer set forth in Section 6.3 and Section 8.7 and shall have performed all other material obligations to be performed by Buyer at or prior to Closing, except as provided otherwise in this Agreement.

(c)      New Franchise Agreement.  Buyer and Franchisor shall have entered into the New Franchise Agreement and in connection therewith, the Franchise Agreement shall have been terminated and Seller shall have been released from any obligations arising or accruing after the date of termination of the Franchise Agreement.

(d)      Franchise Guaranty.  Franchise Guarantor shall have entered into the Franchise Guaranty.

39

SECTION 6.6.  Waiver of Failure of Conditions Precedent.  At any time on or before the Scheduled Closing Date (as the same may be extended pursuant to the terms of this Agreement), Seller or Buyer may elect in writing to waive the benefit of any condition to its obligations hereunder.  By closing the Transaction, Seller and Buyer shall be conclusively deemed to have waived the benefit of any remaining unsatisfied conditions set forth in this Article 6.  If any of the conditions precedent to Buyer's obligation to close the Transaction set forth in Section 6.4 are neither waived nor satisfied on the Scheduled Closing Date (as the same may be extended pursuant to the terms of this Agreement), Buyer may elect to terminate this Agreement and the Deposit shall be returned to Buyer, and thereafter neither party shall have any further rights or obligations hereunder except for obligations that expressly survive termination of this Agreement.  If any of the conditions precedent to Seller's obligation to close the Transaction set forth in Section 6.5 are neither waived nor satisfied on the Scheduled Closing Date (as the same may be extended pursuant to the terms of this Agreement), Seller may elect to terminate this Agreement and the Deposit shall be immediately paid to and retained by Seller without any notice to or consent, approval or agreement of Buyer and notwithstanding any contrary instructions from Buyer, and thereafter neither party shall have any further rights or obligations hereunder except for obligations that expressly survive the termination of this Agreement.   The foregoing shall not limit either party's remedies under Article 9 if the failure of any of the conditions precedent set forth in Section 6.4 or Section 6.5 is the result of a default by the other party.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES

SECTION 7.1.  Buyer's Representations.  Buyer represents and warrants to Seller as follows:

(a)       Buyer's Authorization; Non-Contravention.  Buyer (i) is duly organized (or formed), validly existing and in good standing under the Laws of its State of organization and, to the extent required by applicable Laws, registered to transact business in the State in which the Property is located, and (ii) is authorized to execute this Agreement and consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Buyer and such instruments, obligations and actions are valid and legally binding upon Buyer, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The execution and delivery of this Agreement and all Closing Documents to be executed by Buyer and the performance of the obligations of Buyer hereunder or thereunder will not to Buyer's Knowledge, (w) result in the violation of any Law or any provision of Buyer's organizational documents, (x) conflict with any order of any court or governmental instrumentality binding upon Buyer, (y)  result in any default under, any contract, agreement or commitment to which Buyer is bound, or (z) require the approval, consent or action of, waiver or filing with, or notice to, any third party, including but not limited to, any governmental bodies, agencies or instrumentalities, except as have been obtained or will be obtained on or prior to the Closing Date.

40

(b)    Buyer's Financial Condition.  No petition has been filed by or against Buyer under the Federal Bankruptcy Code or any similar Laws.  Buyer has adequate capital to perform all of its obligations under this Agreement and the Closing Documents.

(c)    OFAC; Patriot Act.  Neither Buyer nor any of Buyer's affiliates, nor, to Buyer's Knowledge, any of their respective brokers or other agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (i) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each a "Prohibited Person") (which lists can be accessed at the following web address:  http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

(d)    No Financing Contingency.  The Transaction is not subject to any financing contingency and no financing for the Transaction shall be provided by Seller.  Buyer has or will have at the Closing sufficient cash or other sources of immediately good funds to enable it to make payment of the Adjusted Purchase Price Balance and any other amounts to be paid by it hereunder.

(e)    Franchise Agreement.  Buyer: (i) is operationally capable of performing the duties and obligations of "Franchisee" under the Franchise Agreement; (ii) has the authority to submit the Franchise Application and enter into the New Franchise Agreement and neither the Franchise Application nor the execution of the New Franchise Agreement will conflict with any obligations of Buyer to other parties; (iii) has not and will not obtain, receive, transfer or provide any funds, property, debt, equity or other financing related to the New Franchise Agreement and the Hotel to/from a Person that qualifies as a Sanctioned Person or, to Buyer's actual or constructive knowledge, is otherwise the target of any applicable Trade Restrictions (as such terms are defined in the Franchise Agreement); (iv) is familiar with the provisions of applicable Anti-Corruption Laws (as such term is defined in the Franchise Agreement) and shall comply with applicable Anti-Corruption Laws in performance of its obligations under or in connection with the New Franchise Agreement; (v) has not received any funds or been paid in connection with entry into or performance of the New Franchise Agreement and will not derive from or commingle with the proceeds of any activities that are proscribed and punishable under the criminal laws of the United States, and Buyer is not engaging in the transaction in furtherance of a criminal act, including acts in violation of applicable Anti-Corruption Laws; and (vi) has not, in preparation for and in entering

41

into the New Franchise Agreement, made any Improper Payment (as such term is defined in the Franchise Agreement) or engaged in any acts or transactions otherwise in violation of any applicable Anti-Corruption Laws, and, in connection with the New Franchise Agreement or the performance of Buyer's obligations under the New Franchise Agreement, will not directly or indirectly make, offer to make, or authorize any Improper Payment or engage in any acts or transactions otherwise in violation of any applicable Anti-Corruption Laws. Neither Buyer (including Buyer's directors and officers, senior management and shareholders (or other Persons) having a controlling interest in Buyer, nor any Controlling Affiliate (as such term is defined in the Franchise Agreement) of Buyer, (x) is owned or controlled by, or acting on behalf of, a Sanctioned Person or, to Buyer's actual knowledge, otherwise the target of Trade Restrictions, or (y) is a Competitor (as such term is defined in the Franchise Agreement).

(f)      <u>ERISA</u>.  Buyer is not, and is not acting on behalf of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), or (iii) an entity deemed to hold "plan assets" of any of the foregoing within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.  To Buyer's Knowledge, none of the transactions contemplated by this Agreement are in violation of any state statutes applicable to Buyer regulating investments of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

(g)      <u>Survival</u>.  Buyer's representations and warranties in this <u>Section 7.1</u> shall survive Closing and not be merged into the Deed.

SECTION 7.2.  <u>Seller's Representations</u>.  Seller represents and warrants to Buyer, as of the Effective Date, as follows:

(a)      <u>Seller's Authorization; Non-Contravention</u>.      Seller (i) is duly organized (or formed), validly existing and in good standing under the Laws of its State of organization and, to the extent required by applicable Laws, registered to transact business in the State in which the Property is located, and (ii) is authorized to execute this Agreement and consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Seller and such instruments, obligations and actions are valid and legally binding upon Seller, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The execution and delivery of this Agreement and all Closing Documents to be executed by Seller and the performance of the obligations of Seller hereunder or thereunder will not (w) result in the violation of any provision of Seller's organizational documents or, to Seller's Knowledge, any Law, (x) conflict with any order of any court or governmental instrumentality binding upon Seller, (y) to Seller's Knowledge, result in any default under, any contract, agreement or commitment to which Seller is bound, or (z) require the approval, consent or action of, waiver or filing with, or notice to, any third party, including but not limited to, any governmental bodies, agencies or instrumentalities, except as have been obtained or will be obtained on or prior to the Closing Date.

(b)      Seller's Financial Condition.  No petition has been filed by Seller, nor has Seller received written notice of any petition filed against Seller under the Federal Bankruptcy Code or any similar Laws.

(c)      OFAC; Patriot Act.  Neither Seller nor any of Seller's affiliates, nor, to Seller's Knowledge, any of their respective brokers or other agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (i) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

(d)      Litigation.   Except as set forth on Schedule 7.2(d), Seller's Designated Representative has not received any written notice of any current or pending litigation against Seller or the Hotel (including any condemnation proceedings) that could, in the reasonable judgment of Seller, materially and adversely affect the Hotel.

(e)      Contracts.  Except as set forth on Exhibit P, Seller has not entered into or assumed any service or maintenance agreements affecting the Hotel that will be binding upon Buyer after the Closing and that cannot be terminated without penalty and on thirty (30) days prior notice or less, other than the Contracts and the Franchise Agreement.  Seller's Designated Representative has not received written notice of any default under the Contracts which has not been cured.

(f)      Compliance with Law.  Except as set forth on Schedule 7.2(f), Seller's Designated Representative has not received, and has no knowledge of Seller receiving, any written notice from any governmental authority of any material violation of any Law applicable to the Hotel that has not been corrected or if it were to remain uncorrected could, in the reasonable judgment of Seller, materially and adversely affect the Hotel.

(g)      Personal Property.  Seller owns the Personal Property, other than any Leased Personal Property, and at Closing the Personal Property will be free of all liens and encumbrances, other than the Permitted Exceptions.

(h)      Franchise Agreement.  The Submission Matters contain a true and correct copy of the Franchise Agreement.

43

(i)      Financial Statements.  Seller has provided to Buyer a copy of the three most recent profit and loss statements with respect to the Hotel that were provided to Seller by Hotel Manager.

(j)      Union Agreement; Employees.  To Seller's Knowledge, the Submission Matters contain a true and correct copy of the Union Agreement and the Owner Agreement.

(i)      Seller has no Employees and to Seller's Knowledge, no individuals are employed at the Hotel other than employees of the Hotel Manager.

(ii)      Since September 1, 2019, to Seller's Knowledge, neither Hotel Manager nor Seller has given or received any written notice of any breach or default under the Union Agreement and Seller's Designated Representative has not received written notice of any breach or default sent by Hotel Manager under the Union Agreement.

(iii)      To Seller's Knowledge, except for the Union Agreement, there are no labor or collective bargaining agreements with any labor organization affecting the Hotel.

(iv)      To Seller's Knowledge, except as set forth or required by the Union Agreement, since September 1, 2019, no petition has been filed, nor has any proceeding been instituted by any employee or group of employees with any labor relations board or commission seeking recognition of a collective bargaining representative other than the Union; to Seller's Knowledge, except as set forth or required by the Union Agreement there is no organizational effort currently being made or threatened by or on behalf of any labor organization or trade union to organize any Hotel Employees, other than the Union; and to Seller's Knowledge, except as set forth or required by the Union no demand for recognition of any Hotel Employees has been made by or on behalf of any labor organization or trade union, other than the Union.

(v)      To Seller's Knowledge, since September 1, 2019, Hotel Manager has not effectuated a "plant closing" (as defined in the WARN Act or any other similar Law) affecting the Property and a "mass layoff" (as defined in the WARN Act or any other similar Law) affecting the Hotel has not occurred. To Seller's Knowledge, none of the current Hotel Employees nor any other individual that had been employed by Hotel Manager in connection with the Hotel has suffered an "employment loss" (as defined in the WARN Act or any other similar Law) during the six (6) month period prior to the date hereof which could, in the reasonable judgment of Seller, materially and adversely affect the Hotel.

(vi)      Except as set forth on Schedule 7.2(j), neither Seller nor to Seller's Knowledge Hotel Manager has experienced any strikes, union grievances (except any which, individually or in the aggregate, would not have a material adverse effect), or the filing of unfair labor practice charges with the National Labor Relations Board (except any which, individually or in the aggregate, would not have a material adverse effect) with respect to the Hotel on or after September 1, 2018.

(vii)      To Seller's Knowledge, Hotel Manager is not in default under the Hotel Management Agreement.

44

(k)      Licenses and Permits.  Except as set forth on Schedule 7.2(k), Seller's Designated Representative has not received any written notice from any governmental authority of any violation of any Licenses and Permits that has not been cured if such failure to cure would have a material adverse effect on the operation and value of the Property.

(l)      Hazardous Materials.   To Seller's Knowledge, except as disclosed in any environmental reports, materials or other documents made available to Buyer (including the Indemnity Agreement), Seller's Designated Representative has not received any written notice from any governmental authority that there has been a release of any hazardous materials on the Property in violation of any Laws regulating the release or disposal of hazardous materials.

(m)      Occupancy Agreements.  Except for the existing Occupancy Agreements listed on Exhibit O or that are permitted by this Agreement, Seller has not entered into any other written agreements for the use and occupancy of the Property, excluding any Bookings or agreements with Hotel guests. (i) the copies of the Occupancy Agreements heretofore delivered or otherwise made available to Buyer by or on behalf of Seller are true, correct and complete in all material respects; and (ii) (A) Seller has not received any written notice from any party under an Occupancy Agreement that Seller is in default in any material respect of any material obligations of Seller to such party under such Occupancy Agreement which default has not been cured, (B) Seller has not delivered any written notice to any party under an Occupancy Agreement that such party is in default in any material respect of any material obligations of such party under such Occupancy Agreement which default has not been cured, (C) no tenant under an Occupancy Agreement has paid rent more than one month in advance, (D) there are no unpaid commissions currently due any broker in connection with any Occupancy Agreement, or that may be due to any broker from and after the Effective Date in connection with any Occupancy Agreement, and (E) to Seller's knowledge, no event has occurred or circumstance exists which, with notice or the passage of time, would result in a breach or default by Seller or the other party thereunder under any Occupancy Agreement.

(n)      ERISA.  Seller is not, and is not acting on behalf of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code, or (iii) an entity deemed to hold "plan assets" of any of the foregoing within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.  To Seller's Knowledge, none of the transactions contemplated by this Agreement are in violation of any state statutes applicable to Seller regulating investments of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

(o)      FIRPTA.  None of the entities comprising Seller is a "foreign person" as defined in the Internal Revenue Code, and as contemplated by the Foreign Investments in Real Property Tax Act (96 Stat. 2682), as amended by the Deficit Reduction Act of 1984.

(p)      Condemnation.  As of the date hereof, Seller has not been served with written notice of any pending or threatened condemnation actions with respect to the Property, or any part thereof.

(q)     Liquor License.  To Seller's Knowledge, the Liquor License has been issued to Hotel Manager and has not been suspended, cancelled, revoked, or terminated.

(r)     Taxes.  To Seller's Knowledge, all sales and use taxes, hotel/motel occupancy taxes, personal property taxes and employer withholding taxes related to the Employees that are due and payable with respect to the Hotel or will be due and payable as of the Closing Date (or which accrue with respect to or are applicable to any period prior to the Cut-Off Time) have been paid or will be paid by Seller in full on or prior to the Closing Date, and all required reports and returns relating thereto have been, or will be, timely filed.  Except as set forth on Schedule 7.2(q), Seller's Representative  has not received written notice from any governmental entity of any audit by such governmental entity of the sales and use taxes, hotel/motel occupancy taxes, personal property taxes, real property taxes and employer withholding taxes related to the Employees with respect to the Hotel which audit has not been completed.  Except as set forth on Schedule 7.2(q), to Seller's Knowledge there are no certiorari proceedings with respect to taxes that have been filed by or on behalf of Seller with respect to the Property that remain pending as of the Effective Date.

SECTION 7.3.  General Provisions.

(a)     Seller's Warranties Deemed Modified.  To the extent that Buyer is deemed to know prior to the Effective Date or Closing Date that any of Seller's Warranties are inaccurate, untrue or incorrect in any way, such Seller's Warranties shall be deemed modified to reflect Buyer's deemed knowledge.

(b)     Breach of Warranties prior to Closing.  If prior to Closing, Buyer obtains actual knowledge that any of Seller's Warranties are untrue, inaccurate or incorrect in any material respect, Buyer shall give Seller written notice thereof within five (5) Business Days of obtaining such knowledge (but, in any event, prior to the Scheduled Closing Date).  If any of Seller's Warranties is untrue, inaccurate or incorrect and Buyer has provided written notice thereof within such five (5) Business Day period, Seller shall have the right to cure such untruth, inaccuracy or incorrectness and shall be entitled to a reasonable extension of the Scheduled Closing Date for purposes of such cure, not to exceed thirty (30) days.  If Seller is unable to so cure such untruth, inaccuracy or incorrectness of Seller's Warranties, then Buyer, as its sole remedy, shall either (i) subject to the last sentence of this Section 7.3(b), proceed to Closing and consummate the Transaction (in which event Buyer shall not be deemed to have waived such misrepresentation or breach, but rather shall have the right to bring a claim or action against Seller for same post-Closing subject to the Cap Amount), or (ii) if Buyer's aggregate damages resulting from such untruth, inaccuracy or incorrectness of Seller's Warranties exceed the Cap Amount, terminate this Agreement by written notice to Seller, in which event the Deposit shall be immediately returned to Buyer in accordance with Section 9.2. Actual damages for any untruth, inaccuracy or incorrectness of Seller's Warranties shall only be recoverable for all purposes under this Agreement if Buyer's aggregate damages resulting from such untruth, inaccuracy or incorrectness of Seller's Warranties are reasonably estimated to exceed Fifty Thousand Dollars ($50,000) (the "Floor Amount").  If any of Seller's Warranties are untrue, inaccurate or incorrect but are not, in the aggregate, untrue, inaccurate or incorrect to an extent that Buyer's damages exceed the Floor Amount, Buyer shall be deemed to have waived such untruth, inaccuracy or incorrectness, and

46

Buyer shall be required to consummate the Transaction without any reduction of or credit against the Purchase Price or right to recover actual damages after the Closing.

(c)     <u>Survival; Limitation on Seller's Liability</u>.  Seller's Warranties shall survive Closing and not be merged into the Deed for a period of six (6) months (such six (6) month period, the "<u>Survival Period</u>") (other than Seller's Warranties set forth in <u>Section 7.2(a)</u>-<u>(c)</u>, which shall survive Closing for a period of twenty four (24) months), and Seller shall only be liable to Buyer for a material untruth, inaccuracy or incorrectness of a Seller's Warranty with respect to which (i) Seller receives a written notice of a claim from Buyer on or before the expiration of the Survival Period, and (ii) Buyer has commenced an action in a court of competent jurisdiction on or before the date that is thirty (30) days following the expiration of the Survival Period.  For the avoidance of doubt, Seller's liability for Seller's Warranties is subject to the terms of <u>Section 4.5</u>.  Notwithstanding anything in this Agreement to the contrary, however, if Closing occurs, Buyer hereby expressly waives, relinquishes and releases any rights or remedies available to it at law, in equity, under this Agreement or otherwise, including any claim against Seller for damages that Buyer may incur, as the result of any of Seller's Warranties being untrue, inaccurate or incorrect if (a) Buyer is deemed to know that any Seller's Warranties were untrue, inaccurate or incorrect at the time of Closing, and such Seller's Warranties shall be deemed modified or qualified to reflect such knowledge, or (b) the untruth, inaccuracy or incorrectness of such Seller's Warranties is not material.  Notwithstanding anything in this Agreement to the contrary, however, if Closing occurs, Seller hereby expressly waives, relinquishes and releases any rights or remedies available to it at law, in equity, under this Agreement or otherwise, including any claim against Buyer for damages that Seller may incur, as the result of any of Buyer's Warranties being untrue, inaccurate or incorrect if (a) Seller is deemed to know that any Buyer's Warranties were untrue, inaccurate or incorrect at the time of Closing, and such Buyer's Warranties shall be deemed modified or qualified to reflect such knowledge, or (b) the untruth, inaccuracy or incorrectness of such Buyer's Warranties is not material.

(d)     <u>Survival</u>.  The provisions of this <u>Section 7.3</u> shall survive Closing (and not be merged into the Deed) or any earlier termination of this Agreement.

## ARTICLE 8
## COVENANTS

SECTION 8.1.  <u>Contracts, Maintenance of Property; Operation of Hotel</u>.  Seller covenants to Buyer that, from and after the Effective Date until the Closing or earlier termination of this Agreement (unless otherwise specified below):

(a)     Seller shall (i) exercise commercially reasonable efforts to cause Hotel Manager to operate and maintain the Hotel in the Ordinary Course, including entering into Contracts, Occupancy Agreements and Bookings in the Ordinary Course, including performing maintenance and repairs in the Ordinary Course, subject to any casualty or condemnation or other events beyond Seller's reasonable control, and (ii) maintain or use commercially reasonable efforts to cause to be maintained the current insurance policies relating to the Hotel.  Buyer shall assume and honor all Contracts, Occupancy Agreements and Bookings for periods of time on or after the Closing.  Seller shall not remove any of the Personal Property (other than Consumables, which are addressed in the next sentence) from the Hotel, unless such removal is in the Ordinary Course and is replaced

47

with like items that are of equal or better quality and condition.  Seller shall maintain the Consumables in the Ordinary Course.  Seller shall cooperate with Buyer in all reasonable respects (including by executing and delivering necessary applications and other documents) to facilitate the transfer of the Licenses and Permits or the issuance of replacement Licenses and Permits, provided that Closing shall not be delayed if any such License or Permit is not transferred or replaced as of the Closing Date, it being agreed that Buyer bears the risk of not receiving all necessary Licenses and Permits or other approvals from governmental authorities prior to the Closing Date.

