# EXHIBIT 1

# LETTER TO
# STAPLED SECURITYHOLDERS

Dear Stapled Securityholders,

We address you with a heavy heart. In the face of unprecedented challenges, please allow us to summarise the events and circumstances that have led us to the precarious situation we find ourselves in today.

**INITIAL PROSPECTS**

Approximately 15 months ago, we started our journey as a public stapled trust with excitement and what we believed were strong prospects. We had confidence in the quality of our hotel portfolio which is defined by geographic distribution in top markets in the U.S., franchise affiliation with leading hotel brands and a significant pre-IPO capital investment programme, among other merits.

**UNFORTUNATE CIRCUMSTANCES**

On the heels of multiple factors including operational challenges and the ongoing Covid-19 pandemic that hit the U.S. in the first quarter of 2020 (which represents the biggest disruption to the global economy and the hospitality industry in modern history), as well as our dependency on a single Master Lessee to resolve all defaults and meet all obligations, our Master Lease Agreements ("**MLAs**") have proven untenable. Loan facilities are in default and have been accelerated, and we continue to engage our lenders in discussions to extend forbearance whilst we focus on developing and implementing a restructuring plan for EHT. The circumstances weigh on the Board of Directors significantly, and we continue to devote ourselves fully to address the situation.

**ORGANISATIONAL TEETHING**

Following the IPO, as a new manager, we sought to hire and enhance our team's capabilities. Concurrently, we focused on developing and implementing processes and procedures as we worked with Urban Commons, themselves a first-time REIT Sponsor and Master Lessee.

In the midst of settling in as a newly listed entity, the group encountered significant scrutiny from the media in the fourth quarter of 2019. The Managers sought to provide prompt clarifications to Stapled Securityholders and the regulators, which required constant explanations and engagement. This resulted in significant distractions that ultimately affected employee morale as the Managers attempted to hire and retain personnel. The Managers, including the Board of Directors worked diligently to address damaging allegations that were often based on information that was incomplete and/or out of context.

**OPERATING CHALLENGES**

Apart from establishing new protocols, the Managers were focused on operating challenges that EHT faced. Specifically, EH-REIT's operating performance was impacted by a weaker than anticipated U.S. lodging market, slower than anticipated ramp-up following pre-IPO renovations, construction delays at five assets in EHT's portfolio, and disruptions from a category-5 hurricane at EHT's largest asset, Holiday Inn Resort Orlando Suites - Waterpark. In addition, our operations encountered transitional friction from changes in third-party property managers across half of EHT's hotels following the IPO.

**OPERATIONAL INITIATIVES**

The effects of many of these operating issues were considered unique to 2019 and were expected to improve with time. Further, many of these setbacks, including the spending related to the 2019 construction delays, and the improvements in respect of certain third-party property manager changes were meant to enhance the income productivity of the assets over time.

The Managers worked with the Sponsor and Master Lessees on a variety of proactive asset management and operational initiatives to support revenue growth and improve operating and cost efficiencies at the hotels. Revenue improvement strategies included an enhanced dynamic pricing strategy through a supplemented sales force and revenue management support through major brand partnerships. EHT also implemented cost-saving initiatives, including expense reduction strategies, energy cost reductions in de-regulated markets through strategic partnerships, and portfolio-wide labour savings initiatives.

Further, the Sponsor, as Master Lessees, proposed and the Managers agreed to certain economic improvements to the rent payment structure in the MLAs, which resulted in more income to EHT in 2019.

**LOOKED TO 2020 WITH HOPE**

We were hopeful that many of the operational challenges and exogenous events that EHT faced in 2019 would be behind us, and 2020 would be a more stable year with less disruption and improved performance.

However, whilst the Master Lessees satisfied its rent obligations for 2019, the Master Lessees have not been able to fulfil their obligations in 2020 and rent payments from January 2020 to date remain substantially unpaid. The Managers, including the Board of Directors, have persistently

reminded the Master Lessees of its obligations under the MLAs, including its rental obligations. The Master Lessees' non-performance of its obligations mounted in 2020 and was exacerbated by the ongoing Covid-19 pandemic.

As circumstances evolved, the Board of Directors determined that it was appropriate to take certain actions, including a decision to draw on security deposits to make up for the shortfall in payments. The Managers also announced that it would be commencing a strategic review. This occurred in conjunction with many factors, including a depressed stock price, delinquent rental payments by the Master Lessees and escalating risks as a result of the Covid-19 pandemic.

**DEFAULT UNDER FACILITIES AGREEMENT AND NON-PAYMENT OF DIVIDEND**

Although the Managers had prepared to distribute the scheduled dividend on 30 March 2020, as a result of the receipt of a notice of default and acceleration under EHT's facilities agreement for a principal amount of US$341.0 million from the Administrative Agent, EH-REIT was restricted under the terms of such facilities agreement from making payment of the scheduled dividend.

**BOARD ACTIONS**

The Board of Directors acted swiftly and established a Special Committee, comprising the Independent Directors of the Board and the Chief Executive Officer of the Managers. The Special Committee excluded the then Non-Independent and Non-Executive Chairman and Deputy Chairman (the "Sponsor Directors"), who concurrently represented the Sponsor and the Master Lessees, to avoid potential conflicts of interest, in order to allow the remaining members of the Board of Directors to independently assess strategic alternatives, pursue forbearance negotiations with lenders, and consider restructuring plans.

**HIRING ADVISERS**

In cooperation with the REIT Trustee, the Special Committee (on behalf of the Managers) hired a set of independent advisers to address severe business challenges and operational dislocation, urgent and critical funding needs, as well as to review alternatives with the objective of safeguarding EHT's assets in the best interests of Stapled Securityholders. The Special Committee, alongside the REIT Trustee and with the benefit of professional advice from its advisers, has worked together with EHT's lenders to utilise EHT's cash resources to protect and preserve the underlying value of EHT's assets.

**FORBEARANCE NEGOTIATIONS AND PORTFOLIO STABILISATION**

Given the circumstances, the Special Committee, with the assistance of its professional advisers, continues to work around the clock and across time zones in an effort to stabilise the portfolio's operations and minimise losses amid the unprecedented disruptions in the hospitality sector in the U.S.. In addition, the Special Committee, with the assistance of its professional advisers, continues to engage the lenders in negotiating continued forbearance as we assess restructuring options.