(b)       Except for Bookings, Occupancy Agreements and Contracts that are entered into in the Ordinary Course, Seller shall not (i) enter into, terminate, surrender, modify or renew any Occupancy Agreement or Contract, in each case, that will be binding on Buyer after Closing and that cannot be terminated without penalty and on thirty (30) days' prior notice or less without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Seller may terminate any Occupancy Agreement or Contract following a material default by the other party to such Occupancy Agreement or Contract without prior notice to or consent of Buyer, or (ii) except to the extent required by Law, for reasonable life safety concerns or as required or contemplated under the Hotel Management Agreement, the Condominium Documents or the Franchise Agreement, perform any capital improvements or material alterations to the Hotel that are not provided for in the Franchise Agreement without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Seller may request Buyer's consent to any of the foregoing to the extent that Buyer's consent is required and if Buyer fails to object to such request within five (5) Business Days after receipt thereof (which objection shall include a description of the reasons for Buyer's objection), then Buyer shall be deemed to have consented to the same.

(c)       Seller shall have no obligation to perform or complete any capital improvements at the Hotel except to the extent required by Law, and the failure to complete any capital improvement at the Hotel shall not constitute the failure of any condition precedent to Buyer's obligation to close hereunder, and Buyer shall have no right to terminate this Agreement as a result thereof or receive a refund of the Deposit as a result thereof.  Seller shall have the right to perform any capital improvements at the Hotel that may be required to comply with the brand standards of Franchisor.

(d)       Seller shall use commercially reasonable efforts to preserve in force all existing Licenses and Permits that are transferable to Buyer and to cause all those expiring to be renewed prior to the Closing Date.  If any such License or Permit shall be suspended or revoked, Seller shall promptly notify Buyer and shall use commercially reasonable efforts to cause the reinstatement of such License or Permit; provided, however, that such suspension or revocation shall not constitute a default by Seller under Section 9.2 or any other provision of this Agreement; provided, further, that if a material License or Permit (excluding any permit that Buyer or New Manager is required to obtain) that is transferable to Buyer is suspended or revoked prior to the Closing, the Closing Date shall be extended to provide sufficient time for Seller to cause such material License or Permit to be reinstated, and if such material License or Permit is not reinstated prior to the date that is four (4) months after the Scheduled Closing Date, Buyer shall have the right to terminate this Agreement by written notice to Seller and receive a refund of the Deposit.

48

To the extent that the consent of any authority is required with respect to the transfer of any Licenses and Permits to Buyer or Buyer's designees, Seller shall reasonably cooperate with Buyer and Buyer's designee in seeking and obtaining any such required consents.

(e)     Seller shall request that the Garage Unit Owner provide Buyer with an estoppel certificate in the form required by the Parking Agreement, provided that such estoppel certificate shall not be a condition to Buyer's obligation to close the Transaction.

SECTION 8.2.   Brokers.   Seller and Buyer expressly acknowledge that, other than Seller's Broker, no party has acted as the broker with respect to the Transaction and with respect to this Agreement.   Seller shall be responsible for the brokerage fees or commissions of Seller's Broker pursuant to the terms of a separate agreement between Seller and Seller's Broker.   Seller agrees to hold Buyer harmless and indemnify Buyer from and against any and all Liabilities (including out-of-pocket reasonable attorneys' fees, expenses and disbursements) actually suffered or incurred by Buyer as a result of any claims by Seller's Broker or any other party claiming to have represented Seller as broker in connection with the Transaction.   Buyer agrees to hold Seller harmless and indemnify Seller and the Seller Parties from and against any and all Liabilities (including reasonable out-of-pocket attorneys' fees, expenses and disbursements) actually suffered or incurred by Seller as a result of any claims by any party claiming to have represented Buyer as broker in connection with the Transaction.   The provisions of this Section 8.2 shall survive Closing (and not be merged into the Deed) or the earlier termination of this Agreement.

SECTION 8.3.   Publicity.   Seller and Buyer each hereby covenant and agree that (a) prior to the Closing, neither Seller nor Buyer (nor any affiliate thereof) shall issue any press release or similar public statement with respect to the Transaction or this Agreement (a "Press Release") without the prior consent of the other, which consent may be granted or withheld in such party's sole discretion, except to the extent required by applicable Law or the rules of any stock exchange, and (b) after the Closing, any Press Release issued by either Seller or Buyer shall be subject to the review and approval of both parties (which approval shall not be unreasonably withheld and such response shall be provided within two (2) Business Days after submission of a draft of the Press Release to the other party for review), except to the extent required by applicable Law.   If either Seller or Buyer is required by applicable Law to issue a Press Release, such party shall, at least two (2) Business Days prior to the issuance of the same, deliver a copy of the proposed Press Release to the other party for its review.   Buyer acknowledges that any such Press Release shall not disclose the identity of any affiliate, member or direct or indirect owner of Seller or any beneficial interest in Seller.   Notwithstanding anything to the contrary contained in this Agreement, the failure of Seller to comply with the terms of this Section 8.3 shall not provide Buyer with a right to terminate this Agreement under Section 9.2 or any other provision of this Agreement. The provisions of this Section 8.3 shall survive Closing (and not be merged into the Deed) or the earlier termination of this Agreement.

SECTION 8.4.   Confidentiality.

(a)     Each party shall hold, and shall use commercially reasonable efforts to cause the other Buyer's Agents or Seller Parties, as applicable, and any prospective investors in or lenders to Buyer or Seller, as applicable, to hold in strict confidence and not disclose to any other person, without in each case the prior written consent of the other party: (i) the existence and the terms of

49

this Agreement, (ii) all information related to or connected with the Property, the Seller Parties or Buyer, as applicable, and the Transaction; provided that in no event shall either party disclose the identity of any affiliate, member or direct or indirect owner of any beneficial interest in the other party without the prior written consent of such party, which may be withheld in such party's sole discretion, and (iii) the identity of any direct or indirect owner of any beneficial interest in the other party.  If the Closing does not occur or this Agreement is terminated, Buyer shall promptly return to Seller all copies of documents delivered by Seller containing any of such information without retaining any copy thereof or extract therefrom.  Notwithstanding the foregoing, either party may disclose such information (A) on a need-to-know basis to its employees, agents, consultants, potential lenders, joint venture partners or investors and members of professional firms serving it or potential lenders, joint venture partners or investors required to perform such party's obligations or exercise such party's rights under the Agreement, so long as any such parties agree to keep such information confidential in accordance with the terms of this <u>Section 8.4</u> and that certain confidentiality agreement dated as of September 30, 2019 by and between Seller and Buyer (the "<u>Confidentiality Agreement</u>"); or (B) as any governmental agency may require in order to comply with applicable Laws or a court order, so long as such party provides the other party with prior notice of any such required disclosure and cooperates with the other party to exercise commercially reasonable efforts to maintain the confidentiality of such information, or (C) to the extent that such information is a matter of public record, other than as a result of a breach of such party's obligations under this <u>Section 8.4</u>.  Buyer hereby agrees to indemnify, defend, and hold each of the Seller Parties free and harmless from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) arising out of or resulting from Buyer's breach of the terms of this <u>Section 8.4</u> and the Confidentiality Agreement. Seller hereby agrees to indemnify, defend and hold Buyer free and harmless from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) arising out of or resulting from Seller's breach of the terms of this <u>Section 8.4</u> and the Confidentiality Agreement.

(b)     The provisions of this <u>Section 8.4</u> shall survive Closing (and not be merged into the Deed) or earlier termination of this Agreement.

SECTION 8.5.  <u>Franchise Agreement</u>.

(a)     Prior to the Effective Date, Buyer submitted to Franchisor an application for a franchise (the "<u>Franchise Application</u>") required to obtain Franchisor's approval of a new franchise agreement between Buyer and Franchisor and all ancillary forms required by Franchisor (the "<u>New Franchise Agreement</u>") and a termination of the Franchise Agreement, at no cost or expense to Seller.  In connection with the Franchise Application and the New Franchise Agreement Buyer shall (i) exercise diligence in providing Franchisor with all information regarding Buyer and Buyer's proposed hotel manager that is requested by Franchisor, including reaffirming the accuracy of Buyer's Warranties contained in this Agreement; (ii) retain a hotel manager that is approved by Franchisor and otherwise meets the requirements of <u>Section 7</u> of the Franchise Agreement; (iii) pay to Franchisor Franchisor's current application fee; (iv) if required by Franchisor, provide a guarantor (the "<u>Franchise Guarantor</u>") that is acceptable to Franchisor to execute a guaranty for the obligations of Franchisee under the Franchise Agreement (the "<u>Franchise Guaranty</u>") that satisfies the requirements of Franchisor; (v) complete any property improvement plan that Franchisor

50

requires as a condition to the New Franchise Agreement and that is approved by Seller (such approval not to be unreasonably withheld, conditioned or delayed) (the "Required PIP"); and (vi) reimburse Seller for any property improvement plan inspection fees charged by Franchisor in connection with the New Franchise Agreement (filing the Franchise Application and complying with items (i)-(vi) in the foregoing sentence are collectively referred to as the "Hilton Requirements"). Buyer shall use commercially reasonable diligent efforts to obtain Franchisor's approval of the Franchise Application and the New Franchise Agreement. The failure of Buyer to comply with the Hilton Requirements shall not provide Buyer with the right to terminate this Agreement or receive a refund of the Deposit. If Buyer and Franchisor fail to enter into a New Franchise Agreement prior to the Closing Date, Seller shall have the right to terminate this Agreement and Escrow Agent shall release the Deposit to Seller immediately upon Seller's request, notwithstanding any contrary instructions from Buyer.

(b)     Notwithstanding the foregoing, Buyer shall use commercially reasonable efforts to cause a project management firm selected by Buyer and reasonably approved by Seller to provide a pricing estimate for the Required PIP (the "PIP Estimate") in a written report to Buyer and Seller prior to the Closing Date. If the aggregate estimated costs in the first twelve (12) months following the Closing Date for the Required PIP are greater than Two Million Dollars ($2,000,000)( the amount of estimated costs over Two Million Dollars ($2,000,000) being the "Excess PIP Costs"), then, by the earlier of (i) three (3) Business Days after receipt of the PIP Estimate or (ii) Two Business Days immediately preceding the Closing Date, Seller shall have the right to elect to fund one hundred percent (100%) of the Excess PIP Costs into escrow pursuant to Section 4.5(d) by written notice to Buyer. If Seller does not elect to fund the Excess PIP Costs by written notice to Buyer by the earlier of (i) three (3) Business Days after receipt of the PIP Estimate or (ii) Two Business Days immediately preceding the Closing Date, Buyer shall have the right to terminate this Agreement by written notice to Seller (a "PIP Termination Notice"), promptly after which the Deposit shall be returned to Buyer..

SECTION 8.6.  Intentionally Deleted.

SECTION 8.7.  Employees.

(a)     Buyer shall, or cause its replacement Hotel manager ("New Manager") to, subject to the requirements in Section 8.7(e)(i), extend offers to hire effective at and upon Closing, all of the Bargaining Unit Employees and a sufficient number of additional Hotel Employees on terms and conditions sufficient to comply with Union Agreement and to not require the Hotel Manager or Seller to provide any WARN Act notice (except for executive staff that are retained or relocated by Hotel Manager) ("Rehired Employees") so that Seller and Hotel Manager shall not be required to give any layoff, closing or other termination notices or otherwise incur any liability pursuant to the provisions of the Union Agreement, the Owner Agreement, the WARN Act or any other similar Laws or policies. Buyer further agrees that the Bargaining Unit Employees shall be offered employment in accordance with Sections 8.7(e), (f) and (g) below. Buyer shall not terminate or cause or permit New Manager to terminate any Rehired Employees for at least ninety (90) days after the Closing Date if any such termination would reasonably be expected to result in liability to Seller or Hotel Manager pursuant to the provisions of the Union Agreement, the Owner Agreement, the Hotel Management Agreement, the WARN Act or any other similar Laws.

(b)     Before the Cut-Off Time, Seller shall be solely responsible for complying or causing compliance with all applicable Laws relating to Employees including compliance with any applicable provisions of the WARN Act, the Owner Agreement and the Union Agreement. Seller shall indemnify, defend and hold Buyer and the Buyer Parties harmless from and against any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and costs) arising in connection with any Employee Liabilities arising out of events occurring before the Cut-Off Time (including, without limitation, any WARN Act claim brought by or on behalf of any Employee or Employees or the Union and any liability for accrued vacation, paid time off, severance, and/or other wage or benefit payments). After the Cut-Off Time, Buyer shall be solely responsible for complying or causing compliance with all applicable Laws relating to Employees, including Buyer's covenants set forth in this Section 8.7, including compliance with any applicable provisions of the WARN Act, ERISA, the Owner Agreement and the Union Agreement. Except to the extent prorated among the parties hereto in accordance with Article 5, Buyer shall indemnify, defend and hold Seller and the Seller Parties harmless from and against any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and costs) arising in connection with (i) any Employee Liabilities arising out of events occurring after the Cut-Off Time (including, without limitation, any WARN Act claim brought by or on behalf of any Employee or Employees or the Union and any liability for accrued vacation, paid time off, severance, and/or other wage or benefit payments), and (ii) any failure by Buyer to comply with the terms of this Section 8.7. Nothing in the subsection (b) or elsewhere in this Agreement shall be deemed to apply to withdrawal liability (as defined below), which shall be governed solely by subsection (f) of this Section 8.7.

(c)     Nothing contained in this Section 8.7 or otherwise in this Agreement shall be deemed to (i) create a joint employer relationship between Buyer, Hotel Manager or Seller and any employer of any Employees, (ii) serve as evidence of a joint employer relationship or (iii) otherwise create or act as evidence of an employer/employee relationship between Buyer or Seller and any Employees.

(d)     During the period prior to Closing, the parties agree to reasonably cooperate and to consult on a regular basis and coordinate their activities relating to employee matters so as to facilitate a smooth transition of Property operations and the continued proper performance by the Employees of their respective duties up to Closing.

(e)     Without limiting any other provisions of this Section 8.7, at Closing (i) Buyer or New Manager shall offer to retain all Bargaining Unit Employees, and if they accept such offers, their employment will continue uninterrupted without loss of seniority, compensation, benefits or other terms and conditions of employment subject to the Union Agreement, if applicable, and applicable Law, and (ii) Buyer shall (a) cause New Manager to execute an assumption agreement substantially in the form attached as Exhibit K (the "Union Assumption Agreement"), and (b) execute an assumption agreement in the form attached hereto as Exhibit L (the "Owner's Union Assumption Agreement"). Buyer and Seller agree to not unreasonably withhold, condition or delay any changes to the form of Union Assumption Agreement requested by Hotel Manager or New Manager, provided that Seller shall have the right to terminate this Agreement if the New Manager does not agree to structure the Union Assumption Agreement as a Manager 4204 Transaction (as defined below) or does not agree to the provisions in the form of Union

52

Assumption Agreement designed to implement the Manager 4204 Transaction by delivering written notice to Buyer and Escrow Agent, and if, Seller elects to terminate this Agreement for that reason, (1) the Deposit shall be promptly returned to Buyer and (2) provided that Buyer has exercised commercially reasonable efforts to cause New Manager to implement the Manager 4204 Transaction, Seller shall reimburse Buyer for all actual, out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement in an amount not to exceed Two Hundred Thousand Dollars ($200,000). In addition, Buyer and Seller acknowledge that the Union Agreement and the Owner Agreement require advance written notice of any transaction that is subject to the successorship provisions of the Union Agreement or the Owner Agreement. Seller shall have the right to send or to cause Hotel Manager to send notice to the Union in the form required by the Union Agreement (the "Union Notice") prior to the Closing, which shall include the identity of the New Manager, together with copies of the Union Assumption Agreement and the Owner's Union Assumption Agreement.

(f)     Seller represents that Seller is not currently an "employer" with respect to the Hotel and Employees for purposes of Title IV of ERISA.  The "employer" with respect to the Property and Employees for purposes of Title IV of ERISA is the Hotel Manager.  Under the Union Agreement, Hotel Manager currently contributes amounts to the UNITE HERE Northwest Pension Trust (the "Union Pension Plan") with respect to Employees.  Seller represents that with respect to the Hotel Employees neither Seller nor to Seller's Knowledge Hotel Manager (nor their respective affiliates) has contributed to or has any direct liability under any multiemployer plans subject to Title IV of ERISA other than the Union Pension Plan.  Based on the foregoing, the parties agree as follows:

(i)     The parties agree to exercise commercially reasonable efforts to cause their respective Hotel managers to enter into a transaction that would satisfy the sale of assets exception under ERISA Section 4204 so that the transactions contemplated in this Agreement will not result in a complete or partial withdrawal of Hotel Manager from the Union Pension Plan for purposes of Title IV of ERISA ("Manager 4204 Transaction"). If Hotel Manager and New Manager engage in a Manager 4204 Transaction, Buyer shall cause the New Manager to provide written notice of the Manager 4204 Transaction to the Union Pension Plan not less than thirty (30) days prior to the end of the Union Pension Plan's plan year in which the Closing incurs.

(ii)     Seller agrees that (i) it shall reimburse Buyer or New Manager for the full cost of any bond, letter of credit or amount held in escrow required to be provided by New Manager under the Manager 4204 Transaction as elected by Seller, or (ii) if Buyer or New Manager determines in its reasonable discretion to apply for a waiver or variance of such bond, letter of credit or amount held in escrow requirement, Seller shall advance to, or to the extent not advanced, reimburse Buyer and new Manager the entire cost of such application, including reasonable attorneys' fees; provided, however, if requested by Seller, Buyer shall exercise commercially reasonable efforts to cause New Manager to request a de minimis waiver of any bond, letter of credit or escrow requirement.

(iii)     Seller agrees that Buyer and New Manager shall not be responsible for, and Seller shall indemnify, defend and hold harmless Buyer, New Manager and their affiliates

from and against, any liability and all related costs and expenses, including reasonable attorneys' fees, relating to any withdrawal liability within the meaning of Section 4201 of ERISA (including, but not limited to, any successor liability) assessed in connection with the withdrawal or alleged withdrawal of Seller, Hotel Manager or any of their affiliates from the Union Pension Plan, including, without limitation, as a result of a determination of the Union Pension Plan that the Manager 4204 Transaction is not effective under with Section 4204 of ERISA or if New Manager does not agree to enter into a 4204 Transaction, except that Seller shall not be required to indemnify Buyer, New Manager or their affiliates from any liability arising as a result of: (1) Buyer or New Manager's failure to contribute to the Union Pension Plan as required by the Union Agreement, (2) New Manager's failure to provide the Union Pension Plan with notice of the Manager 4204 Transaction if required by Section 8.7(f)(i), or (3) Buyer's termination or replacement of New Manager that triggers withdrawal liability.

(g)     The provisions of this Section 8.7 shall survive the Closing (and not be merged into the Deed) or earlier termination of this Agreement.

SECTION 8.8.  Termination of Hotel Manager.  Seller shall provide evidence to Buyer that Seller has terminated the Hotel Management Agreement on the Closing Date and shall use commercially reasonable efforts to take such other actions as Buyer may reasonably request, at Buyer's sole cost and expense, to effect the transition of the management of the Property from Hotel Manager to Buyer's New Manager or Buyer's designee. Notwithstanding anything to the contrary in this Agreement, the breach or default by Hotel Manager of any of its obligations under the Hotel Management Agreement shall not in and of itself constitute a default by Seller for purposes of Section 9.2 or any other Section of this Agreement or the failure of any condition precedent to Buyer's obligation to close hereunder, and Buyer shall have no right to terminate this Agreement or receive a refund of the Deposit as a result of any such breach or default by Hotel Manager.

SECTION 8.9.  Liquor License.  Following the Effective Date, Buyer shall file and diligently pursue an application for a new liquor license for the Hotel in the name of Buyer or its designee (the "New Liquor License"). Seller shall reasonably cooperate with Buyer or Buyer's designee in connection with its application for the New Liquor License. Seller shall use commercially reasonable efforts to cause Liquor Licensee, at no cost, expense, or liability to Seller or Liquor Licensee, to enter into an interim beverage services agreement in the form attached hereto as Exhibit J (the "Interim Beverage Agreement") with Buyer or Buyer's designee as may be reasonably necessary for the continuation of the sale and consumption of alcoholic beverages at the Hotel after the Closing and before such time the Buyer or its designee obtains the New Liquor License.  The Interim Beverage Agreement shall (a) require Buyer to indemnify, defend and hold Seller and the other Seller's Indemnitees harmless from and against any and all actual out-of-pocket claims, liabilities, costs and expenses (including, without limitation, actual out-of-pocket attorney's fees) arising in connection with the alcoholic beverage operations at the Hotel, (b) require Buyer to provide such commercial general liability insurance coverage and "dram shop" coverage and other liability coverage relating to the alcoholic beverage operations at the Hotel as required by Seller and name each of Seller and Liquor Licensee as an additional insured under all Buyer's insurance policies, (c) require Liquor Licensee to renew, if necessary, and to

54

otherwise keep its Liquor License in full force and effect and in good standing, and (d) expire one hundred twenty (120) days after the Closing Date (unless extended as provided therein).