**SPONSORSHIP**

As circumstances developed, Urban Commons, LLC, explored potential partnerships to supplement EHT's Sponsorship. The Special Committee and the REIT Trustee mandated their financial adviser to review all available options to EHT, including an investment in EHT, as part of a potential restructuring plan. From the Managers' SGXNET announcements to date, Stapled Securityholders will be aware that the REIT Trustee, with its professional advisers, has launched a RFP process (which is currently underway) to seek proposals for EHT on an expedited basis. Whilst we cannot be certain as to the outcome of the RFP process, we are encouraged by both the significant investor receptivity to date in respect of managing EHT's assets, and investing in EHT as part of a potential restructuring plan.

The Special Committee continues to work tirelessly in an effort to protect EHT's assets, maximise recovery, and pave the road for a turnaround of EHT in the interests of Stapled Securityholders. We hear all the concerns of the Stapled Securityholders and appreciate that it is a very difficult and trying time. As the Special Committee, together with the Managers and the REIT Trustee, continues to work with our professional advisers to resolve multiple matters amidst fluid circumstances, we greatly appreciate the patience extended to us by the Stapled Securityholders.

For and on behalf of the Board of Directors

**Salvatore Gregory Takoushian**
*Executive Director and Chief Executive Officer*

# CORPORATE GOVERNANCE

The REIT Manager Board has scheduled to meet on a quarterly basis to review the results and to transact normal company business, with ad hoc meetings convened as and when required. Two quarterly meetings were held by the REIT Manager during FY2019 subsequent to the listing date of EHT on 24 May 2019 ("**Listing Date**"). There were numerous ad hoc meetings convened by the Board as a matter of diligence during the initial months after the initial public offering ("**IPO**"). The Board also convened ad hoc meetings with respect to issues that arose that year. The Trustee-Manager being dormant, did not hold any meetings in FY2019. The attendance of the directors of the REIT Manager at the quarterly meetings, as well as the frequency of such meetings during FY2019, is disclosed below:

| Name | Board of Directors | | Audit and Risk Committee | | Nominating and Remuneration Committee | |
|---|---|---|---|---|---|---|
| | Number of meetings | | | | | |
| | Held | Attended | Held | Attended | Held | Attended |
| Howard Wu[1] | 2 | 1 | 2 | 1* | 1 | - |
| Taylor Woods[2] | 2 | 2 | 2 | 1* | 1 | 1 |
| Salvatore Takoushian | 2 | 2 | 2 | 2* | 1 | 1* |
| Davy Lau | 2 | 2 | 2 | 2 | 1 | 1 |
| Kelvin Tan | 2 | 2 | 2 | 2 | 1 | 1* |
| Gabriel Stubbe | 2 | 2 | 2 | 2* | 1 | 1 |
| Tarun Kataria | 2 | 2 | 2 | 2 | 1 | 1* |
| Ng Kheng Choo[3] | 1 | 1 | 1 | 1* | 1 | 1 |

\* By invitation.
1  Howard Chorng Jeng Wu ("Howard Wu") resigned as a Director on 26 May 2020.
2  Taylor Ronald Woods ("Taylor Woods") resigned as a Director on 26 May 2020.
3  Ng Kheng Choo ("Nicole Ng") was appointed as a Director on 8 October 2019 and resigned on 17 March 2020.

Note:   There were no records of meetings of the Special Committee following the resignation of Mr. Howard Wu and Mr. Taylor Woods, as the Special Comittee comprises the existing Board members and all decisions were recorded via written Board Resolutions.

Prior to Board meetings and on an on-going basis, Management endeavors to provide information to the Board to enable the Board to make informed decisions and discharge their duties and responsibilities. Directors are at liberty to request for further explanations, briefings or informal discussions on any aspect of the Managers' operations or business issues from Management. The CEO will make the necessary arrangements for these briefings, informal discussions, or explanations. Management is also required to furnish any additional information, when so requested by the Board, as and when the need arises.

The Company Secretary or her representative attends all quarterly meetings and is responsible for ensuring that Board procedures are followed. The Company Secretary also periodically updates the Board on relevant regulatory changes affecting the Group.

The Board has separate and independent access to Management, the Company Secretary and external advisers (where necessary), at all times and at the Group's expense. The appointment and the removal of the Company Secretary is subject to the approval of the Board.

Upon their appointment to the Board, all Directors are given formal appointment letters explaining the terms of their appointment and setting out the duties and obligations of a Director (including their roles as executive, non-executive and independent directors). There are plans for more formalised induction, training and development programme for the Directors to familiarise them with the business and operations of EHT.

All Non-Executive Directors contribute to the Board process by monitoring and reviewing Management's performance against its goals and objectives. Their views and opinions provide alternative perspectives to EHT's business and enable the Board to make informed and balanced decisions. Non-Executive Directors constructively provide inputs and enable the Board to interact and work with Management to establish strategies.

When reviewing Management's proposals or decisions, the Non-Executive Directors provide objective judgement on business activities and transactions involving conflicts of interest and other complexities.

**Chairman and Chief Executive Officer**

*Principle 3      There is a clear division of responsibilities between the leadership of the Board and Management, and no one individual has unfettered powers of decision-making.*

The Managers ensure that there is a clear division of responsibilities between the leadership of the Board and Management, and no one individual has unfettered powers of decision-making. The Chairman and the CEO are two separate persons. This ensures an appropriate balance of power and authority, increased accountability and greater capacity of the Board for independent decision-making.

During FY2019, the Board was chaired by Mr Howard Wu, a Non-Independent Non-Executive Director (the "**Chairman**") prior to his resignation. The Chairman was responsible for the overall management of the Board ensuring that the members of the Board and Management work together with integrity and competency, and that the Board engages Management in constructive debates on strategy, business operations, enterprise risk, and other plans.

As announced by the Managers on 26 May 2020, in light of the resignations or Mr. Howard Wu and Mr. Taylor Woods from the Board of the Managers, the NRC will be reviewing the composition of the Board and further announcements will be made in due course once a decision has been made on the appointment of a new Chairman.

Mr. Howard Wu and Mr. Taylor Woods had, during their tenure as the Non-Independent and Non-Executive Chairman and Deputy Chairman respectively of the Managers, recused themselves on Board decisions pertaining to the MLAs in view that they are also the Directors ("**Sponsor Directors**") of Urban Commons, LLC (the "**Sponsor**").

Mr. Salvatore Takoushian, as the CEO of the Managers, has executive responsibility over the business direction of the Managers and operational decisions in the day-to-day management of the REIT Manager. He is responsible for working with the REIT Manager Board to determine the overall business, investment, and operational strategies for EH-REIT. The CEO also works with the other members of the Management team of the REIT Manager to ensure that the business, investment, and operational strategies of EH-REIT are carried out as planned. In addition, the CEO is responsible for the overall management and planning of the strategic direction of EH-REIT, including overseeing the acquisition of hospitality and hospitality-related assets and asset management strategies for EH-REIT.