**ARTICLE 9**
**DEFAULTS**

SECTION 9.1.  <u>Seller's Remedies for Buyer Defaults</u>.  If, (a) on the Scheduled Closing Date, all conditions precedent to Buyer's obligation to close the Transaction have been satisfied or waived and Buyer fails to deliver the Adjusted Purchase Price Balance in accordance with <u>Sections 2.3</u> and <u>6.1</u> or if there exists a failure of any condition to Seller's obligation to close the Transaction under this Agreement, or (b) at any time on or before the Scheduled Closing Date, Buyer is in default of any of its other material obligations hereunder in any material respect, or any of Buyer's representations or warranties are, in the aggregate, untrue, inaccurate or incorrect in any material respect, and, in each case, such default or untruth, inaccuracy or incorrectness continues and is not cured to Seller's reasonable satisfaction within five (5) Business Days after written notice from Seller (which written notice shall detail such default or breach), but in any event not later than the Scheduled Closing Date, then, in each case, Seller shall have the right as its sole recourse to elect to (i) terminate this Agreement by written notice to Buyer, promptly after which the Deposit shall be immediately paid to and retained by Seller as liquidated damages without any notice to or consent, approval or agreement of Buyer and notwithstanding any contrary instructions from Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations that expressly survive the termination of this Agreement, or (ii) waive the default or breach and proceed to close the Transaction.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

55

SELLER AND BUYER AGREE THAT IF SELLER ELECTS TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH THIS SECTION 9.1, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN.  ACCORDINGLY, SELLER AND BUYER AGREE THAT SELLER SHALL RETAIN THE ENTIRE DEPOSIT AS LIQUIDATED DAMAGES AS SELLER'S REMEDY FOR BUYER'S DEFAULT; PROVIDED, HOWEVER, THAT THIS SECTION 9.1 SHALL NOT LIMIT SELLER'S CLAIMS FOR ATTORNEYS' FEES AND OTHER AMOUNTS UNDER SECTION 11.17 OF THIS AGREEMENT IF BUYER CONTESTS THE RELEASE OF THE DEPOSIT TO SELLER AND SELLER IS THE PREVAILING PARTY OR SELLER'S CLAIMS PURSUANT TO BUYER'S INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.  BUYER AND SELLER AGREE THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF THE AMOUNT OF SELLER'S ACTUAL DAMAGES FOR BUYER'S NONPERFORMANCE CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, INCLUDING THAT ASCERTAINING THE AMOUNT OF SELLER'S ACTUAL DAMAGES WOULD BE EXTREMELY DIFFICULT, COSTLY AND IMPRACTICAL, AND IS NOT A PENALTY.

IN FURTHER EVIDENCE OF THEIR AGREEMENT TO THIS LIQUIDATED DAMAGES PROVISION, SELLER AND BUYER HAVE INITIALED BELOW:

_____                    _____
        BUYER'S INITIALS                      SELLER'S INITIALS

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SELLER AND BUYER AGREE THAT IF SELLER ELECTS TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH THIS <u>SECTION 9.1</u>, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN.  ACCORDINGLY, SELLER AND BUYER AGREE THAT SELLER SHALL RETAIN THE ENTIRE DEPOSIT AS LIQUIDATED DAMAGES AS SELLER'S REMEDY FOR BUYER'S DEFAULT; PROVIDED, HOWEVER, THAT THIS <u>SECTION 9.1</u> SHALL NOT LIMIT SELLER'S CLAIMS FOR ATTORNEYS' FEES AND OTHER AMOUNTS UNDER SECTION 11.17 OF THIS AGREEMENT IF BUYER CONTESTS THE RELEASE OF THE DEPOSIT TO SELLER AND SELLER IS THE PREVAILING PARTY OR SELLER'S CLAIMS PURSUANT TO BUYER'S INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT.  BUYER AND SELLER AGREE THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF THE AMOUNT OF SELLER'S ACTUAL DAMAGES FOR BUYER'S NONPERFORMANCE CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, INCLUDING THAT ASCERTAINING THE AMOUNT OF SELLER'S ACTUAL DAMAGES WOULD BE EXTREMELY DIFFICULT, COSTLY AND IMPRACTICAL, AND IS NOT A PENALTY.

IN FURTHER EVIDENCE OF THEIR AGREEMENT TO THIS LIQUIDATED DAMAGES PROVISION, SELLER AND BUYER HAVE INITIALED BELOW:

_____          _____
BUYER'S INITIALS                       SELLER'S INITIALS

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SECTION 9.2.  <u>Buyer's Remedies for Seller Defaults</u>.  If at any time on or before the
Scheduled Closing Date, Seller defaults in its obligation to transfer title to the Property or any of
its other material obligations hereunder in any material respect, or any of Seller's Warranties are,
in the aggregate, untrue, inaccurate or incorrect in any material respect and the damages or losses
that Buyer may incur as a result of such untruth, inaccuracy or incorrectness are likely to exceed
the Cap Amount and Buyer has timely delivered the notice contemplated by <u>Section 7.3(b)</u>, and
any such circumstance described in this sentence continues for five (5) Business Days after written
notice (which written notice shall detail such default or breach), then, in each case, Buyer shall
have the right to elect, notwithstanding anything to the contrary in this Agreement, as its sole and
exclusive remedy, to (a) terminate this Agreement by written notice to Seller, promptly after which
the Deposit shall be returned to Buyer and Seller shall reimburse Buyer for all actual, out-of-pocket
costs and expenses incurred by Buyer in connection with this Agreement in an amount not to
exceed Two Hundred Thousand Dollars ($200,000), and thereafter, the parties shall have no
further rights or obligations hereunder except for obligations that expressly survive the termination
of this Agreement, (b) waive the default or breach and proceed to close the Transaction, or
(c) solely in the case of Seller's failure or refusal to perform its obligation to close hereunder in a
timely manner, seek specific performance of this Agreement by Seller.  As a condition precedent
to Buyer exercising any right it may have to bring an action for specific performance hereunder,
Buyer must commence such an action within forty-five (45) days after the occurrence of Seller's
default.  Buyer agrees that its failure to timely commence such an action for specific performance
within such forty-five (45) day period shall be deemed a waiver by it of its right to commence an
action for specific performance as well as a waiver by it of any right it may have to file or record
a notice of *lis pendens* or notice of pendency of action or similar notice against any portion of the
Property.  Notwithstanding anything to the contrary contained in this Agreement, Buyer shall have
no right to file any *lis pendens* or notice of pendency of action or similar notice against the Property
except in connection with a timely filing of an action for specific performance in accordance with
this <u>Section 9.2</u>.  Any attempt by Buyer to file a *lis pendens* or notice of pendency of action or
similar notice against any portion of the Property shall be null and void ab initio and Buyer shall
indemnify, defend and hold Seller and the Seller Parties harmless from and against all actual out-
of-pocket claims, liabilities, costs and expenses (including, without limitation, court costs and
reasonable out-of-pocket attorneys' fees) arising out of Buyer's filing (or attempted filing) of a *lis
pendens* or notice of pendency of action or similar notice against the Property in breach of this
<u>Section 9.2</u>. Notwithstanding the foregoing, (i) if Buyer timely seeks specific performance under
this <u>Section 9.2</u> and a court of competent jurisdiction determines in a final, non-appealable decision
that specific performance is not legally available to Buyer by reason of Seller's conveyance of the
Property to a third party other than Buyer, then Buyer shall have the right to pursue its actual, out-
of-pocket damages (excluding any special, indirect, punitive and consequential damages) in an
amount equal to the lesser of (x) the difference between the purchase price paid to Seller by such
third party and the Purchase Price and (y) Five Million Dollars ($5,000,000), in full satisfaction of
all claims against Seller, and (ii) if Buyer timely seeks specific performance under this <u>Section 9.2</u>
and a court of competent jurisdiction determines in a final, non-appealable decision that specific
performance is not legally available to Buyer as a result of Seller's intentional act or omission for
any reason other than Seller's conveyance of the Property to a third party other than Buyer, then
Seller shall reimburse Buyer for all actual, out-of-pocket costs and expenses incurred by Buyer in
connection with this Agreement in an amount not to exceed Two Hundred Thousand Dollars
($200,000).

## ARTICLE 10
## CASUALTY/CONDEMNATION

SECTION 10.1.     Right to Terminate.  If, after the Effective Date, (i) the interior portion of the Hotel Unit (specifically excluding the Common Elements and Limited Common Elements) (the "Interior Unit Portion") or any portion of the Common Elements or Limited Common Elements (collectively, the "Common Elements Portion") is taken by condemnation or eminent domain (or is the subject of a pending taking), or (ii) the Interior Unit Portion or Common Elements Portion is damaged or destroyed (excluding ordinary wear and tear and damage caused by Buyer or any of its affiliates, consultants or contractors or other Buyer's Agents), Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  If the Interior Unit Portion or Common Elements Portion is the subject of a Major Casualty/Condemnation that occurs after the Effective Date, Buyer shall have the right to terminate this Agreement by giving written notice to Seller no later than ten (10) Business Days after the giving of Seller's notice, and the Scheduled Closing Date shall be extended, if necessary, to provide sufficient time for Buyer to make such election.  The failure by Buyer to terminate this Agreement within such ten (10) Business Day period shall be deemed an election not to terminate this Agreement.  If this Agreement is terminated pursuant to this Section 10.1, the Deposit shall be returned to Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations that expressly survive the termination of this Agreement.  For the purposes of this Agreement, "Major Interior Casualty/Condemnation" shall mean any casualty, condemnation proceedings, or eminent domain proceedings if (a) the Interior Unit Portion that is the subject of such casualty or such condemnation or eminent domain proceedings has a value in excess of five percent (5%) of the Purchase Price, (b) any taking of all or substantially all (or so much thereof so as to substantially and materially interfere with the operation of the Hotel as operated prior to such taking by a governmental authority pursuant to the exercise of the right of condemnation or eminent domain) of the Interior Unit Portion, (c) any portion of the parking areas which are the subject of the Parking Agreement is taken, which results in there being insufficient parking for the operation of the Hotel, but if and only to the extent that applicable Laws require parking for the operation of the Hotel and the Seller or Garage Unit Owner fails to provide sufficient substitute parking; provided that in the event of such a taking as contemplated by this subsection (c), Seller may postpone the Scheduled Closing Date for up to four (4) months to provide Seller or Garage Unit Owner time to provide sufficient substitute parking, (d) any principal access way to the Tower Unit or to any part of any building with guest rooms of the Hotel is taken, (e) any (i) with respect to a casualty affecting the Common Elements Portion, the Association is not required to and elects not to repair or restore the damage pursuant to the Condominium Documents or (ii) with respect to a condemnation or eminent domain proceeding, any condemnation proceedings or eminent domain proceedings affecting the Common Elements Portion results in the termination of the Condominium pursuant to the Condominium Documents, or (f) casualty affecting the Interior Unit Portion is an uninsured casualty and Seller, in its sole and absolute discretion, does not elect to cause the damage to be repaired or restored or give Buyer a credit at Closing against the Purchase Price for the cost of such uninsured repair or restoration reasonably estimated by Seller.

SECTION 10.2.     Allocation of Proceeds and Awards.  If after the Effective Date any portion of the Hotel Unit is taken by condemnation or eminent domain (or is the subject of a pending taking), or any portion of the Hotel Unit is damaged or destroyed (excluding ordinary

wear and tear and damage caused by Buyer or any of its affiliates, consultants or customers or other Buyer's Agents) and this Agreement is not terminated as permitted pursuant to the terms of Section 10.1, then this Agreement shall remain in full force and effect and Buyer shall acquire the Property (except such portion thereof as has been taken by condemnation or eminent domain) upon the terms set forth herein.   Any awards or proceeds actually received by Seller from the condemning authority or Seller's insurance company, as the case may be (the "Casualty/Condemnation Proceeds") shall be allocated between Buyer and Seller as follows: (a) Seller shall be entitled to be reimbursed from the Casualty/Condemnation Proceeds for (i) all reasonable out-of-pocket costs, expenses and fees, including reasonable out-of-pocket attorneys' fees, expenses and disbursements, incurred by Seller in connection with obtaining such Casualty/Condemnation Proceeds, (ii) any rental loss, business interruption or loss of use for which Casualty/Condemnation Proceeds are actually received by Seller and that are allocable to the period prior to the Closing Date, and (iii) the reasonable and actual costs incurred by Seller in physically stabilizing, repairing or restoring the Property following a casualty; and (b) Buyer shall be entitled to (i) the balance of the Casualty/Condemnation Proceeds after Seller is reimbursed in accordance with clause (a) above, which Seller shall pay to Buyer promptly upon Seller's receipt thereof, and (ii) a credit against the Purchase Price from Seller equal to Seller's deductible with respect to a casualty affecting the Interior Unit Portion, if the same is an insured casualty. Buyer acknowledges and agrees that the Condominium Documents provide that certain insurance and condemnation proceeds are payable to the Association and the Association's obligations with respect to casualty and condemnation are limited as set forth in the Condominium Documents.

SECTION 10.3.        Insurance.  Seller shall maintain, or cause the Condominium to maintain, the property insurance coverage currently in effect for the Property, or comparable coverage, through the Closing Date.

SECTION 10.4.        Waiver.  The provisions of this Article 10 supersede the provisions of any applicable Laws with respect to the subject matter of this Article 10, but shall be subject to any conflicting provisions contained in any loan agreement to which Seller is a party or by which the Property is bound.

# ARTICLE 11
# MISCELLANEOUS

SECTION 11.1.        Buyer's Assignment.

(a)        Buyer shall have the right to assign this Agreement to (i) any entity that is wholly owned and controlled solely by Buyer or that is under common control with Buyer (so long as Howard Wu and/or Taylor Woods directly or indirectly controls such assignee and collectively directly or indirectly own 25% or more of such entity) (a "Permitted Assignment") and (ii) to Eagle Hospitality Real Estate Investment Trust or any direct or indirect subsidiary thereof.

(b)        Except for a Permitted Assignment, Buyer shall not assign this Agreement or its rights hereunder without the prior written consent of Seller, which consent Seller may grant or withhold in its sole and absolute discretion, and any such attempted assignment shall be null and void *ab initio*.  Except for a Permitted Assignment, any change in control of Buyer or of any of

59

the direct or indirect ownership interests in Buyer, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment of this Agreement which requires Seller's consent.  For purposes of this <u>Section 11.1</u>, the term "<u>control</u>" and its correlative meanings shall mean, with respect to any entity, and the power to direct or cause the direction of the management and policies of such entity, directly or indirectly, whether through ownership of voting securities, membership or partnership interests, by contract or otherwise.  Subject to <u>Section 11.1(c)</u>, Buyer shall have the right to designate an entity wholly owned and controlled solely by Buyer to acquire title to the Property, and any such entity shall be deemed to have assumed all of the Buyer's obligations under this Agreement and Buyer shall provide written evidence of such assumption to Seller prior to the Scheduled Closing Date.

(c)     If Buyer desires to assign its rights hereunder, Buyer shall deliver to Seller written notice of its request at least five (5) Business Days prior to the Scheduled Closing Date, which notice shall include the legal name and structure of the proposed assignee, and Buyer shall provide Seller with any other information that Seller may reasonably request with respect to the proposed assignee.

(d)     Notwithstanding any provision in this Agreement to the contrary:

(i)     Any Permitted Assignment by Buyer shall not relieve Buyer of any of its obligations and liabilities hereunder, nor shall any such assignment alter, impair or relieve such assignee from the waivers, acknowledgements, obligations and agreements of Buyer set forth herein, including those set forth in <u>Article 4</u>, <u>Article 7</u> and <u>Article 8</u>, all of which will be binding upon all assignees of Buyer.

(ii)     No transfer by Buyer of any interest in this Agreement and no transfers of direct or indirect interests in Buyer shall be permitted if the same would cause any of the representations and warranties made in <u>Section 7.1</u> to be untrue, inaccurate or incomplete and Buyer shall confirm the foregoing to Seller's reasonable satisfaction and cooperate with Seller's reasonable requests to provide any documentation reasonably necessary or desirable for Seller to verify that all such representations and warranties are true, accurate and complete at all times prior to Closing.  If Buyer fails to provide the requested documentation to Seller at least five (5) Business Days prior to the Scheduled Closing Date, then Seller shall have the right, at its election, to postpone the Scheduled Closing Date for a reasonable period until such verification has been made.

SECTION 11.2.     <u>Survival/Merger</u>.  Except for the provisions of this Agreement that are explicitly stated to survive the Closing, (a) none of the terms of this Agreement shall survive the Closing, and (b) the delivery of the Purchase Price, the Deed and the other Closing Documents and the acceptance thereof shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Buyer and Seller to be performed hereunder.

SECTION 11.3.     <u>Integration; Waiver</u>.  This Agreement and the Confidentiality Agreement embody and constitute the entire understanding between the parties with respect to the Transaction and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party

60

against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.  No waiver by either party hereto of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

SECTION 11.4.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Washington, without regard to the principles of conflicts of laws.  The provisions of this Section 11.4 shall survive the Closing (and not be merged into the Deed) or any earlier termination of this Agreement.

SECTION 11.5.     Captions Not Binding; Exhibits and Schedules.  The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof.  All Exhibits and Schedules attached hereto shall be incorporated by reference as if set out herein in full.

SECTION 11.6.     Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

SECTION 11.7.     Severability.  If any term or provision of this Agreement or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.  The provisions of this Section 11.7 shall survive the Closing (and not be merged into the Deed) or any earlier termination of this Agreement.

SECTION 11.8.     Notices.   Any notices or other communications under this Agreement shall be in writing and shall be given by (a) personal delivery, (b) e-mail transmission (with a copy delivered by one of the other methods provided in this Section 11.8) or (c) a reputable overnight courier service, fees prepaid, addressed as follows:

IF TO BUYER:

c/o Urban Commons, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, California 90067
Attention:  Howard Wu
E-mail: howard@urban-commons.com

COPY TO:

Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Attention:  Steven L. Lichtenfeld, Esq.
         David J. Weinberger, Esq.
E-mail: slichtenfeld@proskauer.com
       djweinberger@proskauer.com

IF TO SELLER:

10-1301 HSW Owner, LLC
7121 Fairway Drive, Suite 410
Palm Beach Gardens, FL  33418
Attention:  General Counsel
E-mail: notices@wrefholdings.com

COPY TO:

Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
Attention:  Gerard J. Walsh, Esq.
E-mail:  gwalsh@orrick.com

IF TO ESCROW AGENT:

First American Title Insurance Company
920 Fifth Avenue, Suite 1200
Attention:  Laura Lau
Telephone #:  (206) 615-3017
E-mail:  llau@firstam.com


Any party may designate another addressee for notices hereunder by a notice given pursuant to this Section 11.8.  A notice sent in compliance with the provisions of this Section 11.8 shall be deemed given on the date of receipt (and in the case of notice by e-mail transmission, by delivery by such means to the addressee, regardless of the timing of receipt of any confirmation copy), with failure to accept delivery to constitute receipt for such purpose.  The parties agree that the attorney for such party specified above shall have the authority to deliver notices on such party's behalf to the other party.


SECTION 11.9.        Counterparts; Electronic Signatures.   This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken

62

together shall constitute one and the same agreement.  Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.  Each party agrees to promptly deliver an execution original to this Agreement with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement.

SECTION 11.10.    No Recordation.  Seller and Buyer each agrees that neither this Agreement nor any memorandum or notice hereof shall be recorded and Buyer agrees (a) not to file any notice of pendency or other instrument against the Property or any portion thereof in connection herewith, and (b) to indemnify Seller against all Liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred by Seller by reason of the filing by Buyer of any such notice of pendency or other instrument.

SECTION 11.11.    Additional Agreements; Further Assurances.  Each of the parties hereto shall execute and deliver such documents as the other party shall reasonably request in order to consummate and make effective the Transaction, so long as the execution and delivery of such documents shall not result in any additional Liability or cost to the executing party.

SECTION 11.12.    Construction.  The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, any modification hereof or any of the Closing Documents.

SECTION 11.13.    Time of Essence.  Time is of the essence with respect to Closing and all of the provisions of this Agreement.

SECTION 11.14.    JURISDICTION.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THE TRANSACTION, THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF BUYER AND SELLER HEREUNDER ("PROCEEDINGS") EACH PARTY IRREVOCABLY (a) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN SEATTLE, WASHINGTON, AND (b) WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDINGS BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT SUCH PROCEEDINGS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  THE PROVISIONS OF THIS SECTION 11.14 SHALL SURVIVE THE CLOSING (AND NOT BE MERGED INTO THE DEED) OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 11.15.    WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY THE OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE TRANSACTION, THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF BUYER AND SELLER HEREUNDER.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A

TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE PROVISIONS OF THIS SECTION 11.15 SHALL SURVIVE THE CLOSING (AND NOT BE MERGED INTO THE DEED) OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 11.16.   RELEASES.  WITH RESPECT TO ANY RELEASE SET FORTH IN THIS AGREEMENT RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT SUCH WAIVER AND RELEASE IS MADE WITH THE ADVICE OF COUNSEL AND WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CONSEQUENCES AND EFFECTS OF SUCH RELEASE.