The Board has established in writing the division of responsibilities and duties between the Chairman and the CEO pursuant to Provision 3.2 of the Code which sets a clear separation of responsibilities between the Chairman and the CEO, to maintain an appropriate balance of power and authority. The former Chairman and the CEO are not related to each other.

Mr. Davy Lau was appointed as the Lead Independent Director to provide leadership in situations where the Chairman is conflicted. The Lead Independent Director is available to Stapled Securityholders where they have concerns and for which contact through the normal channels of communication with the Managers are inappropriate or inadequate. Stapled Securityholders may reach the Lead Independent Director via email at Lead-ID@eagleht.com.

# INDEPENDENT AUDITORS' REPORT

**Unitholders**
**Eagle Hospitality Business Trust**
(Constituted under a Trust Deed in the Republic of Singapore)
**Eagle Hospitality Real Estate Investment Trust**
(Constituted under a Trust Deed in the Republic of Singapore)

**Report on the audit of the financial statements**

*Disclaimer of opinion*

We were engaged to audit:

- the financial statements of Eagle Hospitality Business Trust ("EH-BT"), which comprise the statement of financial position as at 31 December 2019, the statement of comprehensive income, statement of movements in unitholders' funds and statement of cash flows of EH-BT for the period from 11 April 2019 (date of constitution) to 31 December 2019, and notes to the financial statements, including a summary of significant accounting policies;

- the consolidated financial statements of Eagle Hospitality Real Estate Investment Trust ("EH-REIT") and its subsidiaries (the "EH-REIT Group"), which comprise the statement of financial position and portfolio statement as at 31 December 2019, the statement of comprehensive income, statement of changes in unitholders' funds and statement of cash flows of the EH-REIT Group for the period from 11 April 2019 (date of constitution) to 31 December 2019, and notes to the financial statements, including a summary of significant accounting policies; and

- the consolidated financial statements of Eagle Hospitality Trust, which comprise the statement of financial position and portfolio statement as at 31 December 2019, the statement of comprehensive income, distribution statement, statement of changes in unitholders' funds and statement of cash flows of Eagle Hospitality Trust for the period from 11 April 2019 (date of constitution) to 31 December 2019, and notes to the financial statements, including a summary of significant accounting policies;

as set out on pages 86 to 157. Eagle Hospitality Trust, which comprises EH-BT and the EH-REIT Group, is hereinafter referred to as "EHT".

Because of the significance of the matters described in the '*Basis for disclaimer of opinion*' section of our report, we have not been able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on these financial statements. Accordingly, we do not express an opinion on the accompanying financial statements of EH-BT and consolidated financial statements of EH-REIT Group and EHT.

*Basis for disclaimer of opinion*

As disclosed in note 2 to the financial statements, EH-REIT and EHT are exposed to significant credit risk from the master lessees of their investment properties which are indirect wholly owned subsidiaries of Urban Commons, LLC (each a "Master Lessee" and collectively, the "Master Lessees"), and both the EH-REIT Group and EHT's going concern is dependent on their receiving rental payments from the Master Lessees and the Master Lessees fulfilling their obligations under the master lease agreements. The ability of the Master Lessees to make rental payments and fulfil their obligations under the master lease agreements is substantially dependent on the profitability of the operations of the properties leased by the Master Lessees.

# INDEPENDENT AUDITORS' REPORT

As at 31 December 2019, there were the following circumstances experienced by the EH-REIT Group:

(i) The EH-REIT Group recorded trade receivables of US$5.0 million from the Master Lessees, which were past due based on payment terms set out in the master lease agreements (each a "MLA" and collectively, the "MLAs") (see note 22). At the date of issuance of these financial statements, the trade receivables have been fully settled by the Master Lessees post 31 December 2019.

(ii) Under the terms of the MLAs, the Master Lessees are to provide security deposits, by way of cash or letter of credit, totaling to US$43.65 million, within 14 days of 24 May 2019 (the "Listing Date"). As at 31 December 2019, the Master Lessees had furnished to the EH-REIT Group US$23.65 million in cash as security deposits. Subsequent to year end, the EH-REIT Group received an additional US$5.0 million of security deposits. At the date of issuance of these financial statements, the EH-REIT Group had received security deposits of US$28.65 million in cash from the Master Lessees (see note 10). The EH-REIT Group had agreed to grant extensions of time to the Master Lessees to furnish the full amount of the security deposits, requiring the Master Lessees to provide the remaining security deposits of US$15.0 million by 8 June 2020 in cash and/or letter of credit, which the Master Lessees had not done so at the date of issuance of these financial statements (see note (h) below). The security deposits are pledged to a financial institution for credit facilities granted to the EH-REIT Group (see note 7).

(iii) Under the terms of the MLAs, the Master Lessees are required to make a contribution to the EH-REIT Group each fiscal quarter for the purpose of funding maintenance and capital improvement works at the investment properties ("CIF Contribution"). The MLA for each property specifies that such CIF Contribution is specific to each property. As at 31 December 2019, CIF Contribution amounting to US$3.2 million (note 5) had not been received from the Master Lessees.

Subsequent to 31 December 2019, as set out in note 2 to the financial statements, there were the following key events:

(a) The Master Lessees indicated to the REIT Manager and the Trustee-Manager (collectively, the "Managers") that there had been delays in payments from debtors at certain properties which caused shortfalls in payments by the Master Lessees to EH-REIT. Accordingly, the Managers took measures to draw down on the security deposits.

(b) Bank of America, N.A., as administrative agent ("Administrative Agent") for the syndicate of lenders ("Lenders") in respect of the syndicated credit agreement dated 16 May 2019 (the "Facilities Agreement"), had issued a notice of default and acceleration (the "Notice") of the Facilities Agreement. The Notice provided that the Administrative Agent, on behalf of the Lenders, is entitled to and is exercising its rights and remedies under the Facilities Agreement, including the right to accelerate the term loan facilities and/or revolving credit facility of which US$341 million had been borrowed to date (the "Loan"), as a result of which a principal amount of US$341 million was declared to have become immediately due and owing. On behalf of the Lenders, the Administrative Agent, in its assertion of its rights and remedies following the issuance of the Notice, had also restricted access to certain bank accounts of EH-REIT's subsidiaries and the Master Lessees that were established with the Administrative Agent. The REIT Manager has also provided irrevocable instructions to DBS Bank (Hong Kong) Limited not to cause or permit any withdrawal or transfers from the bank account of an EH-REIT subsidiary held with DBS Bank (Hong Kong) Limited, whilst discussions with the Administrative Agent and the Lenders are ongoing during the temporary forbearance period. The Facilities Agreement also provides that no Borrower may, directly or indirectly, declare, order, make or set apart any sum for or pay any dividend or distribution following the acceleration of the Loan. At the date of issuance of these financial statements, EHT has entered into documentation with the Administrative Agent and the Lenders for a temporary forbearance from exercising their asserted rights and remedies pending further discussion.