SECTION 11.17.   Attorneys' Fees.  In the event any litigation is instituted between the parties arising out of or relating to this Agreement, the party in whose favor judgment shall be entered in a final, non-appealable decision by a court of competent jurisdiction shall be entitled to have and recover from the non-prevailing party all reasonable out-of-pocket costs and expenses (including reasonable out-of-pocket attorneys' fees and court costs) incurred in such action and any appeal therefrom.  The provisions of this Section 11.17 shall survive the Closing (and not be merged into the Deed) or any earlier termination of this Agreement.

SECTION 11.18.   Lead Paint.   Buyer acknowledges that pursuant to regulation promulgated by the U.S. Department of Housing and Urban Development (24 C.F.R. Part 35) and the Environmental Protection Agency (40 C.F.R. Part 745), pursuant to Section 1018 of the Residential Lead Paint Hazard Reduction Act of 1992, Buyer has the right to make Buyer's obligations under this Agreement contingent on a ten-day period to perform a risk assessment or inspection at the Hotel for lead-based paint and/or lead-based paint hazards.  Buyer hereby represents that it has either (a) performed such risk assessment or inspection prior to the execution of this Agreement or (b) waives its rights to do so and any attendant rights of Buyer to cancel this Agreement for reasons related to the presence, if any, of lead-based paint and/or lead-based paint hazards.

SECTION 11.19.  Bulk Sale and Tax Clearance Certificates.   Seller and Buyer acknowledge that they do not intend to comply with and have agreed to waive the provisions of any statutory bulk sale requirements applicable to the transaction to be effected by this Agreement, nor shall any sale and occupancy tax clearance certificates be obtained in connection with the Closing, and in both cases, Seller and Buyer agree to rely upon the adjustment and indemnification provisions of this Agreement to address any matters that would otherwise be subject to such bulk sale requirements or provided for in such tax clearance certificates.

SECTION 11.20.   Seller Disclosure Statement.  To the maximum extent permitted by the Revised Code of Washington (RCW) 64.06, Buyer expressly waives its right to receive from Seller a disclosure statement as provided for in RCW 64.06.  Buyer is advised to use due diligence to inspect the Property to Buyer's satisfaction.

*[Remainder of page intentionally blank]*

64

*IN WITNESS WHEREOF*, each party hereto has caused this Agreement to be duly executed to be effective as of the day and year first above written.

**SELLER:**

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By: _____
Name: _____ Cindy Woon _____
Title: _____ Vice President _____

[Signature page to Hilton Seattle PSA]

**BUYER:**

URBAN COMMONS, LLC,
a Delaware limited liability company

By:

Name: Howard Wu

Title: Principal

[Signature page to Hilton Seattle PSA

## AGREEMENT OF ESCROW AGENT

The undersigned has executed this Agreement solely to confirm its agreement to hold the Deposit in escrow in accordance with the provisions and otherwise comply with the provisions of <u>Exhibit B</u> to this Agreement.

In witness whereof, the undersigned has executed this Agreement as of December  $\mathcal{B}$  , 2019.

FIRST AMERICAN TITLE INSURANCE COMPANY

By:
Name: _Laura S Lail_
Title: _Commercial Closing Off_

[Signature page to Hilton Seattle PSA]

6397/78216-008 CURRENT/112007571v9

## EXHIBIT A

## <u>LEGAL DESCRIPTION</u>

PARCEL A:

TOWER UNIT OF THE 6TH AND UNIVERSITY CONDOMINIUM, A CONDOMINIUM, ACCORDING TO THE CONDOMINIUM DECLARATION THEREOF RECORDED UNDER RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM RECORDED UNDER RECORDING NO. 20151214000910 (AS AMENDED, THE "DECLARATION"); SAID UNIT IS LOCATED ON THE SURVEY MAP AND PLANS FILED IN VOLUME 285 OF CONDOMINIUMS, AS PAGES 9 THROUGH 18, AND RECORDED UNDER RECORDING NO. 20151120000398, IN KING COUNTY, WASHINGTON.

PARCEL B:

NON-EXCLUSIVE EASEMENTS AS ESTABLISHED UNDER THE CONDOMINIUM DECLARATION RECORDED UNDER RECORDING NO. 20151214000910 AND ALL RIGHTS OF THE OWNER OF THE TOWER UNIT IN AND TO THE COMMON ELEMENTS, LIMITED COMMON ELEMENTS AND EXTERNAL ELEMENTS (TO THE EXTENT APPURTENANT TO THE TOWER UNIT) OF THE CONDOMINIUM AS MORE PARTICULARLY DESCRIBED IN THE DECLARATION.

A - 1

**EXHIBIT B**

**ESCROW PROVISIONS**

The Deposit shall be held by the Escrow Agent, in trust, and disposed of only in accordance with the following provisions:

1.      The Escrow Agent shall invest the Deposit in JPMorgan 100% U.S. Treasury Securities Money Market Fund or similar account that invests in U.S. government securities reasonably satisfactory to Seller, shall promptly provide Buyer and Seller with confirmation of the investments made, shall maintain the Deposit in a segregated interest-bearing account and shall disburse the Deposit once it has been removed from said segregated interest-bearing account in accordance with the terms of this Agreement.  The Escrow Agent shall not otherwise commingle the Deposit with any funds of the Escrow Agent or others.

2.      If the Closing occurs, the Escrow Agent shall deliver the Deposit to, or upon the instructions of, Seller on the Closing Date.

3.      The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for any Liabilities (including reasonable out-of-pocket attorneys' fees, expenses and disbursements) incurred by Seller or Buyer resulting from actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.  Seller and Buyer shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all Liabilities (including reasonable out-of-pocket attorneys' fees, expenses and disbursements) incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence or willful misconduct on the part of the Escrow Agent.

4.      Buyer shall pay any income taxes on any interest earned on the Deposit.  Buyer represents and warrants to the Escrow Agent that its taxpayer identification number is _____.

5.      Section 6045(e) of the United States Internal Revenue Code and the regulations promulgated thereunder (herein collectively called the "Reporting Requirements") require an information return to be made to the United States Internal Revenue Service, and a statement to be furnished to Seller, in connection with the Transaction.  The Escrow Agent is either (x) the person responsible for closing the Transaction (as described in the Reporting Requirements) or (y) the disbursing title or escrow company that is most significant in terms of gross proceeds disbursed in connection with the Transaction (as described in the Reporting Requirements).  Accordingly:

(a)      The Escrow Agent is hereby designated as the "Reporting Person" (as defined in the Reporting Requirements) for the Transaction.  The Escrow Agent shall

B - 1

perform all duties that are required by the Reporting Requirements to be performed by the Reporting Person for the Transaction.

(b)     Seller and Buyer shall furnish to the Escrow Agent, in a timely manner, any information requested by the Escrow Agent and necessary for the Escrow Agent to perform its duties as Reporting Person for the Transaction.

(c)     The Escrow Agent hereby requests Seller to furnish to the Escrow Agent Seller's correct taxpayer identification number.  Seller acknowledges that any failure by Seller to provide the Escrow Agent with Seller's correct taxpayer identification number may subject Seller to civil or criminal penalties imposed by Law.  Accordingly, Seller hereby certifies to the Escrow Agent, under penalties of perjury, that Seller's correct taxpayer identification number is 81-3141564.

6.     The provisions of this **Exhibit B** shall survive Closing (and not be merged into the Deed) or earlier termination of this Agreement.

*[Remainder of page intentionally blank]*

B - 2

**EXHIBIT C**

**FORM OF DEED**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

[_____]
[_____]
[_____]
Attn: [_____].

**BARGAIN AND SALE DEED**

Grantor:            10-1301 HSW OWNER, LLC, a Delaware limited liability company

Grantee:            [_____], a [_____]

Abbreviated Legal   Tower Unit. The 6th and University Condominium, V. 285, P. 9 (see full legal
Description:        description below)

Property Tax        780292-0010-02
Parcel Number(s):

THE GRANTOR, 10-1301 HSW OWNER, LLC, a Delaware limited liability company, for good
and valuable consideration in hand paid, bargains, sells, and conveys to GRANTEE,
[_____], the real estate situate in the City of Seattle, King County, State of Washington
and legally described as follows:

PARCEL A:

TOWER UNIT OF THE 6TH AND UNIVERSITY CONDOMINIUM, A CONDOMINIUM,
ACCORDING TO THE CONDOMINIUM DECLARATION THEREOF RECORDED UNDER
RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO
CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM
RECORDED UNDER RECORDING NO. 20151214000910 (AS AMENDED, THE
"DECLARATION"); SAID UNIT IS LOCATED ON THE SURVEY MAP AND PLANS FILED
IN VOLUME 285 OF CONDOMINIUMS, AS PAGES 9 THROUGH 18, AND RECORDED
UNDER RECORDING NO. 20151120000398, IN KING COUNTY, WASHINGTON.

PARCEL B:

NON-EXCLUSIVE EASEMENTS AS ESTABLISHED UNDER THE CONDOMINIUM
DECLARATION RECORDED UNDER RECORDING NO. 20151214000910 AND ALL

C - 3

4124-5703-1711.13

RIGHTS OF THE OWNER OF THE TOWER UNIT IN AND TO THE COMMON
ELEMENTS, LIMITED COMMON ELEMENTS AND EXTERNAL ELEMENTS (TO THE
EXTENT APPURTENANT TO THE TOWER UNIT) OF THE CONDOMINIUM AS MORE
PARTICULARLY DESCRIBED IN THE DECLARATION.

This Deed is expressly made subject to the Permitted Exceptions listed on <u>Exhibit A</u> hereto.

DATED this _____ day of February, 2020.

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By:      _____
Name: _____
Title:    _____

C - 4

FLORIDA ACKNOWLEDGMENT

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this ____ day of _____, 2020, by_____, in his/her authorized capacity as _____, who is personally known to me or has produced _____ as identification.


My commission expires: _____          _____
                                                                              Notary Public

*SEAL*

C - 5

**EXHIBIT A TO BARGAIN AND SALE DEED**

**PERMITTED EXCEPTIONS**

1.      Preliminary Assessment By:
        City of:                        Seattle
        Account No.:                    780292-0010-02
        Estimated Amount:               $644,299.00
        Improvement:                    Waterfront Seattle
        Local Improvement District No.: Prelim
        Filing Date:                    Undisclosed

        The lien of said preliminary assessment, as between the Grantor and Grantee or Vendor and Vendee in the absence of express agreement as to the payment of assessments, will attach 30 days after the filing date.

2.      Potential charges, for the King County Sewage Treatment Capacity Charge, as authorized under RCW 35.58 and King County Code 28.84.050. Said charges could apply for any property that connected to the King County Sewer Service area on or after February 1, 1990.

        Note: Properties located in Snohomish County and Pierce County may be subject to the King County Sewage Treatment Capacity Charges. To verify charges contact: (206) 296-1450 or CapChargeEscrow@kingcounty.gov.

3.      Ordinance No. 124175 of the City of Seattle, approved on May 6, 2013, being an Ordinance establishing a Downtown Parking and Business Improvement Area; levying special assessments upon the businesses, multifamily residential or mixed-use projects within the area; providing for the deposit of revenues in a special account and expenditures therefrom; providing for collection of and penalties for delinquencies.

4.      The terms and provisions contained in the document entitled "Agreement" recorded November 25, 1968 as Recording No. 6438996 of Official Records. By University Properties, Inc, The Board of Regents of the University of Washington, University Parking, Inc and Elizabeth Davis Crawford Travis and Frances Crawford Beneveniste. Please note the Garage Unit is currently owned by PF Seattle Hilton LLC pursuant to Bargain and Sale Deed recorded December 11, 2015 under Recording No. 20151211000679 as granted by Jet City Lodging, LLC. Construction of the garage has been completed, said paragraph remains regarding the tie-back requirements.

        (Affects Parking Garage Unit and common areas)

5.      Easement, including terms and provisions contained therein:
        Recording Date:                 December 1, 1969
        Recording Information:          6593758
        In Favor of:                    Washington Athletic Club, a Washington corporation
        For:                            Light, air and space
        Affects:                        Common area

6.      Easement, including terms and provisions contained therein:
        Recording Date:                 October 12, 1972 and May 4, 1978

C - 6

Recording Information:    7210120439 and 7805040823
In Favor of:    University Properties, Inc.
For:    Horizontal Elevator and access
Affects:    Common area

Assignment of easement rights between Unico Properties, Inc., formerly known as University Properties Inc., and the board of regents of the University of Washington, dated April 14, 1978, recorded May 26, 1978 under Recording No. 7805260902.

7.     Easement, including terms and provisions contained therein:
Recording Date:    October 12, 1972 and May 4, 1978
Recording Information:    7210120440 and 7805040823
In Favor of:    University Properties, Inc.
For:    Wall Openings, Exit Areas and access
Affects:    Common area

Assignment of easement rights between Unico Properties, Inc., formerly known as University Properties Inc., and the board of regents of the University of Washington, dated April 14, 1978, recorded May 26, 1978 under Recording No. 7805260902.

8.     The terms and provisions contained in the document entitled "Public Place Indemnity Agreement" recorded February 10, 1989 as Recording No. 8902100188 of Official Records.

9.     Covenants, conditions, restrictions and/or easements:

Recorded:    October 14, 1998
Recording No.:    9810140125

7.     Restrictions, conditions, dedications, notes, easements and provisions, if any, as contained and/or delineated on the face of the The 6th and University Condominium recorded November 20, 2015 as under Recording No. 20151120000398, in Volume 285 of Condominiums, at Pages 9 through 18, in King County, Washington.

Document(s) declaring modifications thereof recorded September 1, 2016 as Recording No. 20160901000621 of Official Records.

8.     Terms, provisions, requirements and limitations contained in the Washington Condominium Act, Chapters 43 and 428, Laws of 1989 (RCW 64.34) and as it may hereafter be amended.

9.     Terms, provisions, covenants, conditions, definitions, options, obligations and restrictions contained in Condominium Declaration and as may be contained in the By-Laws adopted pursuant to said Declaration:
Recording Information:    November 20, 2015 under Recording No. 20151120000399

Document(s) declaring modifications thereof recorded December 14, 2015 and September 1, 2016 as Recording Nos. 20151214000910 and 20160901000621 of Official Records.

C - 7

10.     Any assessment now or hereafter levied under the provisions of the Condominium Declaration of The 6th and University Condominium, a Condominium, or any amendment(s) thereto, or under the By-Laws adopted pursuant to said Declaration, to the extent provided for by RCW 64.34.

11.     Provisions of the Articles of Incorporation and By-Laws of the The 6th and University Condominium Owners' Association, and any tax, fee, assessments or charges as may be levied by said association.
        Recorded:                          November 20, 2015
        Recording No.:                     20151120000399

12.     The terms and provisions contained in the document entitled "Memorandum of Parking Agreement" recorded December 11, 2015 as Recording No. 20151211000676 of Official Records.

C - 8

**EXHIBIT D**

**FORM OF BILL OF SALE**

       **THIS BILL OF SALE** (this "<u>Bill of Sale</u>"), is executed as of February \_\_\_\_\_, 2020 by 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("<u>Seller</u>"), for the benefit of [_____, a _____] ("<u>Buyer</u>").

*W I T N E S S E T H:*

       WHEREAS, pursuant to the terms of that certain Purchase and Sale Agreement, dated as of December 24, 2019, by and between Seller and Buyer (as the same may have been amended, modified or assigned, the "<u>Purchase Agreement</u>"), Seller agreed to sell to Buyer, *inter alia*, the Property as more particularly defined and described in the Purchase Agreement, including the Hotel known as the Hilton Seattle, located at 1301 Sixth Avenue, Seattle, Washington 98101. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

       WHEREAS, by the Deed of even date herewith, Seller conveyed the Real Property to Buyer.

       WHEREAS, in connection with the above described conveyance, Seller desires to sell, transfer and convey to Buyer certain items of tangible and intangible Personal Property as hereinafter described.

       NOW, THEREFORE, in consideration of the receipt of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand by Buyer to Seller, the receipt and sufficiency of which are hereby acknowledged, Seller has SOLD, TRANSFERRED, and CONVEYED and by these presents does hereby SELL, TRANSFER, and CONVEY to Buyer, and Buyer hereby accepts, all of Seller's right, title and interest in and to:

           (i)     all tangible Personal Property owned by Seller, including all FF&E, Consumables, Food and Beverage Inventory, Operating Equipment, Inventory, and other tangible personal property of every kind and nature that is located on, in or about and used in connection with the ownership, operation and maintenance of the Hotel and the Real Property, except (a) the Protected Materials, (b) the Leased Personal Property (but shall include the Contracts pursuant to which such Leased Personal Property is leased to Seller), (c) items of personal property owned by Hotel Manager, Franchisor, Employees, guests or tenants of the Hotel or others, (d) Utility Deposits, tax deposits, utility deposits and other deposits held by parties other than Seller, (e) any tax, insurance, FF&E, capital improvement, working capital and/or other escrows, impounds, accounts, cash on hand, house banks or reserves held by Seller's lender, Hotel Manager or any other party and (f) all checks, drafts, notes and other evidence of indebtedness held at the Hotel on the Closing Date and any balances on deposit with banking institutions or Hotel Manager relating to the Hotel;

(ii)      to the extent assignable, all intangible Personal Property owned by Seller, including the Intangible Property, the Bookings, the Hotel Records, and the Licenses and Permits, but specifically excluding any (a) Protected Materials, (b) Leased Personal Property (but shall include the Contracts pursuant to which such Leased Personal Property is leased to Seller), (c) items of personal property owned by Hotel Manager, Franchisor, Employees, guests or tenants of the Hotel or others, (d) Utility Deposits, tax deposits and other deposits held by parties other than Seller, (e) any tax, insurance, FF&E, capital improvement, working capital and/or other escrows, impounds, accounts, cash on hand, house banks or reserves held by Seller's lender, Hotel Manager or any other party and (f) all checks, drafts, notes and other evidence of indebtedness held at the Hotel on the Closing Date and any balances on deposit with banking institutions or Hotel Manager relating to the Hotel; and

(iii)     any subsisting and assignable warranties and guaranties relating to the improvements located at the Hotel or any tangible Personal Property or any part thereof;

in each case, subject to (i) all terms and provisions hereof and in the Purchase Agreement and (ii) the Permitted Exceptions to the full extent same are existing and affect or pertain to the Personal Property.

To the extent Seller has any liability under this Bill of Sale, Seller's liability under this Bill of Sale shall be limited as set forth in Sections 4.5 and 7.3 of the Purchase Agreement.

Except for any representations and warranties contained in the Purchase Agreement solely for which Buyer may maintain an action for breach subject to the terms and conditions of the Purchase Agreement and only to the extent such representations and warranties survive the Purchase Agreement as provided therein, the Personal Property is hereby conveyed on an "as is" "where is" and "with all faults" basis and no Seller Party has made, nor any Seller Party liable for or bound in any manner by any express or implied warranties, guarantees, promises, statements, inducements, warranty of fitness for a particular purpose, representations or information pertaining to the Personal Property or any part thereof, the physical condition, income, expenses or operation thereof, the uses which can be made of the same or any other matter or thing with respect thereto. Without limiting the foregoing, Seller shall not be liable for or be bound by any oral or written statements or representations pertaining to the condition or use of the Personal Property, or any other information respecting same furnished by any Seller Party or other person purportedly representing any Seller Party.  By acceptance of this Bill of Sale, Buyer acknowledges and agrees to the foregoing and represents that, without limiting any of Buyer's rights contained herein or in the Purchase Agreement or the representations, warranties and covenants set forth in the Purchase Agreement, as of the date hereof, it shall have independently investigated, analyzed and appraised to its satisfaction the value and the profitability of the Personal Property.

Within ninety (90) days after the Closing, the other party shall execute such additional documents and instruments as the requesting party may reasonably request in order to fully effectuate the purposes of this Bill of Sale.

*[Remainder of page intentionally blank]*

D - 2

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale to be effective as of the date first set forth hereinabove.

**SELLER:**


10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By:      _____
Name:  _____
Title:   _____

D - 3

**EXHIBIT E**

**FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment"), is made as of February _____, 2020 by and between 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("Assignor"), and [_____, a _____] ("Assignee").

*W I T N E S S E T H :*

WHEREAS, pursuant to the terms of that certain Purchase and Sale Agreement, dated as of December 24, 2019, by and between Assignee and Assignor (as the same may have been amended, modified or assigned, the "Purchase Agreement"), Assignor agreed to sell to Assignee, *inter alia*, the Property as more particularly defined and described in the Purchase Agreement, including the Hotel known as the Hilton Seattle, located at 1301 Sixth Avenue, Seattle, Washington 98101.  Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, the Purchase Agreement provides, *inter alia*, that Assignor and Assignee shall enter into this Assignment.

NOW, THEREFORE, in consideration of the Property, the Purchase Price and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    Assignment of Contracts.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under all Contracts relating to the Hotel set forth on **Exhibit A** attached hereto.  Assignee hereby accepts the foregoing assignment of Contracts and assumes the obligations of Assignor with respect thereto from and after the date hereof.

2.    Assignment of Occupancy Agreement.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under all Occupancy Agreements relating to the Hotel set forth on **Exhibit B** attached hereto.  Assignee hereby accepts the foregoing assignment of the Occupancy Agreements and assumes the obligations of Assignor with respect thereto from and after the date hereof.