(c) The Managers received a notice of default and demand for payment (the "DW Notice") in relation to the mortgage loan (the "DW Mortgage Loan") in respect of the Delta Hotels by Marriott Woodbridge ("Delta Woodbridge") property with a principal amount of US$35.0 million issued by Wells Fargo, National Association ("Wells Fargo"). The DW Notice states that Wells Fargo's rights and remedies include, (i) the right to declare the outstanding principal amount under the DW Mortgage Loan (together with all interest accrued and unpaid thereon) and all other sums due immediately due and payable; (ii) the right to cause the loan to bear interest at the default rate; and (iii) the right to foreclose on the collateral. The DW Notice further indicates that Wells Fargo has exercised its right to cause the loan to bear interest at the default rate calculated from 1 April 2020 (being the date that the outstanding sum were due) and demanded for payment in full of all amounts currently due and payable under the loan.

The DW Mortgage Loan is secured against the Delta Woodbridge property with a carrying value of US$78.5 million as at 31 December 2019.

(d) Following the default of the Loan, the REIT Manager had received a notice of termination of the interest rate swap agreement (the "BOTW Interest Rate Swap Agreement") entered into between EH-REIT (through one of its subsidiaries) and Bank of the West ("BOTW") in relation to the Loan under the Facilities Agreement. The Managers had subsequently received another letter from BOTW stating that the total amounts owing under the BOTW Interest Rate Swap Agreement was approximately US$18.3 million, with default interest accruing on such amount with effect from the termination date in accordance with the applicable provisions of the BOTW Interest Rate Swap Agreement. This amount has become due and payable.

(e) The Managers have been informed that several of the Master Lessees have received notices of defaults from the hotel managers of certain properties for defaults by such Master Lessees under the relevant hotel management agreements ("HMAs") for the properties as a result of, *inter alia*, the certain Master Lessees' failure to provide and/or maintain sufficient working capital for the hotels' operations, and additional defaults from the failure to pay management fees and/or make funds available for the payment of hotel operating expenses ("HMA Default Notices"). In addition, the Managers were informed that certain Master Lessees have received notices of termination from the hotel managers for certain properties under the relevant HMAs as a result of these certain Master Lessees' failure to cure its default (among other items) of maintaining sufficient working capital for the hotels' operations.

The Managers were also informed that certain Master Lessees had received further notices of default from the hotel managers of certain hotels for defaults by the relevant Master Lessees under the HMAs as a result of, *inter alia*, such Master Lessee's failure to timely pay the key money due under the relevant HMAs as demanded by the relevant hotel managers ("HMA Key Money Default Notices").

Certain corresponding Master Lessors (being subsidiaries of EH-REIT), at the direction of the REIT Manager and with the approval of the REIT Trustee, the Administrative Agent and the Lenders, have instituted temporary caretaker arrangements with the incumbent or a new hotel manager for certain properties whose HMAs have been terminated or which the applicable hotel manager was threatening to reduce management services and/or abandon the hotel in the absence of imminent caretaker action, under which such hotel managers are providing temporary caretaker services at the applicable hotel in exchange for payment of monthly caretaker costs by the applicable Master Lessors.

# INDEPENDENT AUDITORS' REPORT

(f)  The Managers were informed by their United States legal counsel that there were six non-disturbance agreements (collectively, the "NDAs") entered into (post the initial public offering of EHT) by certain former directors of the REIT Manager (who are also the indirect controlling shareholders of Urban Commons, LLC (the "Sponsor")) on behalf of certain subsidiaries of EH-REIT (as Master Lessors) with the corresponding Master Lessees (the "NDA Master Lessees") and the relevant hotel manager. Two NDAs were entered into during the financial period ended 31 December 2019 ("2019 NDAs") and four NDAs were entered into in the year 2020 ("2020 NDAs").

Under each of the NDAs, each of the relevant Master Lessor had undertaken to (i) guarantee the payment and performance of all obligations of the respective NDA Master Lessees under the corresponding HMA at all times during the term of the applicable MLA (save for certain exceptions under certain NDAs), including the payment of the base fees, incentive fees, centralised services charges, reimbursable expenses, indemnification obligations (if any) and operating costs, and (ii) in the event of any termination of the applicable MLA, to assume (or cause a new Master Lessee to assume) all of the obligations of the relevant NDA Master Lessees under the applicable HMA, and for certain NDAs, including those arising prior to the termination of the applicable MLA.

In addition, under three of the NDAs, the relevant Master Lessor agreed to repay key money under the applicable HMAs in the event that the key money become due and payable thereunder (including without limitation, in the event the key money becomes immediately due and payable because of an event of default by the applicable NDA Master Lessee under the applicable HMA), save for certain exceptions and except as otherwise provided for in the NDAs.

As at 31 December 2019, no notice of default had been received by the applicable Master Lessors relating to the 2019 NDAs. As at the date of issuance of these financial statements, pursuant to the 2019 NDAs and 2020 NDAs, the EH-REIT Group has received notices of demand from the relevant hotel managers of four properties for failing to fund delinquent working capital amounts and/or repayment of key monies, as a result of the relevant Master Lessee failing to fund and/or pay such amounts.

(g)  In February 2020, the REIT Manager had declared a distribution amounting to approximately US$30.4 million, in respect of the period from 24 May 2019 to 31 December 2019 (the "Distribution"). The Facilities Agreement provides that no Borrower may, directly or indirectly, declare, order, make or set apart any sum for or pay any dividend or distribution following the acceleration of the Loan. In the Notice, the Administrative Agent expressly highlighted this restriction against the payment of any distribution. The payment of the Distribution had been suspended in compliance with one of the key conditions set by the Administrative Agent and the Lenders in agreeing to a temporary forbearance from exercising their rights as a result of the issuance of the Notice in relation to the Facilities Agreement (as disclosed in note (b) above).