3.    No Modification of Purchase Agreement.  As between Assignor and Assignee, this Agreement does not enlarge, restrict or otherwise modify the terms of the Purchase Agreement or constitute a waiver or release by Assignor or Assignee of any liabilities, duties or obligations imposed upon them (or any of their respective affiliates) by the terms of the Purchase Agreement, including without limitation the representations, warranties, covenants, agreements, indemnifications and other provisions of the Purchase Agreement.  As between Assignor and Assignee, in the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

E - 1

4.      <u>Limitation on Liability</u>.  Subject to <u>Section 8</u> below, this Assignment is made without any covenant, warranty or representation by, or recourse against, Assignor, other than Seller's Warranties (as defined in the Purchase Agreement), to the extent applicable.  Assignor's liability under this Assignment shall be limited as set forth in <u>Sections 4.5</u> and <u>7.3</u> of the Purchase Agreement.

5.      <u>Miscellaneous</u>.  This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed within said State and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

6.      <u>Severability</u>.  If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

7.      <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement and may be delivered by email, pdf or other electronic transmission.

8.      <u>Further Assurances</u>.  Within ninety (90) days after the Closing, the other party shall execute such additional documents and instruments as the requesting party may reasonably request in order to fully effectuate the purposes of this Assignment.

*[Remainder of page intentionally blank]*

E - 2

IN WITNESS WHEREOF, the undersigned have executed this Assignment to be effective as of the date first set forth hereinabove.

**ASSIGNOR:**


10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

E - 3

**ASSIGNEE:**

[_____],
a [_____]

By:     _____
Name: _____
Title:   _____

E - 4

**Exhibit A**

Contracts

1. Parking Agreement
2. AAA
3. American Society of Composers, Authors and Publishers (ASCAP)
4. Audio Visual Management Solutions, Inc. (AVMS)
5. Clean the World Ventures, Inc. (CTW)
6. Combustion and Control
7. Comcast
8. eGlobal LLC
9. Elavon Inc.
10. ELTEC Systems LLC
11. Firstline Communications, Inc.
12. Loomis Armored US, LLC (Loomis)
13. Oracle
14. Pitney Bowes
15. Proctor and Gamble Distributing LLC (P&G)
16. React Mobile
17. SESAC LLC (SESAC)
18. SIEMENS
19. Transperfect Global, Inc.
20. Travel Click
21. Travel Click
22. Uniguest
23. Vox Mobile
24. WC Service Company, Inc.
25. Xerox

E - 5

**Exhibit B**

Occupancy Agreements

Retail Lease dated May 16, 2018 between 10-1301 HSW Owner, LLC and Westcoast Café Deli LLC

E - 6

**EXHIBIT F**

**FORM OF FIRPTA AFFIDAVIT**

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  10-1301 HSW HOLDINGS, LLC, a Delaware limited liability company ("Transferor"), is the direct owner of all of the beneficial interests in 10-1301 HSW Owner, LLC, a Delaware limited liability company ("Seller").  To inform the transferee that withholding of tax is not required upon the disposition of a United States real property interest by Seller, Transferor hereby certifies the following:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations); and

2.      Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Internal Revenue Code; and

3.      Transferor's U.S. employer taxpayer identification number is 81-3141564; and

4.      Transferor's office address is 7121 Fairway Drive, Suite 410, Palm Beach Gardens, Florida 33418.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

[Signature page follows]

F - 1

4124-5703-1711.13

Dated:  February ___, 2020.

**TRANSFEROR**

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By:      _____
Name:  _____
Title:    _____

F - 2

**EXHIBIT G**

**FORM OF OWNER'S AFFIDAVIT**

The undersigned (the "**Undersigned**") hereby certifies to First American Title Insurance Company (the "**Company**") that, to the Undersigned's knowledge:

1. The Undersigned has not previously conveyed that certain real property (the "**Premises**") described in that certain title commitment dated as of October 17, 2019 issued by the Company under file no. NCS-984828-WA1 nor has the Undersigned permitted anyone to occupy the Premises other than the hotel manager, hotel guests and pursuant to the Leases (defined below).

2. Except for the work described on **Exhibit A** attached hereto (the "**Work**"), no labor, services or materials have been furnished in connection with the construction or repair of any buildings or other improvements on the Premises, other than for ordinary maintenance and repair, by virtue of an agreement with, or by the consent of, the Undersigned, during the preceding 90 days which could give rise to a mechanic's lien.

3. The only leases which affect the Premises are those listed on **Exhibit B** attached hereto (the "**Leases**").  The Leases contain no rights or options to purchase the Premises.

4. In consideration of the Company issuing an owner's policy of title insurance to [_____] ("**Buyer**") (a) without making exception therein for, and for providing affirmative insurance against, statutory liens for labor or material arising by reason of the Work ("**mechanics' liens**") and (b) without making exception therein for matters first appearing in the public records between 8:00 A.M. on January ___, 2020 and 5:00 P.M. on February ___, 2020 (the "**Gap**"), the Undersigned agrees to remove, bond or otherwise dispose of (i) any mechanics' liens and (ii) any other lien, encumbrance or objectionable matter to title which are filed during the Gap, in each case as a direct result of the Undersigned's actions or omissions (collectively, "**objection(s) to title**"), and to indemnify and hold the Company harmless from and against any actual out of pocket costs or expenses incurred by the Company which arise out of the Undersigned's failure to remove, bond or otherwise dispose of any such objection(s) to title.

The Undersigned makes this affidavit for the purpose of inducing the Company to issue an owner's policy of title insurance to Buyer.  The statement "to the Undersigned's knowledge" shall mean that the Undersigned has no knowledge that such statement is untrue (and, for this purpose, the Undersigned's knowledge shall mean the present actual knowledge, without a duty of investigation or inquiry (excluding constructive or imputed knowledge) of Mr. Matt Kenney, but such individual shall not have any personal liability in connection therewith).  Notwithstanding anything to the contrary herein, to the extent the Company shall have knowledge as of the date hereof that any of the statements contained herein is false or inaccurate, then the Undersigned shall have no liability with

respect to the same.  The Company shall be deemed to have knowledge of any matters of record.

No present or future direct or indirect partner, member, advisor, trustee, director, officer, employee, beneficiary, shareholder, participant or agent of the Undersigned, shall have any personal liability, directly or indirectly, under or in connection with this affidavit; and the Company hereby waives any and all such personal liability.  The limitations of liability provided in this paragraph are in addition to, and not in limitation of, any limitation on liability applicable provided by law or by any other contract, agreement or instrument.

[SIGNATURE PAGE FOLLOWS]

G - 2

4124-5703-1711.13

Dated as of the date first written above.

> 10-1301 HSW OWNER, LLC,
> a Delaware limited liability company
>
> By: _____
> Name: _____
> Title: _____

[Signature Page to Owner's Affidavit]

FLORIDA ACKNOWLEDGMENT


STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this ____ day of _____, 2020, by_____, in his/her authorized capacity as _____, who is personally known to me or has produced _____ as identification.


My commission expires:

    _____

                                                                Notary Public

*SEAL*

EXHIBIT A

WORK

Work described in that certain AIA Document A104-2017 Standard Abbreviated Form of Agreement Between Owner and Contractor dated December 8, 2018 between 10-1301 HSW Owner, LLC and Complete Property Services, LLC.

G - 5

<u>EXHIBIT B</u>

LEASES

Retail Lease dated May 16, 2018 between 10-1301 HSW Owner, LLC and Westcoast Café Deli LLC

G - 6

**EXHIBIT H**

**FORM OF CONDOMINIUM ASSIGNMENT**

**RECORDING REQUESTED BY AND**
**WHEN RECORDED MAIL TO:**

[_____]
[_____]
[_____]
Attn: [_____]

**ASSIGNMENT OF DECLARANT'S RIGHTS**

Grantor:        10-1301 HSW OWNER, LLC, a Delaware limited liability company

Grantee:        [_____], a [_____]

Abbreviated Legal Description:        Tower Unit. The 6th and University Condominium, V. 285, P. 9 (see full legal description in Exhibit A)

Property Tax Parcel Number(s):        780292-0010-02

Reference to Related Documents:

        20151120000398 (condominium survey and maps)
        20151120000399 (condominium declaration)
        20151214000910 (amendment no. 1 to condominium declaration)

## ASSIGNMENT OF DECLARANT'S RIGHTS

**THIS ASSIGNMENT OF DECLARANT'S RIGHTS** (this "**Assignment**") is made as of February ____, 2020, by and between 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("**Assignor**"), and [_____], a [___] ("**Assignee**").

## RECITALS

A.     Reference is made to that certain Condominium Declaration for The 6th and University Condominium made by Jet City Lodging, LLC, a Delaware limited liability company ("**Jet City Lodging**"), as the Declarant thereunder, and recorded under Recording No. 20151120000399, as amended by that certain Amendment No. 1 to Condominium Declaration for The 6th and University Condominium (as amended, the "**Declaration**") and Survey Map and Plans filed in Volume 285 of Condominiums, as Pages 9 through 18, and recorded under Recording No. 20151120000398, in King County, Washington, which established The 6th and University Condominium, as assigned pursuant to that certain Assignment of Declarant's Rights dated September 1, 2016 between Jet City Lodging, as assignor, and Assignor, as assignee, and recorded under Recording No. 20160901000621 (together with the Declaration and all articles of incorporation, bylaws, rules and regulations and consents, collectively, the "**Condominium Documents**").

B.     Pursuant to that certain Bargain and Sale Deed of even date herewith, Assignor conveyed the Tower Unit (as defined in the Condominium Documents and as legally described on Exhibit A attached hereto) to Assignee.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual covenants and conditions herein contained, the parties hereto hereby act and agree as follows:

1.  **Assignment of Declarant's Rights.**  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's rights as "Declarant" under the Condominium Documents.

2.  **Assumption of Declarant's Rights**.  From and after the date of this Assignment, Assignee assumes all of Assignor's rights and obligations as "Declarant" under the Condominium Documents.

3.  **Counterparts.** This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

4.  **Governing Law.**  This Assignment shall be deemed to be an agreement made under the laws of the state of Washington and for all purposes shall be governed by and construed in accordance with such laws.

5.  **Binding Effect.**  This Assignment shall be binding upon and inure to the benefit of, respectively, Assignor and Assignee and their respective successors and assigns.

6. **Warranty of Signers.**  Each individual executing and delivering this Assignment on
behalf of Assignor hereby represents and warrants to Assignee that such individual has
been duly authorized and empowered to make such execution and delivery.

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed and delivered by their respective representatives, thereunto duly authorized, as of the date first above written.

    **ASSIGNOR:**                   10-1301 HSW OWNER, LLC,
a Delaware limited liability company


By:_____
Name:
Title:


[Signature page to Assignment of Declarant's Rights]

FLORIDA ACKNOWLEDGMENT

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this ___ day of _____, 2020, by_____, in his/her authorized capacity as _____, who is personally known to me or has produced _____ as identification.

My commission expires:  _____                    _____

                                                                Notary Public

*SEAL*

Exhibit A
Legal Description of Tower Unit

PARCEL A:

TOWER UNIT OF THE 6TH AND UNIVERSITY CONDOMINIUM, A CONDOMINIUM, ACCORDING TO THE CONDOMINIUM DECLARATION THEREOF RECORDED UNDER RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM RECORDED UNDER RECORDING NO. 20151214000910 (AS AMENDED, THE "DECLARATION"); SAID UNIT IS LOCATED ON THE SURVEY MAP AND PLANS FILED IN VOLUME 285 OF CONDOMINIUMS, AS PAGES 9 THROUGH 18, AND RECORDED UNDER RECORDING NO. 20151120000398, IN KING COUNTY, WASHINGTON.

PARCEL B:

NON-EXCLUSIVE EASEMENTS AS ESTABLISHED UNDER THE CONDOMINIUM DECLARATION RECORDED UNDER RECORDING NO. 20151214000910 AND ALL RIGHTS OF THE OWNER OF THE TOWER UNIT IN AND TO THE COMMON ELEMENTS, LIMITED COMMON ELEMENTS AND EXTERNAL ELEMENTS (TO THE EXTENT APPURTENANT TO THE TOWER UNIT) OF THE CONDOMINIUM AS MORE PARTICULARLY DESCRIBED IN THE DECLARATION.

I - 1

**EXHIBIT I**

**FORM OF GARAGE UNIT ROFO ASSIGNMENT**

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

[_____]
[_____]
[_____]
Attn: [_____]

**ASSIGNMENT AND ASSUMPTION OF RIGHT OF FIRST OFFER AGREEMENT**

Grantor:          10-1301 HSW OWNER, LLC, a Delaware limited liability company

Grantee:          [_____], a [_____]

Legal Description:          Garage Unit, The 6th and University Condominium, V. 285, P. 9

Property Tax Parcel Number(s):          780292-0010-02

Reference to Related Documents:

20151211999677 (memorandum of right of first offer agreement)
20160901000622 (assignment and assumption of right of first offer agreement)

I - 1

4124-5703-1711.13

**ASSIGNMENT AND ASSUMPTION OF RIGHT OF FIRST OFFER AGREEMENT**

       **THIS ASSIGNMENT AND ASSUMPTION OF RIGHT OF FIRST OFFER AGREEMENT** (this "**Assignment**") is made as of February ___, 2020, by and between 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("**Assignor**"), and [_____] ("**Assignee**").

RECITALS

A.     Pursuant to that certain Right of First Offer Agreement dated as of December 11, 2015 (the "**Agreement**"), Jet City Lodging, LLC, a Delaware limited liability company ("**Jet City Lodging**"), as the former owner of certain real property legally described on <u>Exhibit A</u> attached hereto (the "**Garage Unit**") granted to Jet City Lodging, as the owner of certain real property legally described on <u>Exhibit B</u> attached hereto (the "**Tower Unit**"), a right of first offer to purchase the Garage Unit, subject to the terms and conditions set forth in the ROFO Agreement, as assigned pursuant to that certain Assignment and Assumption of Right of First Offer Agreement dated as of September 1, 2016 by and between Jet City Lodging, as assignor, and Assignor, as assignee (the "**Assignment of ROFO**").   A Memorandum of Right of First Offer Agreement evidencing the ROFO Agreement was recorded December 11, 2015 as Recording No. 20151211999677 (the "**Memorandum**", together with the Agreement and Assignment of ROFO, the "**Garage Unit ROFO**").

B.     Pursuant to that certain Bargain and Sale of even date herewith, Assignor conveyed the Tower Unit to Assignee.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual covenants and conditions herein contained, the parties hereto hereby act and agree as follows:

1.     **Assignment.**  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's rights under the Garage Unit ROFO.

2.     **Assumption**.  Assignee hereby accepts the foregoing assignment and assumes all of the obligations and liabilities, if any, of Assignor accruing from and after the date hereof with respect to the Garage Unit ROFO.

3.     **Counterparts**. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

I - 2

4124-5703-1711.13

4.      **Governing Law**. This Assignment shall be deemed to be an agreement made under the laws of the state of Washington and for all purposes shall be governed by and construed in accordance with such laws.

5.      **Binding Effect**.  This Assignment shall be binding upon and inure to the benefit of, respectively, Assignor and Assignee and their respective successors and assigns.

6.      **Warranty of Signers**.  Each individual executing and delivering this Assignment on behalf of Assignor hereby represents and warrants to Assignee that such individual has been duly authorized and empowered to make such execution and delivery.

[Signature Pages Follow]

I - 3

4124-5703-1711.13

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be executed and delivered by their respective representatives, thereunto duly authorized, as of the date first above written.

**ASSIGNOR:**

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Acknowledgment follows]

I - 4

FLORIDA ACKNOWLEDGMENT

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this ___ day of _____, 2020, by_____, in his/her authorized capacity as _____, who is personally known to me or has produced _____ as identification.

My commission expires:  _____
           _____

                                                                Notary Public

*SEAL*

I - 5

[Acknowledgment Page to Garage ROFO Assignment]

**ASSIGNEE**:

[_____],
a [_____]


By: _____
Name: _____
Title: _____


[Acknowledgement follows]

I - 6

[Signature Page to Garage ROFO Assignment]

## ACKNOWLEDGMENT

STATE OF _____       )
                              )          ss.:
COUNTY OF _____         )


On the ___ day of ____, 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
                                   Notary Public


I - 7

[Acknowledgment Page to Garage ROFO Assignment]

4124-5703-1711.13

EXHIBIT A
Legal Description of Garage Unit

GARAGE UNIT OF THE 6TH AND UNIVERSITY CONDOMINIUM, A CONDOMINIUM,
ACCORDING TO THE CONDOMINIUM DECLARATION THEREOF RECORDED
UNDER RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO
CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM
RECORDED UNDER RECORDING NO. 20151214000910; SAID UNIT IS LOCATED ON
THE SURVEY MAP AND PLANS FILED IN VOLUME 285 OF CONDOMINIUMS, AS
PAGES 9 THROUGH 18, AND RECORDED UNDER RECORDING NO. 20151120000398,
IN KING COUNTY, WASHINGTON.

4124-5703-1711.13

EXHIBIT B
Legal Description of Tower Unit

PARCEL A:

TOWER UNIT OF THE 6TH AND UNIVERSITY CONDOMINIUM, A CONDOMINIUM, ACCORDING TO THE CONDOMINIUM DECLARATION THEREOF RECORDED UNDER RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM RECORDED UNDER RECORDING NO. 20151214000910 (AS AMENDED, THE "DECLARATION"); SAID UNIT IS LOCATED ON THE SURVEY MAP AND PLANS FILED IN VOLUME 285 OF CONDOMINIUMS, AS PAGES 9 THROUGH 18, AND RECORDED UNDER RECORDING NO. 20151120000398, IN KING COUNTY, WASHINGTON.

PARCEL B:

NON-EXCLUSIVE EASEMENTS AS ESTABLISHED UNDER THE CONDOMINIUM DECLARATION RECORDED UNDER RECORDING NO. 20151120000399; AS AMENDED BY AMENDMENT NO. 1 TO CONDOMINIUM DECLARATION FOR THE 6TH AND UNIVERSITY CONDOMINIUM RECORDED UNDER RECORDING NO. 20151214000910 (AS AMENDED, THE "DECLARATION"); AND ALL RIGHTS OF THE OWNER OF THE TOWER UNIT IN AND TO THE COMMON ELEMENTS, LIMITED COMMON ELEMENTS AND EXTERNAL ELEMENTS (TO THE EXTENT APPURTENANT TO THE TOWER UNIT) OF THE CONDOMINIUM AS MORE PARTICULARLY DESCRIBED IN THE DECLARATION.

I - 9

# EXHIBIT J

## FORM OF INTERIM BEVERAGE AGREEMENT[1]


THIS INTERIM BEVERAGE AGREEMENT ("**Agreement**") is made as of this _____ day of February, 2020 ("**Effective Date**") by and between 365 MANAGEMENT COMPANY, LLC, a Delaware limited liability company ("**Licensee**"), and [_____], a [_____] ("**New Owner**").

WHEREAS, Licensee holds a Hotel License number 357370 (the "**Existing Liquor License**") issued by the Washington State Liquor and Cannabis Board ("**WSLCB**") authorizing Licensee to sell and serve distilled spirits, wine, and malt beverages at certain portions of the real property and improvements commonly known as the Hilton Seattle located at 1301 6th Ave., Seattle, WA. 98101-2304 (the "**Property**");

WHEREAS, concurrently with the execution and delivery of this Agreement, the Property is being sold, assigned and transferred by 10-1301 HSW Owner, LLC, a Delaware limited liability company ("**Seller**") to New Owner pursuant to that certain Purchase and Sale Agreement dated as of December 24, 2019 (the "**Purchase Agreement**");

WHEREAS, New Owner desires to grant to Licensee the right to continue to operate all food and beverage operations, including liquor-related operations, at those portions of the Property on which alcoholic beverages are served and sold ("**F&B Operations**") to ensure there is continuity in the operation of the Property until such time as New Owner or its designee has been issued a valid liquor license (a "**New Liquor License**") or temporary permit ("**Temporary Permit**") by WSLCB for the alcohol-related operation of the Property;

WHEREAS, New Owner desires to engage Licensee to manage and operate the F&B Operations at the Property during the Interim Period (defined below), subject to the terms and conditions hereinafter set forth; and

WHEREAS, New Owner or its designee desires to operate the Property (other than the F&B Operations) during the time period between the Effective Date and the earlier of (a) such time as New Owner or its designee has been issued a New Liquor License or Temporary Permit or (b) the day which is one hundred twenty (120) days after the Effective Date (the "**Interim Period**"), subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Recitals.  The recitals set forth above are true and correct and are incorporated herein by reference.

---

[1] Subject to review by Stonebridge's liquor counsel.

3.     <u>Alcoholic Beverage License</u>.  At all times during the Interim Period, Licensee and New Owner or its designee shall comply with any and all relevant ordinances, laws, statues and other requirements imposed by WSLCB with respect to the Existing Liquor License and shall keep the Existing Liquor License in full force and effect and in good standing, provided that Licensee shall not be deemed to be in default under this Agreement if the Existing Liquor License is revoked, terminated, suspended or not renewed as a result of New Owner's or its designee's operation and management of the Property.