The Managers and the REIT Trustee, having received and reviewed the advice of their professional advisers and after consideration, had determined that it is in the best interest of EHT and the Stapled Securityholders to utilise available funds of EH-REIT (including in particular the funds constituting the security deposits available to EH-REIT as permitted under the terms of the MLAs, and funds that were originally intended for the payment of the distribution to Stapled Securityholders of approximately US$30.4 million for the period from 24 May 2019 (being the listing date of EHT) to 31 December 2019) to fund the necessary and critical expenses of EHT and its underlying portfolio to protect and safeguard the asset value of EHT's portfolio, to the extent appropriate and necessary and in such manner and proportion as may be agreed with the Administrative Agent and the Lenders.

(h) The Master Lessees had not provided the remaining outstanding security deposits of approximately US$15.0 million either in cash and/or letter of credit by the stipulated extended deadline (see note (ii) above), which, in turn, constitutes an event of default under the relevant MLAs (the "SD Defaults"). Accordingly, the EH-REIT Group has issued notices of default in respect of the SD Defaults to the Master Lessees. As at the date of issuance of these financial statements, the Master Lessees have yet to furnish the outstanding security deposits.

As at the date of issuance of these financial statements, the fixed rent for the months of January 2020 to July 2020 and the variable rent for the first two quarters of 2020 remain substantially outstanding and unpaid by the Master Lessees, which constitutes events of default by the Master Lessees under the MLAs. The EH-REIT Group has applied the security deposits provided by the Master Lessees to the payment of certain outstanding obligations of certain properties as permitted pursuant to the applicable MLAs. In addition, the defaults by the Master Lessees under the HMAs as a result of, *inter alia*, the Master Lessees' failure to provide and/or maintain sufficient working capital for the hotels' operations (see note (e) above), and additional defaults resulting from the failure to pay management fees and/or failure to make funds available for the payment of hotel operating expenses, constitute additional defaults and/or events of default under the respective MLAs by the Master Lessee. As announced by the Managers on 29 June 2020, in light of the above defaults under the HMAs, and together with additional defaults and events of default on other obligations under the relevant MLAs by the Master Lessees, the Master Lessors had, on 18 June 2020, issued a separate notice in respect of the defaults and events of default under the MLAs to the Master Lessees. The Managers had, on 5 August 2020, issued a second notice to the Master Lessees in respect of the events of default which had occurred and are continuing under each MLA by the applicable Master Lessee in connection with the operation of each of the properties pursuant to the MLA.

(i) The City of Pasadena has initiated proceedings in the United States in relation to one of EH-REIT Group's properties, Sheraton Pasadena (the "Complaint"). The defendants are the Sponsor and its related entities (the "Defendants"). The Complaint alleged (among other causes of action), *inter alia*, that the Defendants (i) remain delinquent to pay certain outstanding transient occupancy taxes ("TOT") and tourism business improvement districts ("TBID") assessments to the City of Pasadena for the period of May 2019 through February 2020 (as of the date of the Complaint); (ii) failed and refused to hold the TOT principal in trust for the account of the City of Pasadena from the time the TOT was collected from each hotel guest until remitted to the City of Pasadena and failed and refused to remit the said monies to the City of Pasadena; and (iii) failed to pay to the City of Pasadena the TBID assessment (based on gross occupancy revenues), as required pursuant to the relevant City of Pasadena municipal legislation.

Pursuant to the terms of the MLA in respect of the Sheraton Pasadena property, the relevant Master Lessee is responsible for the payment of such TOT and TBID monies to the City of Pasadena and the Master Lessee's failure to timely pay such outgoings by the due date for payment constitutes an event of default by the Master Lessee under the applicable MLA. Nevertheless, the Managers have been informed that the hotel manager of the Sheraton Pasadena had filed a cross-complaint against the relevant Master Lessee and the Master Lessor of the Sheraton Pasadena (being a subsidiary of EH-REIT) (the "Cross-Complaint") alleging that there existed a unity of interest in ownership between the Master Lessee and the Master Lessor, and requesting that the Superior Court for the State of California grant, *inter alia*, the judgement against both the Master Lessee and the Master Lessor of the Sheraton Pasadena that (a) the hotel manager be fully indemnified and held harmless from and against any settlement entered or judgement rendered against it in the litigation brought by the City of Pasadena against the hotel manager; and (b) if the City of Pasadena recovers any sums against the hotel manager, then the hotel manager should have judgement against the Master Lessee and/or the Master Lessor of the Sheraton Pasadena, and each of them, in an amount equal to the judgement of the City of Pasadena, in addition to its costs and expenses (including attorneys' fees) in connection with the City of Pasadena's Complaint. The Managers are currently consulting their professional advisers as to the appropriate course of action to be taken as regards to the Cross-Complaint.

In the event that the Defendants (including the relevant Master Lessee) do not litigate and/or settle the Complaint and the relevant Master Lessor is unable to defeat the cross-complaint, the EH-REIT Group and EHT may have to incur additional expenses and liabilities.

# INDEPENDENT AUDITORS' REPORT

(j)  The Managers have been informed that, based on publicly available information, delinquent taxes and/or tax liens, in addition to certain judgement and/or mechanics' liens, were filed on the title of certain of EH-REIT Group's properties by various taxing authorities and third-party service providers on account of unpaid taxes and/or amounts for services rendered and/or materials provided by such third-party service providers for the improvement and/or renovation of the relevant hotels. In the 21 June 2020 announcement made by EHT, the hotels with tax liens are the (1) Embassy Suites by Hilton Anaheim North; (2) Holiday Inn Hotel & Suites Anaheim North; (3) Embassy Suites by Hilton Palm Desert; (4) Sheraton Pasadena; (5) Westin Sacramento; (6) Four Points by Sheraton San Jose Airport; (7) Holiday Inn and Suites San Mateo; (8) Crowne Plaza Danbury; (9) Holiday Inn Resorts Orlando Suites – Waterpark; and (10) The Queen Mary Long Beach. The hotels with judgement and/or mechanics' liens are (1) The Queen Mary Long Beach; (2) Holiday Inn Denver East – Stapleton; (3) Renaissance Denver Stapleton; (4) Holiday Inn Resorts Orlando Suites – Waterpark; (5) Doubletree by Hilton Salt Lake City Airport; (6) Holiday Inn and Suites San Mateo; and (7) Crowne Plaza Danbury. The judgement and/or mechanics' liens were filed following the IPO and relate to both (i) capital expenditures, the work for which commenced, or was contracted for, before the IPO, which constitute claims for work performed by or on behalf of the prior owner and/or the Master Lessee of the applicable hotel; and (ii) operating expenditures (e.g. day to day maintenance and repair), the work for which commenced, or was contracted for, after the IPO, which constitute claims for work performed by or on behalf of the Master Lessee of the applicable hotel. For the avoidance of doubt, the Sponsor is responsible for the costs and expenses of work performed on EH-REIT Group's hotels that commenced, or was contracted for, before the IPO. However, as payment for such work performed was not received by the relevant counterparties, this resulted in liens being filed on the title of the relevant hotels in the Portfolio.