4.     <u>Interim Operating Fee; Operating Expenses</u>. In consideration of Licensee's operation of the F&B Operations at the Property during the Interim Period, Licensee shall retain all net profits from the sale of alcoholic beverages during the Interim Period.  Licensee shall pay to New Owner a facilities usage fee equal to all ongoing expenditures incurred by New Owner in connection with the F&B Operations at the Property including, but not limited to sales taxes, the cost of food and alcoholic beverages, food and beverage employee compensation, cost of inventory, furniture, fixtures, equipment and supplies necessary for the food and beverage operations and other fees related to the F&B Operations (collectively, "**Operating Expenses**") each month (prorated for each partial month), payable in arrears on the fifteenth (15th) day of each month with respect to the previous month; provided, however, that in no event shall Licensee be required to pay any Operating Expenses in excess of the net profits from the sale of alcoholic beverages for the applicable month.  Upon execution of this Agreement, the parties will, in good faith, negotiate the exact cost allocation and method of accounting to be employed to fulfill the intent of this Section 4.

5.     <u>Purchase of Alcoholic Beverages</u>. All alcoholic beverages to be purchased for service or sale at the Property shall be purchased from distributors and other suppliers by or in the name of Licensee, unless New Owner is permitted to purchase such alcoholic beverages under applicable law.

6.     <u>Alterations</u>. Licensee shall not make any alterations, additions or improvements to any portion of the Property, without the prior written consent of New Owner, which consent may be withheld by New Owner in its sole discretion. Upon expiration of the Interim Period, Licensee shall relinquish its possession of the Property and shall deliver to New Owner all of New Owner's keys and other property of New Owner in Licensee's possession.

7.     <u>Existing Liquor License</u>. Subject to the other terms of this Agreement, Licensee shall not relinquish the Existing Liquor License (other than as required by any governmental authority), or take or fail to take any action which would cause a suspension, revocation or termination of such Existing Liquor License, and, at New Owner's cost and expense, shall renew, extend, reapply for or otherwise continue any such Existing Liquor License, as necessary to keep such Existing Liquor License in full force and effect until the expiration of the Interim Period. New Owner or its designee, at New Owner's or its designee's cost and expense, shall diligently pursue its application for the New Liquor License as promptly as reasonably practicable.  Licensee shall cooperate in all reasonable respects with New Owner (at no cost or expense to Licensee, other than any de minimis cost or expense or any cost of expense which New Owner agrees in writing to reimburse) for New Owner or its designee to obtain the issuance of the New Liquor License.

8.     <u>Insurance</u>.

a)      New Owner shall carry and maintain, or cause to be carried and maintained at its own cost and expense the following during the Interim Period:

i)      Workers' compensation insurance that complies with the applicable workers' compensation laws governing New Owner's hotel manager and all employees working for New Owner's hotel manager and employers' liability insurance with a minimum limit of $1,000,000 (ONE MILLION DOLLARS and 00/100) each accident for bodily injury, $1,000,000 (ONE MILLION DOLLARS and 00/100) per employee for bodily injury, and $1,000,000 (ONE MILLION DOLLARS and 00/100) policy limit for bodily injury by disease. Such insurance shall be obtained by New Owner's hotel manager.

ii)      Comprehensive general liability insurance including liquor liability, contractual liability and liability for bodily injury or property damage, with a combined single limit of not less than $3,000,000 (THREE MILLION DOLLARS AND 00/100) for each occurrence.  Such insurance shall name Licensee as an additional insured as its interests may appear.

iii)      Automobile liability insurance covering all owned, non-owned, and hired vehicles used in conjunction with Licensee's Business for bodily injury or property damage with a combined single limit of not less than $1,000,000 (ONE MILLION DOLLARS and 00/100) each occurrence. Such insurance shall name Licensee as an additional insured as its interests may appear.

iv)      Umbrella excess liability insurance that follows the form of the insurance coverages required in sections (ii) (including liquor liability coverage) and (iii) of this Insurance section, in amount of not less than $50,000,000 (FIFTY MILLION DOLLARS AND 00/100). Such insurance shall name Licensee as an additional insured as its interests may appear.

b)      All policies shall be specifically endorsed to provide that (i) the coverages obtained by virtue of this Agreement will be primary and (ii) any insurance carried by Licensee shall be excess and non-contributory.  All policies shall be specifically endorsed to provide that such coverage shall not be canceled or materially reduced without at least thirty (30) days prior written notice to Licensee.  New Owner, upon five (5) days' notice by Licensee, shall deliver certificates of insurance and any renewals thereof to Licensee, which evidences the required coverages.  A certificate of insurance evidencing the required insurance and additional insured endorsement is attached hereto as **Exhibit A**.

9.      Indemnification.

a)      New Owner shall defend, indemnify and hold harmless Licensee, Seller and their respective principals, officers, directors, shareholders, employees, subsidiaries, agents, and affiliates (individually, "**Indemnitee**," or, collectively, "**Indemnitees**") from and against any and all actual, out-of-pocket damages (excluding any prospective or speculative profits, consequential, punitive, special, exemplary and indirect damages), costs, losses, expenses, unpaid operating expenses, obligations, suits, claims or liabilities of every kind and description including reasonable out-of-pocket attorneys' fees

3

("**Damages**") sustained by any of the Indemnitees to the extent that such Damages arise after the Effective Date from or are related to (a) this Agreement, (b) the service of alcoholic beverages at the Property by any person or entity controlled by New Owner or its designee and (c) any action or inaction relating to the providing of food and beverage services at the Property by any person under the direction or control of New Owner or its designee; provided, that Licensee (i) gives New Owner prompt written notice of the claim for indemnity under the provisions of this Agreement ("**Claim**"), (ii) authorizes New Owner to control the defense and settlement of the Claim (provided that New Owner will not enter into any settlement that results in liability or damages to an Indemnitee without such Indemnitee's consent), (iii) provides such assistance in connection with the defense and settlement of the Claim as New Owner may reasonably request, (iv) does not settle or compromise the Claim without the prior written consent of New Owner and (v) complies with any settlement or court order made in connection with the Claim.

b) The parties acknowledge and agree that Seller is an intended third-party beneficiary with respect to this Section 9. The obligations of New Owner under this Section 9 shall survive the termination or expiration of this Agreement.

10. <u>Termination</u>. This Agreement shall automatically terminate upon the earlier of the issuance of the New Liquor License or the expiration of the Interim Period. Notwithstanding anything to the contrary contained herein, if the New Liquor License has not been used by the expiration of the Interim Period, this Agreement shall automatically be extended for thirty (30) days provided that the New Owner is diligently pursuing the New Liquor License.

11. <u>Entire Agreement; Amendments</u>. This Agreement supersedes any agreements made between the parties relating to its subject matter. There are no other understandings or agreements between them relating to the subject matter hereof. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by the parties.

12. <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington.

13. <u>Binding Effect</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

14. <u>Power</u>. Each of Licensee and New Owner represents that it has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transactions contemplated hereby.

15. <u>Authority</u>. Each of the individuals executing this Agreement and the instruments referenced herein on behalf of Licensee and/or New Owner represents that he or she has the legal right, power and authority to bind the party on whose behalf such individual is executing this Agreement and such other instruments to the terms and conditions hereof and thereof.

4

16.    <u>Validity</u>.  This Agreement is and shall a valid, legally binding obligation of and enforceable against Licensee and New Owner in accordance with its terms, subject only to applicable laws affecting or limiting the rights of contracting parties generally.

17.    <u>Severability</u>.  If any provision of this Agreement should be determined to be invalid for any reason, the remaining provisions shall remain in effect for life of the Agreement.

18.    <u>Attorney's Fees</u>.   In the event of any litigation, mediation, or arbitration in connection with or with respect to this Agreement, the prevailing party (as determined in a final, non-appealable decision by a court of competent jurisdiction) shall be awarded all costs, including, without limitation, reasonable out-of-pocket attorney's fees.

19.    <u>Counterparts; Electronic Delivery</u>.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same agreement. Duly executed counterparts delivered via fax or email shall have the same force and effects as originals for all purposes.

20.    <u>Notices</u>. All notices, demands and other communications from any party to the other party shall be in writing and delivered in accordance with the Purchase Agreement.

21.    <u>Assignment</u>. New Owner and Licensee shall not assign any of their rights, or delegate any of their obligations, in this Agreement, without the prior written consent of the other party.

22.    <u>Conflict with Purchase Agreement</u>. If any of the terms or provisions of this Agreement conflict with, or are inconsistent with, any terms or provisions of the Purchase Agreement, the terms and provisions of this Agreement shall control.

23.    EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY THE OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

5

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**MANAGER**:

365 MANAGEMENT COMPANY, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

[Signature page to Interim Operating Agreement]

**NEW OWNER**:

[_____],
a [_____]

By: _____

Name: _____

Title: _____

[Signature page to Interim Operating Agreement]

**Exhibit A**

Certificate of Insurance

[see attached]

J - 1

## EXHIBIT K

## FORM OF UNION ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION OF COLLECTIVE BARGAINING AGREEMENT AND TRANSFER OF RELATED ASSETS

**THIS ASSIGNMENT AND ASSUMPTION OF COLLECTIVE BARGAINING AGREEMENT AND TRANSFER OF RELATED ASSETS** (this "Agreement") is made as of February _____, 2020 (the "Effective Date"), by and between 365 MANAGEMENT COMPANY, LLC, a Delaware limited liability company, having an address at c/o Stonebridge Realty Advisors, Inc., 9100 East Panorama Drive, Suite 300, Centennial, CO 80112 ("Assignor") and  , a _____ company, having an address at _____ ("Assignee").

WHEREAS, 10-1301 HSW Owner, LLC, a Delaware limited liability company ("Seller"), and [_____], a [_____] ("Buyer") are parties to that certain Purchase and Sale Agreement, dated as of December 24, 2019 (the "Purchase Agreement"), pursuant to which Seller, among other things, has agreed to sell, assign, transfer and convey to Buyer, that certain hotel commonly known as the Hilton Seattle located at 1301 Sixth Avenue, Seattle, Washington (the "Hotel").

WHEREAS, Assignor manages the Hotel for Seller pursuant to that certain Hotel Management Agreement dated September 1, 2016 (the "Management Agreement").

WHEREAS, Assignor is a party to that certain Collective Bargaining Agreement dated June 30, 2015 and effective from June 1, 2018 through May 31, 2021 by and between Assignor and UNITE HERE Local 8 ("Local 8") relating to the Hotel (the "Collective Bargaining Agreement").

WHEREAS, Assignor will not be retained by Buyer to manage the Hotel and Assignee shall be engaged by Buyer to manage the Hotel.

WHEREAS, Assignor has agreed to sell and assign to Assignee, and Assignee has agreed to purchase and assume from Assignor, all of Assignor's rights, duties and obligations under the Collective Bargaining Agreement and the other assets set forth below in accordance with this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     Assignment and Sale of Assets by Assignor. As part of the sale of the Hotel to Buyer with title passing to Buyer, effective at the time of the sale, Assignor hereby sells, assigns, transfers, sets over and conveys to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to (a) the Collective Bargaining Agreement, (b) licenses, permits, and other books and records of Assignor related to its employment of employees pursuant to the Collective Bargaining Agreement, (c) correspondence with Local 8 with respect to the Collective Bargaining Agreement or employees employed pursuant to the Collective Bargaining Agreement and employment records of Assignor related to employees, and (d) such other books and records relating to the Hotel as set forth on Schedule A to this Agreement (collectively, the "Transferred Assets").

K - 1

2.  <u>Acceptance and Assumption by Assignee</u>. Assignee hereby accepts the foregoing sale, assignment and transfer of the Transferred Assets, and hereby purchases, assumes the Transferred Assets and agrees to fulfill, perform, discharge and comply with all of the rights, duties and obligations of Assignor under the Collective Bargaining Agreement to be performed on or after the date hereof. Assignee shall at the time of the sale of the Hotel and its commencement as manager of the Hotel retain the employees employed at the Hotel whose terms of employment are covered by the collective bargaining agreement with Local 8 and retain facially valid Forms I-9 maintained by Assignor without re-verifying the work authorization status of any employee for whom Assignor provides to Assignee a facially valid Form I-9.  Nothing herein shall require the continued employment for any specific period of time of any employee after the time of the sale.

3.  <u>ERISA Section 4204 Compliance</u>.

a.  Assignee agrees that following the Effective Date Assignee shall make contributions to the UNITE HERE Northwest Pension Trust (the "<u>Union Plan</u>") with respect to the Hotel in accordance with the Collective Bargaining Agreement, for substantially the same number of contribution base units, within the meaning of Section 4001(a)(11) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), for which Assignor had an obligation to contribute with respect to the Hotel.

b.  Subject to paragraph 3(e) below, during the period commencing on the first day of the first plan year following the Effective Date and ending on the expiration of the fifth such plan year (the "<u>Contribution Period</u>"), Assignee shall provide to the Union Plan either a bond, letter of credit, or an escrow in an amount and manner meeting the requirements of Section 4204 of ERISA.

c.  If all, or substantially all, of Assignor's assets are distributed, or if Assignor is liquidated before the end of the Contribution Period, Assignor shall to provide to the Union Plan a bond or amount in escrow equal to the amount specified in Section 4204(a)(3) of ERISA.

d.  If Assignee at any time during the Contribution Period withdraws from the Union Plan in a complete or partial withdrawal with respect to the assets acquired pursuant to this Agreement , then Assignee shall be primarily liable and Assignor shall be secondarily liable for any withdrawal liability arising under Title IV of ERISA that Assignor would have had to the Union Plan with respect to the Hotel (but for the provisions of Section 4204 of ERISA) if any such withdrawal liability of Assignee with respect to such Union Plan is not paid. Assignee shall as soon as practicable furnish Assignor with a copy of any notice, including a notice of withdrawal liability, that Assignee may receive with respect to the Union Plan, together with all the pertinent details. If any such withdrawal liability shall be assessed against Assignee, Assignee further agrees to provide Assignor with reasonable advance notice of any intention on the part of Assignee not to make full payment of any withdrawal liability when the same shall become due.

e.  Assignee shall not be obligated to provide any bond, letter of credit, or escrow in the event and to the extent Assignee or Buyer obtains from the Union Plan or the Pension Benefit Guaranty Corporation a proper variance or exemption under Section 4204(c) of ERISA and the applicable regulations thereunder. Upon Assignee's request, Assignor agrees to reasonably cooperate with Assignee in providing the Union Plan with notice of the parties'

K - 2

intention that the sale of the Hotel and the matters covered by this Agreement be covered by Section 4204 of ERISA.

4.      Representations of Assignor. Assignor hereby represents and warrants to Assignee that the Collective Bargaining Agreement is the only collective bargaining agreement affecting the Hotel and is in full force and effect and there are no side agreements that Assignor has entered into with Local 8.

5.      Successors and Assigns; Third-Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  This Agreement shall not confer any rights or remedies upon any Person other than the (a) Assignee and (b) Assignor and Seller and their respective shareholders, members, partners, trustees, beneficiaries, directors, officers, employees and agents, and the successors, assigns, heirs and legal representatives of each of the foregoing as expressly provided under the Purchase Agreement. Notwithstanding the foregoing, Assignee understands and agrees that Assignor and/or Seller will provide a copy of this Agreement to Local 8.

6.      Entire Agreement; Amendments to Agreement. This Agreement (including the recitals to this Agreement which are incorporated herein) and the Purchase Agreement set forth the entire understanding and agreement of the parties hereto, and shall supersede any other agreements and understandings (written or oral) between Assignor and Assignee on or prior to the Effective Date with respect to the matters set forth herein. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by Assignor and Assignee.

7.      Further Assurances. Each party agrees to execute such other and further instruments and documents as may be reasonably necessary or proper in order to consummate the transaction contemplated by this Agreement provided there is no cost or liability to Assignor in connection therewith.

8.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, subject to the venue provisions of 29 U.S.C. § 185 if and when applicable.

9.      Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

*[Remainder of page intentionally left blank; Signatures on following pages]*

K - 3

IN WITNESS WHEREOF, Assignor and Assignee have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

**ASSIGNOR**:

365 MANAGEMENT COMPANY, LLC,
a Delaware limited liability company

By:       _____
Name:   _____
Title:    _____

**ASSIGNEE**:

[_____],
a [_____]

By:       _____
Name:   _____
Title:    _____

K - 4

# EXHIBIT L

## FORM OF OWNER'S UNION ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION OF OWNER AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION OF OWNER AGREEMENT** (this "Agreement") is made as of February ___, 2020 (the "Effective Date"), by and between 10-1301 HSW OWNER, LLC, a Delaware limited liability company, ("Assignor") and [____], a [_____] ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Purchase and Sale Agreement, dated as of December 24, 2019 (the "Purchase Agreement"), pursuant to which Assignor, among other things, has agreed to sell, assign, transfer and convey to Assignee, that certain hotel commonly known as the Hilton Seattle located at 1301 Sixth Avenue, Seattle, Washington (the "Hotel").

WHEREAS, Assignor is a party to that certain Owner Agreement (UNITE HERE Local 8 and 10-1301 HSW Owner, LLC) dated as of December 19, 2018 by and between Assignor and UNITE HERE Local 8 ("Local 8") relating to the Hotel (the "Owner Agreement").

WHEREAS, the Purchase Agreement provides, *inter alia*, that Assignor and Assignee shall enter into this Agreement as a condition to Assignee's purchase of the Hotel, Assignor has agreed to sell and assign to Assignee, and Assignee has agreed to purchase and assume from Assignor, all of Assignor's rights, duties and obligations under the Owner Agreement in accordance with this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment by Assignor.  As part of the sale of the Hotel to Buyer with title passing to Buyer, Assignor, effective at the time of the sale, hereby sells, assigns, transfers, sets over and conveys to Assignee, its successors and assigns, all of Assignor's right, title and interest in, to and under the Owner Agreement.

2.      Acceptance and Assumption by Assignee. Assignee hereby accepts the foregoing assignment and transfer of the Owner Agreement, and hereby purchases, assumes the obligations of Assignor and agrees to fulfill, perform, discharge and comply with all of the rights, duties and obligations of Assignor under the Owner Agreement to be performed on or after the date hereof.  At the time of the sale, Assignee shall cause its manager to retain the employees employed at the Hotel whose terms and conditions of employment are covered by the collective bargaining agreement with Local 8 and retain facially valid Forms I-9 maintained by Assignor or its manager without re-verifying the work authorization status of any employee for whom Assignor provides to Assignee a facially valid Form I-9. Nothing herein shall require the continued employment for any specific period of time of any employee after the time of the sale.

3.      Successors and Assigns; Third-Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  This Agreement shall not confer any rights or remedies upon any Person other than the (a) Assignee and (b)

Assignor.  Notwithstanding the foregoing, Assignee understands and agrees that Assignor and/or its manager will provide a copy of this Agreement to Local 8.

       4.    <u>Entire Agreement; Amendments to Agreement</u>. This Agreement (including the recitals to this Agreement which are incorporated herein) and the Purchase Agreement set forth the entire understanding and agreement of the parties hereto, and shall supersede any other agreements and understandings (written or oral) between Assignor and Assignee on or prior to the Effective Date with respect to the matters set forth herein.  No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by Assignor and Assignee.

       5.    <u>Further Assurances.</u> Each party agrees to execute such other and further instruments and documents as may be reasonably necessary or proper in order to consummate the transaction contemplated by this Agreement provided there is no cost or liability to Assignor in connection therewith.

       6.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, subject to the venue provisions of 29 U.S.C. § 185 if and when applicable.

       7.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

*[Remainder of page intentionally left blank; Signatures on following pages]*

L - 2

IN WITNESS WHEREOF, Assignor and Assignee have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

**ASSIGNOR**:

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By:      _____
Name:   _____
Title:    _____

**ASSIGNEE**:

[_____],
a [_____]

By:      _____
Name:   _____
Title:    _____

L - 3

## EXHIBIT M

## FORM OF ASSIGNMENT OF INDEMNITY AGREEMENT

## ASSIGNMENT OF UNDIVIDED INTEREST IN ENVIRONMENTAL REMEDIATION AND INDEMNITY

THIS ASSIGNMENT OF AN UNDIVIDED INTEREST IN ENVIRONMENTAL REMEDIATION AND INDEMNITY (this "Assignment") is made and entered into this ____ day of February ____, 2020 between [_____], a [_____] ("Buyer"), and 10-1301 HSW OWNER, LLC, a Delaware limited liability company ("Seller"), with reference to the following recitals.

## RECITALS

A.      Seller is the owner of that certain commercial condominium unit designated as the Tower Unit within The 6th and University Condominium (the "**Condominium**"), a condominium located in Seattle, Washington, as shown under the Survey Map and Plans recorded under recording no. 20151120000398 in Volume 285 of Condominiums, pages 009 through 018, records of King County, Washington (the "**Property**").

B.      Jet City Lodging, LLC, a Delaware limited liability company ("Jet City Lodging"), predecessor-in-interest to Seller, is the indemnitee under that certain Environmental Remediation and Indemnity dated July 6, 2012, as amended that certain First Amendment to Environmental Remediation and Indemnity dated August 12, 2014 and that Second Amendment to Environmental Remediation and Indemnity dated June 28, 2016 (as amended and assigned from time to time, collectively, the "**Environmental Indemnity**"), executed by SH Hotel LLC, a Washington limited liability company, Richard C. Hedreen and Elizabeth A. Hedreen, as indemnitors (collectively, the "**Indemnitors**").  A copy of the Environmental Indemnity is attached hereto as Exhibit A.