Such liens constitute security interests in the title of the relevant properties and potentially compromise EH-REIT's ability to sell, refinance or otherwise deal with the relevant properties. In addition, in the event that the relevant Master Lessees will not be able to settle the liens that they are responsible for and the relevant Master Lessors are found liable, the EH-REIT Group and EHT may have to incur additional expenses and liabilities in relation to the amounts claimed by the various third-party service providers and delinquent tax assessments under the abovementioned liens and encumbrances.

(k)  Urban Commons Queensway, LLC (a subsidiary of EH-REIT and the lessee in respect of The Queen Mary Long Beach) (the "QM Subsidiary") received notices of default from the City of Long Beach (the "QM Notices") in relation to its defaults under the lease agreement with the City of Long Beach (the "QM Lease Agreement").

Such defaults arose as a result of the QM Subsidiary failing to (a) pay the monthly TOT amounts to the City of Long Beach for certain months in both 2019 and 2020 as required under the QM Lease Agreement (and the relevant Long Beach municipal legislation), which failure resulted in an additional default under the QM Lease Agreement for failing to comply with applicable governmental restrictions (the "QM TOT Default", which the Managers have been informed by the Sponsor has since been cured, as further stated below); (b) provide access to, and/or copies of, certain records (including financial statements and maintenance records) to the City of Long Beach's auditor as required under the QM Lease Agreement, which documentation was requested by the City of Long Beach as part of an audit initiated in December 2019, in addition to failing to provide full audited financial statements for 2019 as required pursuant to the QM Lease Agreement (the "QM Audit Default"); and (c) pay the monthly rent to the City of Long Beach for the month of June 2020 as required under the QM Lease Agreement (the "QM Rent Default" which the Managers were informed by the Sponsor and based on information available to the Managers, has since been cured, as further stated below, and together with the QM TOT Default and the QM Audit Default, collectively, the "QM Defaults"). Pursuant to the master sublease agreement (i.e., the MLA) between the QM Subsidiary (as Master Lessor and sublessor) and the Master Lessee as sublessee of The Queen Mary Long Beach (the "QM Master Lessee"), the QM Master Lessee is responsible for the payment of the rent and the TOT amounts to the City of Long Beach and compliance with such audit request (but see paragraph below).

Notwithstanding the sublease of The Queen Mary Long Beach to the QM Master Lessee pursuant to the applicable MLA, (a) as between the QM Subsidiary and the QM Master Lessee, under the terms of the MLA, the QM Subsidiary (as Master Lessor) remains responsible for its obligations under the QM Lease Agreement in the event the QM Master Lessee fails to perform the same; and (b) as between the QM Subsidiary and the City of Long Beach, under the terms of the documents containing the City of Long Beach's consent to the sublease of the premises under the QM Lease Agreement to the QM Master Lessee (and notwithstanding the City of Long Beach's agreement to accept performance by the QM Master Lessee of the QM Subsidiary's obligations under the QM Lease Agreement), the QM Subsidiary remains liable for its obligations under the QM Lease Agreement to the City of Long Beach.

Under the QM Notices, the QM Subsidiary had (a) with respect to the QM Audit Default, until 30 June 2020; and (b) with respect to the QM Rent Default, until 25 June 2020, and in each instance to cure the applicable QM Defaults, and failing which, the City of Long Beach is entitled to pursue remedies available to it under the QM Lease Agreement and otherwise as provided by applicable law.

At the date of issuance of these financial statements, based on the information available to the Managers, the Managers have been informed by (a) the City of Long Beach that the QM Subsidiary has 120 days to cure the QM Audit Default from 1 July 2020; and (b) the Sponsor that the QM Master Lessee has paid the monthly rent required in respect of the QM Rent Default and has cured the QM TOT Default, with the outstanding TOT amounts having been fully paid by the QM Master Lessee.

(l) The Managers and the REIT Trustee have been informed that the Master Lessees of the Holiday Inn Denver East – Stapleton and the Renaissance Denver Stapleton (the "Denver Master Lessees") have been deficient in paying certain outstanding sales taxes, lodger's taxes and tourism improvement district taxes that have continued to accrue over certain periods in respect of the abovementioned hotels since at least December 2019 to the tax authorities of the City and County of Denver (the "Denver Outstanding Taxes"). The Denver Master Lessees have entered into a settlement arrangement with the Denver tax authorities on 1 July 2020 pursuant to which the Denver Master Lessees would pay the Denver Outstanding Taxes by way of instalments. The Managers and the REIT Trustee understand that the total outstanding amount of the Denver Outstanding Taxes to be settled under the settlement arrangement (inclusive of penalties and interests) is approximately US$954,000, which is to be paid by way of six (6) monthly instalments from July 2020 to December 2020.

Subsequently, it was brought to the attention of the Managers and the REIT Trustee that the Denver Master Lessees failed to pay the first instalment that was due on 13 July 2020 to the tax authorities of the City and County of Denver. In response, the tax authorities issued a warrant of seizure of assets (the "Warrant") in respect of the Holiday Inn Denver East – Stapleton and Renaissance Denver Stapleton. Under the terms of the MLAs between the relevant Master Lessors and the Denver Master Lessees, the Denver Master Lessees are responsible for the payment of the Denver Outstanding Taxes to the tax authorities of the City and County of Denver and the Denver Master Lessees' failure to timely pay such outgoings by the due date for payment constitutes an event of default by the Denver Master Lessees under the respective MLAs.

The Managers and the REIT Trustee were subsequently informed that on 14 July 2020, the Denver Master Lessees paid the first instalment in respect of the Denver Outstanding Taxes to the tax authorities of the City and County of Denver and the tax authorities have accepted such payment. Pursuant to the settlement arrangement between the Denver Master Lessees and the Denver tax authorities with regard to the Denver Outstanding Taxes, a second instalment was due on 6 August 2020 which, as at the date of issuance of these financial statements, has not been paid by the Denver Master Lessees. The Managers and the REIT Trustee's local counsel has informed the Managers and the REIT Trustee that as a result of the non-payment by the Denver Master Lessees of the second instalment by the due date, the tax authorities of the City and County of Denver have indicated that they will not be giving any advance notice prior to issuing and executing their seizure warrants on the Holiday Inn Denver East – Stapleton and the Renaissance Denver Stapleton.