C.      On December 11, 2015, Jet City Lodging conveyed the Garage Unit of the Condominium to PF Seattle Hilton, LLC and contemporaneously with such conveyance assigned an undivided interest in the Environmental Indemnity to PF Seattle Hilton, LLC pursuant to that certain Assignment of Undivided Interest in Environmental Remediation and Indemnity dated December 11, 2015 (the "**Garage Assignment**").  A copy of the Garage Assignment is attached hereto as Exhibit B.

D.      On September 1, 2016, Jet City Lodging conveyed the Tower Unit of the Condominium to Seller and contemporaneously with such conveyance assigned an undivided interest in the Environmental Indemnity and the Garage Assignment to Seller pursuant to that certain Assignment of Undivided Interest in Environmental Remediation and Indemnity dated September 1, 2016 (the "**Tower Assignment**").  A copy of the Tower Assignment is attached hereto as Exhibit C.

E.      The Environmental Indemnity provides that Seller shall have the right to assign the Environmental Indemnity to a subsequent purchaser of the Property.

4

F.      Contemporaneously herewith Seller is conveying to Buyer the Tower Unit of the Condominium.  Pursuant to that certain Purchase and Sale Agreement dated December 24, 2019 (the "**Purchase Agreement**") between Seller and Buyer, the parties agreed that Seller would assign an undivided interest in the Environmental Indemnity to Buyer, on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing; the covenants and agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Assignment of Environmental Indemnity.  Seller hereby assigns, transfers, sells and conveys to Buyer, as a subsequent purchaser of a portion of the Property, an undivided co-interest in all of Seller's right and interest in, to, and under the Environmental Indemnity, the Garage Assignment, and the Tower Assignment, subject to the terms of this Assignment.

2.      Assumption of Environmental Indemnity.  By execution hereof, Buyer hereby assumes and agrees to perform all duties, obligations and responsibilities which Buyer may have as an owner of the Property pursuant to the Environmental Indemnity, the Tower Assignment and/or the Garage Assignment arising from and after the date hereof, subject to the terms of this Assignment.

3.      Binding Effect.  This Assignment shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

4.      Governing Law.  This Assignment shall be construed, interpreted and enforced in accordance with the laws of the State of Washington, without regard to principles of conflict of laws.

5.      Counterparts.  This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement.

6.      Attorneys' Fees.  If any action is brought by either party against the other party, relating to or arising out of this Assignment, the transaction described herein or the enforcement hereof, the prevailing party shall be entitled to recover from the other party reasonable out-of-pocket attorneys' fees, costs and expenses incurred in connection with prosecution or defense of such action.  The provisions of this Section 6 shall survive the entry of any judgment, and shall not merge or be deemed to have merged into any judgment.

7.      Limitation on Liability.  This Assignment is made without any covenant, warranty or representation by, or recourse against, Seller, to the extent applicable.  Seller's liability under this Assignment shall be limited as set forth in Sections 4.5 and 7.3 of the Purchase Agreement.

5

[*signatures on the following page*]

6

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment and affixed their seals as of the day and year first above written.

**SELLER (ASSIGNOR):**

10-1301 HSW OWNER, LLC,
a Delaware limited liability company

By:  _____
Name:  _____
Title:  _____

**BUYER (ASSIGNEE):**

[_____],
a [_____]

By:  _____
Name:  _____
Title:  _____

Acknowledged by:

THE 6TH AND UNIVERSITY CONDOMINIUM ASSOCIATION, a Washington nonprofit corporation

By:  _____
Name:  _____
Title:  _____

7

Exhibit A

COPY OF ENVIRONMENTAL INDEMNITY

(see attached)

8

Exhibit B

COPY OF GARAGE ASSIGNMENT

(see attached)

9

Exhibit C

COPY OF TOWER ASSIGNMENT

(see attached)

M - 1

## **EXHIBIT N**

## **LICENSES AND PERMITS**

| |
|---|
| Assembly Occupancy Permit |
| Business License Tax Certificate (10-1301 HSW Owner) |
| Business License Tax Certificate (365 Management) |
| Food Permit |
| Foreign Qualification Filing |
| Liquor License |
| Non-Marine Hot Work Permit |
| Reseller Permit |
| Street Use Permit |
| Tank Permit |
| Transient Accommodation License |

Exhibit N - 1

4124-5703-1711.13

## EXHIBIT O

## OCCUPANCY AGREEMENTS

Retail Lease dated May 16, 2018 between 10-1301 HSW Owner, LLC and Westcoast Café Deli LLC

## EXHIBIT P

## CONTRACTS

1. Parking Agreement
2. AAA
3. American Society of Composers, Authors and Publishers (ASCAP)
4. Audio Visual Management Solutions, Inc. (AVMS)
5. Clean the World Ventures, Inc. (CTW)
6. Combustion and Control
7. Comcast
8. eGlobal LLC
9. Elavon Inc.
10. ELTEC Systems LLC
11. Firstline Communications, Inc.
12. Loomis Armored US, LLC (Loomis)
13. Oracle
14. Pitney Bowes
15. Proctor and Gamble Distributing LLC (P&G)
16. React Mobile
17. SESAC LLC (SESAC)
18. SIEMENS
19. Transperfect Global, Inc.
20. Travel Click
21. Travel Click
22. Uniguest
23. Vox Mobile
24. WC Service Company, Inc.
25. Xerox

**<u>EXHIBIT Q</u>**

**<u>FORM OF R&W HOLDBACK ESCROW AGREEMENT</u>**

This ***HOLDBACK ESCROW AGREEMENT*** (this "**<u>Agreement</u>**") is entered into as of the
___ day of February, 2020, among **FIRST AMERICAN TITLE INSURANCE COMPANY**
("**<u>Escrow Agent</u>**"), **10-1301 HSW OWNER, LLC**, a Delaware limited liability company
("**<u>Seller</u>**"), and **URBAN COMMONS, LLC**, a Delaware limited liability company ("**<u>Buyer</u>**").

**RECITALS**:

A. **WHEREAS**, Seller and Buyer entered into that certain Purchase and Sale Agreement dated
December 24, 2019 (as the same may be amended, the "**<u>PSA</u>**"). Each initially capitalized
term not otherwise defined in this Agreement shall have the meaning ascribed to such term
in the PSA.

B. **WHEREAS**, pursuant to <u>Section 4.5</u> of the PSA, to secure Seller's obligations for breach
of Seller's Warranties, Seller's Contingent Retained Liability, Taxes relating to the
operation of the Hotel that are the responsibility of Seller under the PSA, and any claims
by Buyer for attorneys' fees if Buyer is the prevailing party and is owed attorneys' fees
under the PSA (collectively, the "**<u>Seller Obligations</u>**"), Seller agreed to fund into an
escrow account held by Escrow Agent, the sum of One Million Seven Hundred Thousand
and No/100 Dollars ($1,700,000) (the "**<u>Holdback Amount</u>**").

C. **WHEREAS**, Buyer and Seller desire to appoint Escrow Agent as the escrow agent
pursuant to this Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

**NOW THEREFORE**, in consideration of the covenants and agreements contained in this
Agreement, and intending to be legally bound, Escrow Agent, Seller and Buyer agree as follows:

**ARTICLE I**
APPOINTMENT OF ESCROW AGENT

1.1     Seller and Buyer hereby appoint the Escrow Agent to act as escrow agent, and the
Escrow Agent hereby agrees to serve as escrow agent, upon the terms and conditions set forth in
this Agreement.

**ARTICLE II**
ESCROW

2.1     <u>Escrow</u>.  At Closing, Escrow Agent shall hold back from Seller's proceeds from
the sale of the Property the Holdback Amount.  The Holdback Amount, together with the interest
thereon, shall be invested by Escrow Agent in JPMorgan 100% U.S. Treasury Securities Money
Market Fund or similar account that invests in U.S. government securities reasonably satisfactory
to Seller, and deposited by Escrow Agent into a segregated interest-bearing escrow account (the
"**<u>Holdback Account</u>**").

2.2     <u>Receipt of Holdback Amount</u>.     By signing below, Escrow Agent hereby

acknowledges its receipt of the Holdback Amount from Seller. Escrow Agent shall hold, invest and disburse the Holdback Amount in accordance with the terms and conditions of this Agreement. Seller and Buyer shall each bear one-half of all costs associated with maintaining the Holdback Amount with Escrow Agent. Escrow Agent shall promptly provide Buyer and Seller with confirmation of the investments made and shall not commingle the Holdback Amount with any funds of the Escrow Agent.

2.3     Disbursement of Holdback Amount.

2.3.1    At such time as Buyer asserts a claim for disbursement of funds from the Holdback Account, Buyer shall give written notice thereof (the "**Disbursement Request**") to Seller and Escrow Agent. Any such Disbursement Request shall generally explain the respective Seller Obligations not performed or breached by Seller or otherwise generating Buyer's claim to all or any portion of the Holdback Amount, contain appropriate supporting documentation with respect thereto, and shall provide Buyer's good faith calculations of Buyer's actual, out-of-pocket damages in excess of the Floor Amount that Buyer is entitled to recover from Seller in connection therewith (the "**Claim Amount**"). Seller shall have five (5) Business Days after receipt of the Disbursement Request to object to the disbursement of all or any portion of the Holdback Amount requested by Buyer by submitting a notice of objection (the "**Objection Notice**") to Buyer and Escrow Agent, which objection shall be solely on the grounds that Seller disagrees, in good faith, with Buyer's entitlement to or calculations of the Claim Amount(s) set forth in the applicable Disbursement Request. If Seller delivers the Objection Notice within such five (5) Business Day period, then the Claim Amount (or portion thereof that is in dispute) shall be retained in the Holdback Account by Escrow Agent until (i) Seller and Buyer resolve such dispute pursuant to a written settlement agreement entered into between Buyer and Seller, in which case the Claim Amount shall be disbursed in accordance with the instructions set forth in such settlement agreement, (ii) Seller's and Buyer's respective rights to the Claim Amount are determined pursuant to a judgment, beyond right of appeal, of a court of competent jurisdiction in an action in which Seller and Buyer are parties, in which case the Claim Amount shall be disbursed in accordance with such final non-appealable judgment or (iii) Seller and Buyer otherwise jointly direct Escrow Agent in writing as to how to disburse the Claim Amount, in which case the Claim Amount shall be disbursed in accordance with such joint written direction. If Seller does not deliver the Objection Notice to Buyer and Escrow Agent within such five (5) Business Day period, then Escrow Agent shall disburse the Claim Amount to Buyer in accordance with the Disbursement Request within one (1) Business Day following the expiration of such five (5) Business Day period. If Buyer and Seller jointly submit a Disbursement Request with regard to all or any portion of the Holdback Amount, Escrow Agent shall disburse the requested amounts from the Holdback Account within one (1) Business Day following its receipt of the joint Disbursement Request pursuant to the directions set forth therein.

2.3.2    On [March __, 2021] (the "**Release Date**"), Escrow Agent shall disburse the entire remaining Holdback Amount then held in the Holdback Account, together with any interest accrued thereon, to Seller in accordance with instructions provided by Seller without further instruction from Buyer, and notwithstanding any instructions from Buyer to the contrary; provided that, if prior to the Release Date, Escrow Agent has received one (1) or more Disbursement Requests from Buyer but has not yet released the Claim Amount(s) set forth therein to Buyer, then Escrow Agent shall retain all such Claim Amounts in the Holdback Account and

only release to Seller the balance of the Holdback Amount, if any.  The Claim Amounts shall be retained in the Holdback Account by Escrow Agent until, with respect to each Claim Amount, (i) the expiration of the five (5) Business Day period provided in Section 2.3.1 of this Agreement with respect to a specific Disbursement Request, if no Objection Notice is delivered by Seller to Escrow Agent within such five (5) Business Day period with respect to such Disbursement Request, in which case the Claim Amount shall be disbursed to Buyer in accordance with the Disbursement Request; (ii) Seller and Buyer resolve any dispute with respect to any Objection Notice which has been timely provided by Seller in accordance with Section 2.3.1 of this Agreement pursuant to a written settlement agreement entered into between Buyer and Seller, in which case the Claim Amount shall be disbursed in accordance with the instructions set forth in such settlement agreement, (iii) if an Objection Notice which has been timely provided by Seller in accordance with Section 2.3.1 of this Agreement, Seller's and Buyer's respective rights to the Claim Amount have been determined pursuant to a judgment, beyond right of appeal, of a court of competent jurisdiction in an action in which Seller and Buyer are parties, in which case the Claim Amount shall be disbursed in accordance with such final non-appealable judgment or (iv) Seller and Buyer otherwise jointly direct Escrow Agent in writing as to how to disburse the Claim Amount, in which case the Claim Amount shall be disbursed in accordance with such joint written direction. Notwithstanding the preceding sentence, if Buyer has delivered a Disbursement Request to Seller and Escrow Agent prior to the expiration of the Release Date but Buyer does not file an action for the Claim Amount in a court of competent jurisdiction within ninety (90) days after the expiration of the Release Date, then Escrow Agent shall immediately pay and release to Seller the balance of the Holdback Amount that was subject to such Disbursement Request, together with any accrued interest thereon.

2.3.3    Any interest earned on the Holdback Amount shall be reinvested and become part of the Holdback Amount.  Seller shall be responsible for the payment of all income tax due on such interest.  Seller hereby certifies to the Escrow Agent, that Seller's correct taxpayer identification number is 81-3141564.

## ARTICLE III
### LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Holdback Amount except for Escrow Agent's bad faith, disregard of this Agreement, willful misconduct or negligence.  Escrow Agent's sole responsibility shall be for the safekeeping, and disbursement of the Holdback Amount in accordance with the terms and conditions of this Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth in this Agreement. Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Agreement. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Holdback Amount, any account in which Holdback Amount is deposited, this Agreement or the PSA, or to appear in, prosecute or defend any such legal action or proceeding.

3.2     Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court with respect to the Holdback Amount, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Holdback Amount is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3     Indemnification of Escrow Agent.  Seller and Buyer hereby jointly and severally agree to indemnify Escrow Agent for, and to hold it harmless against, any actual, out-of-pocket loss, liability, damage (excluding any prospective or speculative profits, consequential, punitive, special, exemplary and indirect damages) or expense incurred without bad faith, disregard of this Agreement, gross negligence or willful misconduct on the part of Escrow Agent arising out of or in connection with its entering into and/or performing under this Agreement.

**ARTICLE IV**
MISCELLANEOUS

4.1     Assignment; Successors and Assigns; Third Parties.  Neither Buyer nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Agreement without the express written consent of the other party.  Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Agreement shall require express written consent of both Buyer and Seller.  This Agreement shall be binding upon and shall inure to the benefit of Buyer, Seller and Escrow Agent, and their respective successors and permitted assigns. This Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person other than Buyer, Seller and Escrow Agent and their successors and permitted assigns.

4.2     Entire Agreement.  This Agreement and the PSA set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written.  In the event of any direct conflict of the terms and conditions of this Agreement and the terms and conditions of the PSA, the terms and conditions of this Agreement shall control and prevail.

4.3     Severability.  If a provision of this Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.4     Notices.  Any notices, communications or other deliveries required to be sent under this Agreement shall be delivered in accordance with Section 11.8 of the PSA.

4.5     Governing Law.  This Agreement, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of Washington (without reference to principles of conflict of laws).

4.6     Execution Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.  An electronic image of a signature will have the same legal effect for the purpose of establishing the execution of this Agreement as an originally drawn signature.

4.7     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.8     Waiver of Jury Trial; Venue.

(a)     TO THE FULLEST EXTENT PERMITTED BY LAW, SELLER, BUYER AND ESCROW AGENT HEREBY EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BY ANY SELLER, BUYER OR ESCROW AGENT AGAINST ANY OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

(b)     Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in any State or Federal Court located in Seattle, Washington, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment.  Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding shall be heard and determined in such courts.  Buyer, Seller and Escrow Agent agree that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY STATE OR FEDERAL COURT LOCATED IN SEATTLE, WASHINGTON, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO (1) THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING AND (2) THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING (INCLUDING ANY OBJECTION OF OR RELATING TO FORUM NON-CONVENIENS).

4.9     No Waiver.  No failure on the part of Buyer or Seller at any time to require the performance by the other of any provision of this Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be

taken or held to be a waiver of any other provision hereof.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of Escrow Agent, Seller and Buyer has caused this Agreement to be executed on its behalf as of the day and year first above written.

**ESCROW AGENT**:

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By:    _____
        Name: _____
        Title: _____

**SELLER:**

**10-1301 HSW OWNER, LLC**,
a Delaware limited liability company

By:    _____
Name: _____
Title: _____

**BUYER:**

**URBAN COMMONS, LLC**,
a Delaware limited liability company

By:    _____
        Name: _____
        Title: _____

Exhibit Q - 1

## EXHIBIT R

## FORM OF NOI HOLDBACK ESCROW AGREEMENT

This ***HOLDBACK ESCROW AGREEMENT*** (this "**Agreement**") is entered into as of the ___ day of February, 2020, among **FIRST AMERICAN TITLE INSURANCE COMPANY** ("**Escrow Agent**"), **10-1301 HSW OWNER, LLC**, a Delaware limited liability company ("**Seller**"), and **URBAN COMMONS, LLC**, a Delaware limited liability company ("**Buyer**").

## RECITALS:

A. **WHEREAS**, Seller and Buyer entered into that certain Purchase and Sale Agreement dated December 24, 2019 (as the same may be amended, the "**PSA**"). Each initially capitalized term not otherwise defined in this Agreement shall have the meaning ascribed to such term in the PSA.

B. **WHEREAS**, pursuant to Section 4.5 of the PSA, Seller agreed to fund into an escrow account held by Escrow Agent, the sum of Two Million Dollars ($2,000,000) (the "**NOI Holdback Amount**") to secure Seller's obligation to pay to Buyer, if NOI is less than the NOI Threshold, the NOI Payment.

C. **WHEREAS**, Buyer and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

**NOW THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and intending to be legally bound, Escrow Agent, Seller and Buyer agree as follows:

## ARTICLE I
### APPOINTMENT OF ESCROW AGENT

1.1     Seller and Buyer hereby appoint the Escrow Agent to act as escrow agent, and the Escrow Agent hereby agrees to serve as escrow agent, upon the terms and conditions set forth in this Agreement.

## ARTICLE II
### ESCROW

2.1     Escrow.  At Closing, Escrow Agent shall hold back from Seller's proceeds from the sale of the Property the NOI Holdback Amount.  The NOI Holdback Amount, together with the interest thereon, shall be invested by Escrow Agent in JPMorgan 100% U.S. Treasury Securities Money Market Fund or similar account that invests in U.S. government securities reasonably satisfactory to Seller, and deposited by Escrow Agent into a segregated interest-bearing escrow account (the "**NOI Holdback Account**").

2.2     Receipt of NOI Holdback Amount.  By signing below, Escrow Agent hereby acknowledges its receipt of the NOI Holdback Amount from Seller.  Escrow Agent shall hold, invest and disburse the NOI Holdback Amount in accordance with the terms and conditions of this Agreement.  Seller and Buyer shall each bear one-half of all costs associated with maintaining the

NOI Holdback Amount with Escrow Agent.  Escrow Agent shall promptly provide Buyer and Seller with confirmation of the investments made and shall not commingle the NOI Holdback Amount with any funds of the Escrow Agent.

    2.3    <u>Disbursement of NOI Holdback Amount</u>.

        2.3.1   If NOI is less than the NOI Threshold, prior to the Release Date (defined below), Buyer may assert a claim for disbursement of funds in the amount of the NOI Payment from the NOI Holdback Account by giving written notice thereof (the "**Disbursement Request**") to Seller and Escrow Agent.  Seller shall have five (5) Business Days after receipt of the Disbursement Request to object to the disbursement of all or any portion of the NOI Payment requested by Buyer by submitting a notice of objection (the "**Objection Notice**") to Buyer and Escrow Agent, which objection shall be solely on the grounds that Seller disagrees, in good faith, with Buyer's calculation of the NOI Payment or NOI set forth in the applicable Disbursement Request.  If Seller delivers the Objection Notice within such five (5) Business Day period, then the NOI Payment (or portion thereof that is in dispute) shall be retained in the NOI Holdback Account by Escrow Agent until (i) Seller and Buyer resolve such dispute pursuant to a written settlement agreement entered into between Buyer and Seller, in which case the NOI Payment shall be disbursed in accordance with the instructions set forth in such settlement agreement, (ii) Seller's and Buyer's respective rights to the NOI Payment are determined by the Outside Accountants in accordance with the PSA, in which case the NOI Payment shall be disbursed in accordance with the determination of the Outside Accountants or (iii) Seller and Buyer otherwise jointly direct Escrow Agent in writing as to how to disburse the NOI Payment, in which case the NOI Payment shall be disbursed in accordance with such joint written direction.  If Seller does not deliver the Objection Notice to Buyer and Escrow Agent within such five (5) Business Day period, then Escrow Agent shall disburse the NOI Payment to Buyer in accordance with the Disbursement Request within one (1) Business Day following the expiration of such five (5) Business Day period. If Buyer and Seller jointly submit a Disbursement Request with regard to all or any portion of the NOI Holdback Amount, Escrow Agent shall disburse the requested amounts from the NOI Holdback Account within one (1) Business Day following its receipt of the joint Disbursement Request pursuant to the directions set forth therein.