As at the date of issuance of these financial statements, based on the information available to the Managers, there has been no enforcement action taken by the relevant tax authorities or enforcement agencies pursuant to the Warrant. The Manager and the REIT Trustee are in the process of consulting their professional advisers to ascertain the impact of the non-payment of the relevant Denver Outstanding Taxes by the Denver Master Lessees to the tax authorities of the City and County of Denver and the appropriate course of action to be taken.

# INDEPENDENT AUDITORS' REPORT

(m) The Managers and the REIT Trustee have been informed that the Master Lessee of the Holiday Inn Resort Orlando Suites – Waterpark (the "HIOR Master Lessee") has been deficient in paying certain outstanding tourism development taxes that have continued to accrue in respect of the Holiday Inn Resort Orlando Suites – Waterpark since February 2020 to the Comptroller of Orange County, Florida.

The Comptroller of Orange County, Florida further issued a notice dated 12 June 2020 (the "HIOR Tax Notice") to the HIOR Master Lessor of its intent to levy upon any cash in possession of the HIOR Master Lessor and a bank account of the HIOR Master Lessor with Bank of America (the "HIOR Account"). Under the terms of the MLA between the HIOR Master Lessor and the HIOR Master Lessee, the HIOR Master Lessee is responsible for the payment of the Orlando Outstanding Taxes to the tax authorities of Orange County, Florida and the HIOR Master Lessee's failure to timely pay such outgoings by the due date for payment constitutes an event of default by the HIOR Master Lessee under the applicable MLA.

The Managers and the REIT Trustee understand that on or about 25 June 2020, the Sponsor entered into a repayment agreement with the Comptroller of Orange County, Florida to pay all delinquent tourist development taxes (including penalties and interest) due to the Comptroller of Orange County, Florida in three (3) instalments due on 26 June 2020, 1 August 2020 and 1 September 2020, as well as to satisfy the levy. Despite the Sponsor's payment of the first instalment due on 26 June 2020, the Comptroller of Orange County, Florida refused to release the HIOR Account or delay enforcement of the garnishment referenced in the HIOR Tax Notice. The Managers and the REIT Trustee appointed local counsel which then filed a complaint on behalf of the HIOR Master Lessor against the Comptroller of Orange County, Florida on 2 July 2020 (the "HIOR Complaint") to contest the Comptroller of Orange County, Florida's levy and garnishment of the HIOR Account to collect the Orlando Outstanding Taxes as (a) the HIOR Master Lessee is the party that is directly and solely liable to pay the Orlando Outstanding Taxes pursuant to the terms of the MLA and (b) the Comptroller of Orange County, Florida is able to collect the Outstanding Orlando Taxes pursuant to the repayment arrangement with the Sponsor.

As advised by the Managers and the REIT Trustee's local counsel, pursuant to applicable laws, the filing of the HIOR Complaint should prevent the garnishment over the HIOR Account from being enforced by the Comptroller of Orange County, Florida until the proceedings are fully resolved. The Comptroller of Orange County, Florida then indicated that it would lift the levy and the garnishment over the HIOR Account if the Sponsor paid the second instalment that was due on 1 August 2020.

As at the date of these financial statements, based on the information available to the Managers, the Managers understand that the Sponsor failed to pay the second instalment by the due date and therefore, the levy and garnishment over the HIOR Account by the Comptroller of Orange County, Florida has not been lifted. The Managers and the REIT Trustee's local counsel have been instructed to continue with its proceedings against the Comptroller of Orange County, Florida pursuant to the HIOR Complaint to set aside the levy, the garnishment and any judgement or liability against the HIOR Master Lessor in respect of the Orlando Outstanding Taxes.

(n) The Managers and the REIT Trustee have been informed that the Master Lessees of ten (10) hotels have received notices of default and termination from the relevant franchisors under the respective franchise agreements (the "Franchise Agreements") as a result of the Master Lessees' failure to cure its default for non-payment of fees and other amounts due and owing to the relevant franchisor under the relevant Franchise Agreement (the "FA Termination Notices"). Based on the FA Termination Notices and the information available to FTI Consulting, Inc. (being the Chief Restructuring Officer), the aggregate outstanding amount due by the Master Lessees to the franchisors under such Franchise Agreements amounted to approximately US$3.8 million.

Pursuant to the FA Termination Notices, the relevant franchisors will have the right to terminate the respective Franchise Agreements if the relevant Master Lessees do not cure the defaults under the Franchise Agreements within the applicable cure periods as stated in the FA Termination Notices. Pursuant to the terms of the applicable MLAs in respect of the hotels under the FA Termination Notices, the relevant Master Lessees are responsible for payment of such outstanding amounts under the Franchise Agreements to the applicable franchisors and the alleged defaults under the FA Termination Notices, if true, would in turn also constitute a breach of the respective MLAs by the Master Lessees. The Managers and the REIT Trustee, with the assistance of their professional advisers, are in the midst of assessing the impact of the alleged defaults and the appropriate steps to be taken in response to the FA Termination Notices.

(o)   The Managers and REIT Trustee have been informed that on 12 August 2020 the Master Lessors have received a notice of breaches from the Master Lessees under the MLAs (the "Notice of Breach"). The Managers are in the midst of seeking legal advice from its legal advisers as to the appropriate course of action to be taken in respect of the Notice of Breach.

(p)   The Managers and the REIT Trustee have also been recently informed of other key events which may affect EHT and which are still in the midst of being investigated by the Managers and the REIT Trustee with the possibility of additional liability materialising. As at the date of issuance of these financial statements, the Managers are in the process of seeking professional advice and will need more time to assess the implications of such events and determine if such events give rise to additional liabilities (contingent or otherwise) as at 31 December 2019 or subsequent to that date, and the actions to be undertaken.

(q)   As at 31 December 2019, the EH-REIT Group had mortgage loans secured by the Hilton Houston Galleria Area property (the "HHG Mortgage Loan") and Crowne Plaza Dallas Near Galleria-Addison property (the "CPD Mortgage Loan"), with a principal amount of approximately US$15.6 million and US$27.6 million, respectively. As at the date of the issuance of these financial statements and based on the information available to the EH-REIT Group, the lender under the HHG Mortgage Loan and the CPD Mortgage Loan has yet to issue a notice of default and/or demand for payment in relation to the respective loans. Nevertheless, in light of the events surrounding EH-REIT including but not limited to the issuance of the Notice by the Administrative Agent and the Master Lessees' numerous defaults under the MLAs, EH-REIT has been unable to fulfil its obligations under the HHG Mortgage Loan and the CPD Mortgage Loan. If an event of default occurs under the HHG Mortgage Loan or CPD Mortgage Loan, the lender may, amongst other things, accelerate the repayment of the outstanding loan amount under the relevant loan.