        2.3.2   On March 1, 2021 or if there is a dispute regarding the calculation of NOI, three (3) Business Days after the resolution of the dispute by the Outside Accountants (the "**Release Date**"), Escrow Agent shall disburse the entire remaining NOI Holdback Amount then held in the NOI Holdback Account, together with any interest accrued thereon, to Seller in accordance with instructions provided by Seller without further instruction from Buyer, and notwithstanding any instructions from Buyer to the contrary; <u>provided</u> that, if prior to the Release Date, Escrow Agent has received a Disbursement Request from Buyer but has not yet released the NOI Payment set forth therein to Buyer, then Escrow Agent shall retain the NOI Payment in the NOI Holdback Account and only release to Seller the balance of the NOI Holdback Amount, if any.  The NOI Payment shall be retained in the NOI Holdback Account by Escrow Agent until (i) the expiration of the five (5) Business Day period provided in <u>Section 2.3.1</u> of this Agreement with respect to a specific Disbursement Request, if no Objection Notice is delivered by Seller to Escrow Agent within such five (5) Business Day period with respect to such Disbursement Request, in which case the NOI Payment shall be disbursed to Buyer in accordance with the Disbursement

Request; (ii) Seller and Buyer resolve any dispute with respect to any Objection Notice which has been timely provided by Seller in accordance with <u>Section 2.3.1</u> of this Agreement pursuant to a written settlement agreement entered into between Buyer and Seller, in which case the Claim Amount shall be disbursed in accordance with the instructions set forth in such settlement agreement, (iii) if an Objection Notice which has been timely provided by Seller in accordance with <u>Section 2.3.1</u> of this Agreement, Seller's and Buyer's respective rights to the Claim Amount have been determined by the Outside Accountants in accordance with the PSA, in which case the NOI Payment shall be disbursed in accordance with the determination of the Outside Accountants or (iv) Seller and Buyer otherwise jointly direct Escrow Agent in writing as to how to disburse the NOI Payment, in which case the NOI Payment shall be disbursed in accordance with such joint written direction.

2.3.3   Any interest earned on the NOI Holdback Amount shall be reinvested and become part of the NOI Holdback Amount.  Seller shall be responsible for the payment of all income tax due on such interest.  Seller hereby certifies to the Escrow Agent, that Seller's correct taxpayer identification number is 81-3141564.

# ARTICLE III
## LIABILITY OF ESCROW AGENT

3.1   <u>Liability of Escrow Agent</u>.  Escrow Agent shall have no liability or obligation with respect to the NOI Holdback Amount except for Escrow Agent's bad faith, disregard of this Agreement, willful misconduct or negligence.  Escrow Agent's sole responsibility shall be for the safekeeping, and disbursement of the NOI Holdback Amount in accordance with the terms and conditions of this Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth in this Agreement.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Agreement.   In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the NOI Holdback Amount, any account in which the NOI Holdback Amount is deposited, this Agreement or the PSA, or to appear in, prosecute or defend any such legal action or proceeding.

3.2   <u>Authorization of Escrow Agent</u>.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court with respect to the NOI Holdback Amount, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the NOI Holdback Amount is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with

Exhibit R - 4

any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any
other person by reason of such compliance even though such order, writ, judgment or decree may
be subsequently reversed, modified, annulled, set aside or vacated.

3.3    Indemnification of Escrow Agent.  Seller and Buyer hereby jointly and severally
agree to indemnify Escrow Agent for, and to hold it harmless against, any actual, out-of-pocket
loss, liability, damage (excluding any prospective or speculative profits, consequential, punitive,
special, exemplary and indirect damages) or expense incurred without bad faith, disregard of this
Agreement, gross negligence or willful misconduct on the part of Escrow Agent arising out of or
in connection with its entering into and/or performing under this Agreement.

## ARTICLE IV
## MISCELLANEOUS

4.1    Assignment; Successors and Assigns; Third Parties.  Neither Buyer nor Seller shall
convey, assign or otherwise transfer any of its rights or obligations under this Agreement without
the express written consent of the other party.  Any conveyance, assignment or other transfer of
any of Escrow Agent's rights and obligations under this Agreement shall require express written
consent of both Buyer and Seller.  This Agreement shall be binding upon and shall inure to the
benefit of Buyer, Seller and Escrow Agent, and their respective successors and permitted assigns.
This Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by,
any other person other than Buyer, Seller and Escrow Agent and their successors and permitted
assigns.

4.2    Entire Agreement.  This Agreement and the PSA set forth all of the promises,
covenants, agreements, conditions and undertakings between the parties hereto with respect to the
subject matter hereof and supersede all prior or contemporaneous agreements and understandings,
negotiations, inducements or conditions, express or implied, oral or written.  In the event of any
direct conflict of the terms and conditions of this Agreement and the terms and conditions of the
PSA, the terms and conditions of this Agreement shall control and prevail.

4.3    Severability.  If a provision of this Agreement is deemed to be contrary to law, that
provision will be deemed separable from the remaining provisions of this Agreement, and will not
affect the validity, interpretation or effect of the other provisions of either this Agreement or any
agreement executed pursuant to it or the application of that provision to other circumstances not
contrary to law.

4.4    Notices.  Any notices, communications or other deliveries required to be sent under
this Agreement shall be delivered in accordance with Section 11.8 of the PSA.

4.5    Governing Law.  This Agreement, and all questions of interpretation hereof and all
controversies hereunder shall be construed in accordance with and governed by the laws of the
State of Washington (without reference to principles of conflict of laws).

4.6    Execution Counterparts.  This Agreement may be executed in two (2) or more
counterparts, each of which shall be deemed to be an original but all of which together shall be
deemed to be one and the same instrument.  An electronic image of a signature will have the same

Exhibit R - 5

legal effect for the purpose of establishing the execution of this Agreement as an originally drawn signature.

      4.7    <u>Captions</u>.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

      4.8    <u>Waiver of Jury Trial; Venue</u>.

      (a)    TO THE FULLEST EXTENT PERMITTED BY LAW, SELLER, BUYER AND ESCROW AGENT HEREBY EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BY ANY SELLER, BUYER OR ESCROW AGENT AGAINST ANY OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

      (b)    Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in any State or Federal Court located in Seattle, Washington, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment.  Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding shall be heard and determined in such courts.  Buyer, Seller and Escrow Agent agree that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY STATE OR FEDERAL COURT LOCATED IN SEATTLE, WASHINGTON, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO (1) THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING AND (2) THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING (INCLUDING ANY OBJECTION OF OR RELATING TO FORUM NON-CONVENIENS).

      4.9    <u>No Waiver</u>.  No failure on the part of Buyer or Seller at any time to require the performance by the other of any provision of this Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[SIGNATURE PAGE FOLLOWS]

Exhibit R - 6

IN WITNESS WHEREOF, each of Escrow Agent, Seller and Buyer has caused this Agreement to be executed on its behalf as of the day and year first above written.

**ESCROW AGENT**:

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
      Name: _____
      Title: _____

**SELLER:**

**10-1301 HSW OWNER, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

**URBAN COMMONS, LLC**,
a Delaware limited liability company

By: _____
      Name: _____
      Title: _____

Exhibit R - 1

## EXHIBIT S

## FORM OF PIP ESCROW HOLDBACK AGREEMENT

This ***PIP ESCROW HOLDBACK AGREEMENT*** (this "**Agreement**") is entered into as of the ___ day of February, 2020, among **FIRST AMERICAN TITLE INSURANCE COMPANY** ("**Escrow Agent**"), **10-1301 HSW OWNER, LLC**, a Delaware limited liability company ("**Seller**"), and **URBAN COMMONS, LLC**, a Delaware limited liability company ("**Buyer**").

## RECITALS:

A. **WHEREAS**, Seller and Buyer entered into that certain Purchase and Sale Agreement dated December 24, 2019 (as the same may be amended, the "**PSA**").  Each initially capitalized term not otherwise defined in this Agreement shall have the meaning ascribed to such term in the PSA.

B. **WHEREAS**, pursuant to <u>Section 4.5</u> of the PSA, Seller agreed to fund into an escrow account held by Escrow Agent, the sum of _____[1] (the "**Excess PIP Costs Holdback Amount**") to secure Seller's obligation to pay to Buyer the actual costs of the Required PIP in excess of Two Million Dollars ($2,000,000) in the first twelve (12) months following the Closing.

C. **WHEREAS**, Buyer and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

**NOW THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and intending to be legally bound, Escrow Agent, Seller and Buyer agree as follows:

## ARTICLE I
### APPOINTMENT OF ESCROW AGENT

1.1    Seller and Buyer hereby appoint the Escrow Agent to act as escrow agent, and the Escrow Agent hereby agrees to serve as escrow agent, upon the terms and conditions set forth in this Agreement.

## ARTICLE II
### ESCROW

2.1    <u>Escrow</u>.  At Closing, Escrow Agent shall hold back from Seller's proceeds from the sale of the Property the Excess PIP Costs Holdback Amount.  The Excess Pip Costs Holdback Amount, together with the interest thereon, shall be invested by Escrow Agent in JPMorgan 100% U.S. Treasury Securities Money Market Fund or similar account that invests in U.S. government securities reasonably satisfactory to Seller, and deposited by Escrow Agent into a segregated

---

[1] Note to Draft: To be an amount equal to 100% of the Excess PIP Costs.

interest-bearing escrow account (the "**Excess PIP Costs Holdback Account**").

2.2     Receipt of Excess PIP Costs Holdback Amount.  By signing below, Escrow Agent
hereby acknowledges its receipt of the Excess PIP Costs Holdback Amount from Seller.  Escrow
Agent shall hold, invest and disburse the Excess PIP Costs Holdback Amount in accordance with
the terms and conditions of this Agreement.  Seller and Buyer shall each bear one-half of all costs
associated with maintaining the Excess PIP Costs Holdback Amount with Escrow Agent.  Escrow
Agent shall promptly provide Buyer and Seller with confirmation of the investments made and
shall not commingle the Excess PIP Costs Holdback Amount with any funds of the Escrow Agent.

2.3     Disbursement of Excess PIP Costs Holdback Amount.

2.3.1   After Buyer has actually paid Two Million Dollars ($2,000,000) for
Required PIP costs during the first twelve (12) months following the Closing, Buyer may assert
claims for disbursement of funds in the amount of actual costs of the Required PIP in excess of
Two Million Dollars ($2,000,000) (an "**Excess PIP Costs Payment**") from the Excess PIP Costs
Holdback Account by giving written notice thereof (the "**Disbursement Request**") to Seller and
Escrow Agent.  Seller shall have five (5) Business Days after receipt of the Disbursement Request
to object to the disbursement of all or any portion of the Excess PIP Costs Payment requested by
Buyer by submitting a notice of objection (the "**Objection Notice**") to Buyer and Escrow Agent,
which objection shall be solely on the grounds that Seller disagrees, in good faith, with Buyer's
calculation of the of actual costs of the Required PIP set forth in the applicable Disbursement
Request.  If Seller delivers the Objection Notice within such five (5) Business Day period, then
the Excess PIP Costs Payment (or portion thereof that is in dispute) shall be retained in the Excess
PIP Costs Holdback Account by Escrow Agent until (i) Seller and Buyer resolve such dispute
pursuant to a written settlement agreement entered into between Buyer and Seller, in which case
the Excess PIP Costs Payment shall be disbursed in accordance with the instructions set forth in
such settlement agreement, (ii) either party submits such dispute to the Outside Accountants (for
determination by the Outside Accountants within a period of fifteen (15) days after such
submittal), in which case the Excess PIP Costs Payment shall be disbursed in accordance with the
determination of the Outside Accountants (the fees and expenses of the Outside Accountants shall
be shared equally by Buyer, on the one hand, and Seller on the other hand) or (iii) Seller and Buyer
otherwise jointly direct Escrow Agent in writing as to how to disburse the Excess PIP Costs
Payment, in which case the Excess PIP Costs Payment shall be disbursed in accordance with such
joint written direction.  If Seller does not deliver the Objection Notice to Buyer and Escrow Agent
within such five (5) Business Day period, then Escrow Agent shall disburse the Excess PIP Costs
Payment to Buyer in accordance with the Disbursement Request within one (1) Business Day
following the expiration of such five (5) Business Day period.  If Buyer and Seller jointly submit
a Disbursement Request with regard to all or any portion of the Excess PIP Costs Holdback
Amount, Escrow Agent shall disburse the requested amounts from the Excess PIP Costs Holdback
Account within one (1) Business Day following its receipt of the joint Disbursement Request
pursuant to the directions set forth therein.

2.3.2   On the date which is ninety (90) days after [February ___, 2021][2] (the

_____

[2] 90 days after 12 month anniversary of Closing Date.

Exhibit S - 3

"**Release Date**"), Escrow Agent shall disburse the entire remaining Excess PIP Costs Holdback Amount then held in the Excess PIP Costs Holdback Account, together with any interest accrued thereon, to Seller in accordance with instructions provided by Seller without further instruction from Buyer, and notwithstanding any instructions from Buyer to the contrary; provided that, if prior to the Release Date, Escrow Agent has received one (1) or more Disbursement Requests from Buyer but has not yet released the Excess PIP Costs Payment(s) set forth therein to Buyer, then Escrow Agent shall retain all such Excess PIP Costs Payments in the Excess PIP Costs Holdback Account and only release to Seller the balance of the Excess PIP Costs Holdback Amount, if any. The Excess PIP Costs Payment shall be retained in the Excess PIP Costs Holdback Account by Escrow Agent until, with respect to each Excess PIP Costs Payment, such Excess PIP Costs Payment is disbursed in accordance with Section 2.3.1.

2.3.3   Any interest earned on the Excess PIP Costs Holdback Amount shall be reinvested and become part of the Excess PIP Costs Holdback Amount.  Seller shall be responsible for the payment of all income tax due on such interest.  Seller hereby certifies to the Escrow Agent, that Seller's correct taxpayer identification number is 81-3141564.

## ARTICLE III
### LIABILITY OF ESCROW AGENT

3.1   Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Excess PIP Costs Holdback Amount except for Escrow Agent's bad faith, disregard of this Agreement, willful misconduct or negligence.  Escrow Agent's sole responsibility shall be for the safekeeping, and disbursement of the Excess PIP Costs Holdback Amount in accordance with the terms and conditions of this Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth in this Agreement.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Agreement.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Excess PIP Costs Holdback Amount, any account in which Excess PIP Costs Holdback Amount is deposited, this Agreement or the PSA, or to appear in, prosecute or defend any such legal action or proceeding.

3.2   Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court with respect to the Excess PIP Costs Holdback Amount, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Excess PIP Costs Holdback Amount is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow

Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

       3.3    <u>Indemnification of Escrow Agent</u>.  Seller and Buyer hereby jointly and severally agree to indemnify Escrow Agent for, and to hold it harmless against, any actual, out-of-pocket loss, liability, damage (excluding any prospective or speculative profits, consequential, punitive, special, exemplary and indirect damages) or expense incurred without bad faith, disregard of this Agreement, gross negligence or willful misconduct on the part of Escrow Agent arising out of or in connection with its entering into and/or performing under this Agreement.

**ARTICLE IV**
MISCELLANEOUS

       4.1    <u>Assignment; Successors and Assigns; Third Parties</u>.  Neither Buyer nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Agreement without the express written consent of the other party.  Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Agreement shall require express written consent of both Buyer and Seller.  This Agreement shall be binding upon and shall inure to the benefit of Buyer, Seller and Escrow Agent, and their respective successors and permitted assigns. This Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person other than Buyer, Seller and Escrow Agent and their successors and permitted assigns.

       4.2    <u>Entire Agreement</u>.  This Agreement and the PSA set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written.  In the event of any direct conflict of the terms and conditions of this Agreement and the terms and conditions of the PSA, the terms and conditions of this Agreement shall control and prevail.

       4.3    <u>Severability</u>.  If a provision of this Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

       4.4    <u>Notices</u>.  Any notices, communications or other deliveries required to be sent under this Agreement shall be delivered in accordance with <u>Section 11.8</u> of the PSA.

       4.5    <u>Governing Law</u>.  This Agreement, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of Washington (without reference to principles of conflict of laws).

       4.6    <u>Execution Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.  An electronic image of a signature will have the same

Exhibit S - 5

legal effect for the purpose of establishing the execution of this Agreement as an originally drawn signature.

4.7     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.8     Waiver of Jury Trial; Venue.

(a)     TO THE FULLEST EXTENT PERMITTED BY LAW, SELLER, BUYER AND ESCROW AGENT HEREBY EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BY ANY SELLER, BUYER OR ESCROW AGENT AGAINST ANY OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

(b)     Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in any State or Federal Court located in Seattle, Washington, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment.  Buyer, Seller and Escrow Agent hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding shall be heard and determined in such courts.  Buyer, Seller and Escrow Agent agree that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY STATE OR FEDERAL COURT LOCATED IN SEATTLE, WASHINGTON, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO (1) THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING AND (2) THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING (INCLUDING ANY OBJECTION OF OR RELATING TO FORUM NON-CONVENIENS).

4.9     No Waiver.  No failure on the part of Buyer or Seller at any time to require the performance by the other of any provision of this Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[SIGNATURE PAGE FOLLOWS]

Exhibit S - 6

IN WITNESS WHEREOF, each of Escrow Agent, Seller and Buyer has caused this Agreement to be executed on its behalf as of the day and year first above written.

**ESCROW AGENT**:

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
      Name: _____
      Title: _____

**SELLER:**

**10-1301 HSW OWNER, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

**URBAN COMMONS, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

Schedule 2.1 - 1

**SCHEDULE 2.1**

**PURCHASE PRICE ALLOCATION**

| | |
|---|---|
| Land | $20,200,000 |
| Improvements | $58,056,000 |
| Total Real Estate | $78,256,000 |
| Personal Property | $6,144,00 |
| Intangible/Goodwill Value | $13,100,000 |
| Purchase Price | $97,500,000 |

Schedule 2.1 - 1

**SCHEDULE 4.2**

**ADDITIONAL INSUREDS**

1. 10-1301 HSW Owner, LLC
2. 10-1301 HSW Holdings, LLC
3. 10-1301 HSW MFM, LLC
4. 10-1301 HSW CIFM, LLC
5. Westbrook Real Estate Fund X, L.P.
6. Westbrook Real Estate Co-Investment Partnership X, L.P.
7. Westbrook Realty Management X, L.P.
8. WRM X GP, L.L.C.
9. 365 Management Company, LLC
10. Hilton Franchise Holding LLC
11. HSBC Bank USA, National Association

4124-5703-1711.13

# SCHEDULE 5.1(j)

## VOUCHERS

| GC # | ACCOMODATIONS |
|---|---|
| 9103 | 1 night stay |
| 9106 | 1 night |
| 9108 | 1 night stay |
| 9109 | 1 night |
| 9113 | 2 night stay |
| 9114 | 1 night stay |
| 9121 | 1 night stay w/ breakfast |
| 9122 | 3 night stay with breakfast |
| 9123 | 1 night stay with breakfast |
| 9124 | 1 night stay |
| 9127 | 1 night stay w/ executive lounge privilege |
| 9130 | 2 night stay |
| 9131 | 1 night |
| 9132 | 1 night |
| 9146 | 1 night stay for 2 |
| 9148 | 2 night stay |
| 9149 | 1 night w/ breakfast |
| 9150 | 1 night stay with breakfast |
| 9151 | 1 night stay with breakfast |
| 9080 | 1 night stay |

Schedule 5.1(j) - 1

| 9152 | 1 night stay for 2 |
|------|--------------------|
| 9153 | 1 night stay |
| 9156 | 1 night stay |
| 9157 | 1 night stay for 2 |
| 9163 | 2 night stay with breakfast |
| 9164 | 3 night stay with breakfast |
| 9165 | 2 night stay |
| 9167 | 1 night stay |
| 9168 | 1 night stay |
| 9169 | 1 night stay |
| 9170 | 1 night stay |
| 9171 | 1 night stay with breakfast |
| 9174 | 1 night stay |
| 9176 | 1 night stay w/ bfast |
| 9177 | 2 night stay |
| 9178 | 3 night stay |
| 9179 | 1 night stay |
| 9180 | 2 night stay |
| 9175 | 1 night stay w/ bfast |

Schedule 5.1(j) - 2

**SCHEDULE 7.2(d)**

**LITIGATION**

None

**SCHEDULE 7.2(f)**

**COMPLIANCE WITH LAW**

None

4124-5703-1711.13

**SCHEDULE 7.2(j)**

**LABOR MATTERS**

None

**SCHEDULE 7.2(k)**

**<u>VIOLATIONS OF LICENSES AND PERMITS</u>**

None

**SCHEDULE 7.2(q)**

**<u>TAXES</u>**

None