(r)   As at 31 December 2019, the EH-REIT Group had a US$89.0 million unsecured loan ("Unsecured Loan") from Lodging USA Lendco, LLC ("Lendco"). At the date of the issuance of these financial statements and based on the information available to the EH-REIT Group, Lendco has yet to issue a notice of default and/or demand for payment in relation to the Unsecured Loan. Nevertheless, in light of the events surrounding EH-REIT including, but not limited to, the issuance of the Notice by the Administrative Agent and the Master Lessees' numerous defaults under the MLAs, EH-REIT has been unable to fulfil its obligations under the Unsecured Loan. Lendco's right to receive payments under the Unsecured Loan (including interest) is subordinate to the payment obligations under the Facilities Agreement. Only interest is payable on the Unsecured Loan and the Unsecured Loan may be prepaid in whole or in part at any time (including in connection with certain mandatory prepayments as provided in the loan agreement) without any prepayment penalty or charge.

(s)   The Managers had appointed (i) FTI Consulting, Inc ("FTI") to assist with, *inter alia*, the restructuring process of EHT and (ii) Moelis & Company ("Moelis") to assist with, *inter alia*, the comprehensive strategic review of EHT's business, including advising on available options to achieve the best possible outcomes for Stapled Securityholders. Both FTI and Moelis, as professional advisers to the EH-REIT Group, also assist in negotiating with the Administrative Agent, lenders and other counterparties of the EH-REIT Group with a view to restructuring the relevant facilities, and reviewing and analysing a range of strategic and corporate options for EHT.

(t)   The outbreak of COVID-19 was declared by the World Health Organisation as a global pandemic on 11 March 2020, and subsequently declared a national emergency in the United States of America ("United States") on 13 March 2020. The spread of COVID-19, both globally and in the United States, has resulted in significant uncertainty in global economies and unprecedented disruptions in the United States lodging industry. Consequently, the operations of and revenue stream from EHT's properties have been severely disrupted and its full impact, including the impact on the valuations of EHT's properties, cannot be meaningfully assessed as at the date of these financial statements. At the date of issuance of these financial statements, 15 out of the EH-REIT Group's 18 properties have shuttered and the cessation of operations is expected to have a significant impact on the revenue of the EH-REIT Group and EHT.

# INDEPENDENT AUDITORS' REPORT

The potential impact of the events and conditions as described above indicate the existence of multiple uncertainties that are, in aggregate, significant to the appropriateness of the going concern assumption underlying the preparation of the financial statements.

At the date of this report, we are unable to obtain sufficient appropriate audit evidence on the ability of EH-BT, the EH-REIT Group and EHT to generate sufficient cash flows to meet their debt obligations. As set out in note 8 to the financial statements, the directors of the REIT Manager have not been able to definitively conclude if Lodging USA Lendco, LLC, which has extended an unsecured loan of US$89.0 million to the EH-REIT Group is a non-related party of the EH-REIT Group and EHT for the period covered in the financial statements. In addition, events that have occurred subsequent to the reporting date could give rise to additional liabilities (contingent or otherwise) as at 31 December 2019 or subsequent to that date, to the EH-REIT Group and EHT. In light of the above, we are unable to ascertain the completeness of related party transactions identified and the completeness of liabilities recorded and/or disclosed by the EH-REIT Group and EHT as at 31 December 2019.

Accordingly, we are unable to satisfy ourselves on the appropriateness of the Managers' preparation of the financial statements of EH-BT, the EH-REIT Group and EHT on a going concern basis, and the completeness of related party transactions identified and the completeness of liabilities recorded and/or disclosed by the EH-REIT Group and EHT.

The financial statements do not include any adjustments that may be necessary in respect of the matters described above.

*Responsibilities of the Trustee-Manager for the financial statements*

The Trustee-Manager is responsible for the preparation of financial statements of EH-BT that give a true and fair view in accordance with the provisions of Business Trusts Act, Chapter 31A of Singapore (the "Act") and International Financial Reporting Standards ("IFRS"), and for devising and maintaining a system of internal accounting controls sufficient to provide a reasonable assurance that assets that are part of the trust property of the registered business trust are safeguarded against loss from unauthorised use or disposition; and transactions by the Trustee-Manager entered into on behalf of or purported to be entered into on behalf of the registered business trust are properly authorised and that they are recorded as necessary to permit the preparation of true and fair accounts and to maintain accountability of assets.

In preparing the financial statements, the Trustee-Manager is responsible for assessing EH-BT's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Trustee-Manager either intends to terminate EH-BT or to cease operations of EH-BT, or has no realistic alternative but to do so.

The Trustee-Manager's responsibilities include overseeing EH-BT's financial reporting process.

*Responsibilities of the REIT Manager for the financial statements*

The REIT Manager is responsible for the preparation and fair presentation of the consolidated financial statements of the EH-REIT Group and EHT in accordance with IFRS, and for such internal control as the REIT Manager determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the REIT Manager is responsible for assessing the ability of the EH-REIT Group and the EHT to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the REIT Manager either intends to terminate the EH-REIT Group or the EHT or to cease operations of the EH-REIT Group or the EHT, or has no realistic alternative but to do so.

The REIT Manager's responsibilities include overseeing the financial reporting process of the EH-REIT Group and EHT.

*Auditors' responsibilities for the audit of the financial statements*

Our responsibility is to conduct an audit of the financial statements of EH-BT and the consolidated financial statements of the EH-REIT Group and EHT in accordance with Singapore Standards on Auditing ("SSAs") and to issue an auditors' report. However, because of the matters described in the '*Basis for disclaimer of opinion*' section of our report, we were not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on these financial statements.

We are independent of EH-BT, the EH-REIT Group and EHT in accordance with the Accounting and Corporate Regulatory Authority *Code of Professional Conduct and Ethics for Public Accountants and Accounting Entities* ("ACRA Code") together with the ethical requirements that are relevant to our audit of the financial statements in Singapore, and we have fulfilled our other ethical responsibilities in accordance with these requirements and the ACRA Code.

**Report on other legal and regulatory requirements**

In our opinion, because of the significance of the matters described in the '*Basis for disclaimer of opinion*' section of our report, we do not express an opinion on whether the accounting and other records required by the Act to be kept by the Trustee-Manager on behalf of EH-BT have been properly kept in accordance with the provisions of the Act.

The engagement partner on the audit resulting in this independent auditors' report is Lo Mun Wai.

**KPMG LLP**
*Public Accountants and Chartered Accountants*

**Singapore**
14 August 2020